## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| REAPERS HOCKEY ASSOCIATION, INC. | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:19-cv-01302 |
| v. | ) ) | |
| AMATEUR HOCKEY ASSOCIATION ILLINOIS, INC., TEAM ILLINOIS HOCKEY CLUB, INC., CHICAGO MISSION AAA HOCKEY CLUB, INC., CHICAGO FURY, INC., and CHICAGO YOUNG AMERICANS, INC., | ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) | |

## COMPLAINT

Plaintiff Reapers Hockey Association, Inc. ("the Reapers"), by and through its attorneys, Ulmer & Berne LLP, alleges as follows:

## INTRODUCTION

1.      This litigation concerns an organization whose stated mission is to foster competition in youth sports, but which has become so corrupted by its "boy's club" leadership that it now works aggressively to do precisely the opposite, hiding behind a non-transparent system and enriching its enablers at the direct expense of member families.

2.      Defendant Amateur Hockey Association of Illinois, Inc. ("AHAI") governs all organized amateur hockey in Illinois.  Its stated mission is to provide for "the growth and development of USA Hockey and its members," and "designing programs aimed at encouraging increased participation [and] improved skills."  But AHAI has abandoned that mission, having been effectively hijacked into serving the pecuniary interests of the existing four hockey clubs that possess a charter from AHAI to compete at the "Tier I" level.  As this Complaint and subsequent

discovery will demonstrate, rather than appropriately providing for the growth and development of youth players in Illinois, AHAI and its leaders instead insulate and protect existing Tier I clubs from competition and arbitrarily and capriciously enforce the Rules on Tier I eligibility, as well as other Rules regarding member club governance, and ensure that no new Tier I club can enter the market. Indeed, contrary to its own rules, AHAI treats the existing four Tier I clubs as if they are chartered in perpetuity, thereby guaranteeing those clubs a permanent protected status and providing AHAI an excuse to deny consideration of any new applications. Only judicial intervention can put AHAI back on track.

3.     AHAI possesses monopoly power over amateur hockey in Illinois. AHAI has exercised this power so as to allow only four Illinois hockey clubs to compete at the "Tier I" level: Team Illinois, the Chicago Mission, The Chicago Fury, and the Chicago Young Americans, hereinafter referred to collectively as "the Club Defendants." The Club Defendants control the actions of AHAI either directly (through representatives who are voting members of AHAI's "Tier I Committee" and/or its Board of Directors) or indirectly (by using misrepresentation, misinformation, or other inappropriate influence over how AHAI Board members vote). The Club Defendants also abuse their not-for-profit 501(c)(3) status and operate largely for the pecuniary benefit of themselves and a small number of individuals affiliated with those clubs. AHAI turns a blind eye to these activities.

4.     Among other things, AHAI and the Club Defendants have conspired (a) to maintain and abuse AHAI's monopoly power over amateur hockey in Illinois; (b) to restrain competition and trade in the Tier I amateur youth hockey market in Illinois through an unlawful restraint; (c) to artificially inflate the price of participation in Tier 1 hockey in Illinois for their own financial benefit and to the detriment of players and player families; (d) to cover up unlawful and anti-

competitive behavior by those affiliated with AHAI and/or the Club Defendants; (e) to deliver personal pecuniary benefits to a small group of individuals affiliated with AHAI and/or the Club Defendants; and (f) to bully and intimidate anyone who challenges them in these efforts.

5.     Based on this wrongful conduct, AHAI individually, and in collusion with the Club Defendants, has injured competition in the Relevant Market and in doing so, has caused injury to the business and property of the Reapers and that injury is of the type that the antitrust laws were intended to prevent. This includes, among other things, (i) precluding the Reapers from entry in the Tier I amateur hockey market in Illinois; and (ii) preventing the Reapers from conducting training and tryouts necessary in order for its Tier I teams to participate in the 2019-2020 season, which begins in September 2019. The Reapers also suffered injury by AHAI systematically failing to govern the Club Defendants in accord with USAH's rules and its own rules, and/or applying its mission, bylaws and rules in an arbitrary and capricious manner.

6.     In this Complaint, the Reapers allege Defendants' conduct amounts to conspiracy in restraint of trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

7.     The Reapers allege AHAI's conduct amounts to monopolization and anti-competitive conduct in furtherance thereof, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

8.     The Reapers allege Defendants' conduct offends the public policy of the State of Illinois, is otherwise immoral, unethical, oppressive and unscrupulous, and caused substantial injury to consumers, in violation of The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS §§ 505/1, et seq.

9.     The Reapers allege that the Four Club Restraint is contrary to USAH's mission, bylaws and rules, violates AHAI's mission, bylaws, and rules, constitutes arbitrary and capricious

3

conduct and an abuse of discretion, and is otherwise unenforceable.

10. The Reapers seek preliminary and permanent injunctive relief (i) directing AHAI that it shall not enforce its rule barring any more than four Tier I charters to be issued, (ii) directing AHAI to rescind that rule, and (iii) directing AHAI to grant the Reapers a charter to sponsor a Tier I club. The Reapers seek also permanent injunctive relief (i) barring the Club Defendants from serving on AHAI's Tier I Committee, and (ii) barring the Club Defendants from otherwise being involved in deciding issues relating to the number of Tier I charters AHAI should issue and which clubs should be awarded those charters.

11. In the event the Court declines to order AHAI to rescind the Four Club Restraint, the Reapers ask the Court, in the alternative, to order AHAI to adopt and implement an objectively fair, unbiased, and transparent process for annually weighing the relative merits of each club's application and determining the four clubs that will receive a charter each year.

12. As declaratory relief, the Reapers also seek an Order declaring that AHAI's conduct, in collusion with the Club Defendants in preventing new, legitimate, and qualified clubs from entering Tier I via the issuance of a new charter, and in preventing new, legitimate and qualified clubs from competing equally with the Club Defendants for one of the four charters AHAI is currently authorized to issue, constitutes arbitrary and capricious conduct and an abuse of discretion.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1337 because Counts I and II arise under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Section 16 of the Clayton Act, 15 U.S.C. § 26. This Court has also jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 because the action arises under federal law. This

Court has supplemental jurisdiction over the claims arising under the laws of the State of Illinois pursuant to 28 U.S.C. § 1367(a).

14.    This Court has personal jurisdiction over AHAI and the Club Defendants because they may be found in this District and the conduct complained of has occurred in this District.

15.    Venue is proper in this District because AHAI and the Club Defendants may be found in this District. 28 U.S.C. §§ 1391(b)(1), (c)(2).  Venue is also proper in this district under 28 U.S.C. § 1391(b)(2) and 15 U.S.C. § 22 because a substantial part of the transactions, occurrences, and events giving rise to Plaintiff's claims occurred, and Defendants transact business, in this district.

## PARTIES

16.    Plaintiff the Reapers Hockey Association, Inc. ("the Reapers") is a not-for-profit corporation incorporated under the laws of the State of Illinois. The Reapers filed a proper application with AHAI for a charter to offer hockey programs for Tier I youth hockey players, from "Squirt Major" through "U18" age groups.

17.    Defendant AHAI is an Illinois not-for-profit corporation and a tax-exempt entity under Section 501(c)(3) of the United States Internal Revenue Code. AHAI was founded in 1975 as a sanctioned affiliate of USA Hockey, Inc. ("USAH"), which has been appointed by Congress pursuant to the Ted Stevens Olympic and Amateur Sports Act, 36 U.S.C. § 220501, et seq., as the national governing body for the sport of amateur hockey. Its principal place of business is located at the Edge Ice Arena at 735 E. Jefferson St., Bensenville, IL 60106.

18.    Defendant Team Illinois Hockey Club, Inc. ("Team Illinois") is a not-for-profit corporation and a tax-exempt entity under Section 501(c)(3) of the United States Internal Revenue Code. Team Illinois is incorporated under the laws of the State of Illinois and is based in

Woodridge, Illinois. Team Illinois is one of only four Tier I amateur youth hockey clubs currently chartered by AHAI. Team Illinois is an economic actor separate from AHAI, pursuing economic interests that are separate from AHAI's.

19.     Defendant Chicago Mission AAA Hockey Club, Inc. ("the Mission") is a not-for-profit corporation and a tax-exempt entity under Section 501(c)(3) of the United States Internal Revenue Code. The Mission is incorporated under the laws of the State of Illinois and is based in Chicago's Near West Side and in Bensenville, Illinois. The Mission is one of only four Tier I amateur youth hockey clubs currently chartered by AHAI. The Mission is an economic actor separate from AHAI, pursuing economic interests that are separate from AHAI's.

20.     Defendant Chicago Fury, Inc. ("the Fury") is a not-for-profit corporation and a tax-exempt entity under Section 501(c)(3) of the United States Internal Revenue Code. The Fury is incorporated under the laws of the State of Illinois and is based in Orland Park, Illinois. The Fury is one of only four Tier I amateur youth hockey clubs currently chartered by AHAI. The Fury is an economic actor separate from AHAI, pursuing economic interests that are separate from AHAI's.

21.     Defendant Chicago Young Americans Amateur Hockey Association, Inc. ("CYA") is a not-for-profit corporation and a tax-exempt entity under Section 501(c)(3) of the United States Internal Revenue Code. CYA is incorporated under the laws of the State of Illinois and is based in Palatine, Illinois. CYA is one of only four Tier I amateur youth hockey clubs currently chartered by AHAI. CYA is an economic actor separate from AHAI, pursuing economic interests that are separate from AHAI's.

22.     Various other persons and entities, not named as defendants in this Complaint, have participated as co-conspirators with Defendants in the offenses complained of herein, and have

performed acts and made statements in furtherance of Defendants' conspiracy. Each person or entity is a separate economic actor from AHAI. These presently unnamed co-conspirators may be named as defendants in the future, as discovery warrants.

## FACTUAL ALLEGATIONS

### I.   Description of USA Hockey and Amateur Hockey in the United States

23.   USAH is the National Governing Body for the sport of amateur ice hockey in the United States. It is the official representative to the United States Olympic Committee and the International Ice Hockey Federation, and is responsible for organizing and training men's and women's teams for international tournaments at the world's highest level of competition. Accordingly, for up-and-coming amateur hockey athletes in the United States, USAH acts as the gatekeeper for the most valuable sporting opportunities in the world.

24.   USAH has delegated some of its responsibility over United States amateur hockey to regional affiliate organizations. These organizations include twelve districts (organized geographically) which have been given responsibility for club registration, training of officials, and risk management. The State of Illinois is in USAH's Central District.

25.   Each district, in turn, has member organizations that serve as the local governing body for clubs and players within an assigned geography. AHAI is the governing body for the State of Illinois.

26.   USAH and its designees (such as AHAI, in the State of Illinois) regulate both club amateur hockey, in which participants pay fees to a private association, and high school hockey, at both private and public high schools.

27.   With respect to skill level, youth players and the clubs in which they participate are categorized as Tier I, Tier II, or Tier III.

28.   Tier I clubs are intended for the highest skill level players ages 9 to 18. These clubs

typically travel across the United States and to Canada to play against other clubs having elite players. Under USAH guidelines, Tier I clubs should account for a maximum of 15% of the amateur hockey athletes in a given State (as measured by USAH statistics). There are approximately 125 Tier 1 clubs in the USA.

29. Tier II clubs are intended for individuals ages 5 to 18 and provide an opportunity to play competitive clubs in their local area as well as provide opportunities, from time to time, to play other clubs located outside their local area, such as in national tournaments.

30. Tier III clubs are for beginning players and are intended to provide opportunities for beginner or recreational play with limited or no travel. Tier III players will typically play all games and conduct all practices at their local rink.

## II. The Relevant Market for Purposes of the Sherman Act

31. The relevant product market consists of competitive amateur youth hockey at the Tier I level.

32. The relevant geographic market consists of the State of Illinois.

33. Hereinafter, the relevant product market and the relevant geographic market are collectively referred to as "the Relevant Market." In the Relevant Market, Tier I competition provides players with important hockey development and recruiting opportunities that are unique to Tier I and cannot be realized elsewhere.

## III. AHAI's Monopoly Control Over Amateur Hockey in the Relevant Market

34. AHAI was founded in 1975 as a sanctioned affiliate of USAH. As such, it is the sole governing body for all USAH registered players, clubs, coaches and officials in Illinois. AHAI is one of the largest amateur ice hockey organizations in the United States, consisting of clubs fielding nearly 2,500 member teams.

35.     AHAI is authorized by USAH to act in the best interests of AHAI's members to promote the sport of ice hockey, but only "within the bylaws and rules and regulations as promulgated by USAH."

36.     AHAI's stated mission is to "[p]rovide an improved grassroots foundation for the growth and development of USA Hockey and its members, designing programs aimed at encouraging increased participation, improved skills and a responsible environment for the conduct of youth hockey."

37.     Pursuant to the authority delegated to it by USAH, AHAI establishes rules and standards that govern the conduct of amateur hockey in the State of Illinois, determines what clubs and which players may participate in amateur hockey in Illinois, sponsors tournaments at which sanctioned clubs may compete, and provides clinics in which sanctioned players and coaches may enhance their skills.

38.     In the State of Illinois, except in the context of very young players eight years and younger, virtually every organized amateur hockey club, including Tier I, Tier II, and Tier III clubs, and virtually every high school hockey club, is a member of AHAI. For players eight years of age and older, there is no alternate amateur hockey association in Illinois.

39.     AHAI sponsors or controls the vast majority of amateur hockey events in Illinois. AHAI controls nearly all of those games, clinics, tournaments, and other events.

40.     By virtue of its monopoly, AHAI has the power to issue binding requirements for all of amateur hockey in Illinois. For example, under its Bylaw 4.9, AHAI declares that it has "complete jurisdiction over all amateur hockey in the State of Illinois," and as such sanctions "all league and tournament play in the State." Under its Bylaw 5.1, AHAI declares that its Board of Directors "shall determine what is in the best interest of amateur hockey and shall have the

authority to develop, implement and enforce rules, policies, procedures, incentives and penalties that advance those interests." AHAI also touts that it has "established various policies and guidelines for all of its members" which "should be adhered to by everyone involved in the sport of ice hockey." (AHAI Policies/Guidelines, available at https://www.ahai.org/page/show/223726-policies.) Everyone involved in the sport of amateur ice hockey in the State of Illinois is therefore subject to AHAI's control.

41. Moreover, USAH sanctions tournaments throughout the United States, but only allows teams from Illinois to compete in those tournaments if they are chartered by AHAI. While a non-chartered club could be formed, such a club and its players would effectively be barred by AHAI from competing in any USAH sanctioned Tier I play. AHAI's action of withholding a Tier I charter therefore deprives players that have the ability to play Tier I hockey from opportunities to compete, to develop, and to be scouted by junior and college talent scouts, who typically only attend Tier I level events.

42. AHAI's share of the Relevant Market is 100%, or virtually 100%, as it is the only organization capable of granting the Reapers or any organization a charter to sponsor, coach, and manage a Tier I club in Illinois having teams that would participate in competitive play with other Tier I teams.

### IV. Growing Demand for Amateur Hockey in the Relevant Market

43. Amateur youth hockey is rapidly growing in popularity in the State of Illinois. Over the last five years, participation nationwide among youth players has increased by almost nine percent. Youth amateur hockey is growing at an even faster rate in Illinois, with growth in excess

of 18% over the last five years, and in excess of 59% since 2001.[1]

44.     In spite of this substantial growth in the demand for youth hockey, the current supply of Tier I clubs is not meeting demand.  Currently, there are only four Tier I youth hockey clubs in Illinois, **none** of which are located in Chicago's North Shore geographic area: Team Illinois (based in Woodridge, Illinois), the Chicago Fury (based in Orland Park, Illinois), the Chicago Mission (based in Chicago's Near West Side and in Bensenville, Illinois), and the Chicago Young Americans (based in Palatine, Illinois).

45.     Affiliates in other states almost uniformly permit a higher percentage of young hockey players to participate in Tier I.  The following chart shows the degree to which Illinois, with a ratio of one Tier I club to approximately every 5,840 players, is out of step with other major hockey and/or Midwest states:

| State | Approximate Number of Amateur Youth Hockey Competitors[2] | Number of Tier I Clubs | Ratio of Tier I Clubs : Number of Competitors |
|---|---|---|---|
| Indiana | 3,845 | 3 | 1 club : 1,282 players |
| New Hampshire / Vermont / Maine | 9,767 | 7 | 1 club : 1,395 players |
| New Jersey | 14,295 | 10 | 1 club : 1,423 players |
| New York | 36,340 | 18 | 1 club : 2,019 players |
| Connecticut | 11,244 | 5 | 1 club : 2,248 players |
| Iowa | 2,670 | 1 | 1 club : 2,670 players |
| Pennsylvania | 22,511 | 8 | 1 club : 2,814 players |
| Massachusetts | 43,674 | 15 | 1 club : 2,912 players |
| Missouri | 6,255 | 2 | 1 club : 3,128 players |
| Michigan | 25,707 | 8 | 1 club : 3,213 players |
| Ohio | 10,224 | 3 | 1 club : 3,408 players |
| Wisconsin | 15,440 | 4 | 1 club : 3,860 players |
| **Illinois** | **23,346** | **4** | **1 club : 5,837 players** |

[1] Source: USAH.  Note that due to the limitations of statistical information publicly available from USAH, the figures listed here reflect the number of players in Illinois aged 6-19, not all of whom are eligible or qualified to compete in Tier I.

[2] Source:  USAH.  The figures listed here reflect the number of players in each State aged 6-18 for the 2017-18 season.

46.     Even as the sport is booming nationally and in the State of Illinois, opportunities to play at the highest Tier I level in Illinois are artificially restricted by AHAI, in stark contrast to the rest of the country.

**V.     The Anticompetitive Restraint of Trade On the Part of AHAI Individually and in Concert with the Club Defendants**

47.     Despite the significant growth in participation and demand for high quality amateur play over the last five years, AHAI has not allowed the supply of Tier I clubs to increase.

48.     USAH's mission and bylaws encourage the promotion and growth of the sport and the promotion of player development and excellence.  Its mission includes "supporting the growth of the sport and all its participants and enthusiasts. (USAH 2018-19 Annual Guide at 5, available at https://www.usahockey.com/annualguide.)  It "fulfills its vision, purpose, and mission by," among other things, "enabl[ing] the widest possible access to the game," "ensuring the growth of all participating member categories," and "ensuring the progressive development of all players, coaches, officials, and volunteers—from novices to the highest level of sport." (*Id.*)  And its "Key strategies for the Tier I program" include "attract[ing] the best players, coaches, and officials in the U.S.," "strengthen[ing] relationships in the hockey community by promoting the league," and "becom[ing] the most successful junior hockey league in the world." (*Id.* at 20.)

49.     In line with its pro-growth vision for the sport, USAH allows Tier I clubs to account for up to 15% of all amateur youth players in a given State. (*Id.* at 139.)  ***USAH sets no other bar limiting Tier I competition***.  To the contrary, USAH ensures that regardless of the number of registered players in a State, "[e]ach Affiliate shall be permitted to have at least one team per age classification." (*Id.*)  It is clear, therefore, that USAH intends for its affiliates to aggressively promote Tier I competition.

50.     Yet AHAI refuses to expand its Tier I program.  The last time AHAI granted a new

Tier I charter was in or about 2001, when AHAI granted a Tier I charter to the Chicago Mission.

51.     On information and belief, after AHAI granted the Mission a Tier 1 charter, former AHAI President John Dunne and a group of AHAI Board members and representatives from the Club Defendants including, but not limited to, Mike Mullally, Michael Barrett, and Gino Cavallini, agreed to protect the then-existing Tier I clubs and to choke off any further potential competition so as to ensure their own monetary gain.  To that end, they caused AHAI to change its Rules & Regulations to prevent any new Tier I clubs from receiving a charter to operate.

52.     Paragraph 16.3 of AHAI's Rules & Regulations provides "Guidelines for Determining the Number of Teams" that participate in Tier I play.  Prior to 2001, Paragraph 16.3 conformed to USAH's expectations and rules.  Paragraph 16.3.4 provided that Tier I should consist of "[n]ot more than 15% of the total rostered Youth Players at any age level … per the USA Hockey Rule."

53.     But AHAI and the Club Defendants knew that complying with USAH's guidelines or otherwise acting consistent with other states' affiliates threatened to erode the personal fiefdoms the Club Defendants built by running both the Tier I clubs and the organization tasked with overseeing Tier I hockey in Illinois.  And so they caused AHAI to adopt a new rule, Rule 16.3.4 (hereinafter, the "Four Club Restraint"), which artificially restrained Tier I to "Not more than four (4) Tier I Youth Organizations fielding not more than eight (8) Tier I youth teams at any age level."

54.     The addition of the Four Club Restraint served the needs of Club Defendants and individuals affiliated with those clubs, but it did not serve the needs of USAH, AHAI, or the thousands of amateur youth hockey players in the State of Illinois.  The adoption of the Four Club Restraint by AHAI served to protect the four chartered Tier I clubs from competition, and forced players and families to pay artificially inflated prices to join one of those clubs in order to secure

13

prime Tier I playing opportunities. Revenues generated by these artificially high prices could then be skimmed off by the Club Defendants and individuals associated with them, notwithstanding their nominal "not for profit" status.

55. AHAI's refusal to allow a sufficient and market-driven number of Tier I clubs to exist in Illinois not only allows the Club Defendants to over-charge players and families, but also deprives otherwise qualified Illinois athletes who want opportunities to perform at the Tier I level. In amateur hockey, participation in USAH tournaments featuring Tier I competition is critically important from a player development and recruiting perspective. Recruiters and scouts for junior- and college-level teams almost exclusively draw talent from USAH Tier I tournament play, and do not bother to target tournaments drawing only Tier II or Tier III clubs. Accordingly, AHAI's Four Club Restraint deprives otherwise qualified and talented athletes—athletes who would currently be competing at the Tier I level in any other State—of critical opportunities to appear on recruiters' radar and to compete for college scholarships, among other things.

56. The fact that the Four Club Restraint deprives qualified players of the opportunity to compete at their appropriate level and of the opportunity to be appropriately scouted for post-high school opportunities is underscored by the performance of top Tier II clubs in Illinois—clubs filled with players that would be in Tier I in any other State. Illinois' Tier II clubs are permitted to play a limited number of games against Tier I opponents, and the top Tier II clubs do so. On those occasions, Illinois' top Tier II clubs compete favorably even with *Tier I* clubs from other states, demonstrating that there are large numbers of young athletes in the State who are more than good enough to play at a higher level, if AHAI would not prevent them from doing so.

57. Accordingly, the Four Club Restraint deprives otherwise qualified Illinois players of post-high school opportunities that are afforded players in other states. This anti-competitive

14

artificial constraint is contrary to USAH's and AHAI's stated mission, and is the result of the successful efforts by AHAI, the Club Defendants, and certain individuals to insulate their operations and fee structure from competition. The Reapers are not currently aware of any other state having adopted a Four Club Restraint or similar restraint, and on information and belief, no other state has adopted such a restraint.

58.     The adoption of the Four Club Restraint also created irreconcilable inconsistencies with other Rules & Regulations that are supposed to bind AHAI with respect to the admission of new clubs. For while AHAI was now committed to allowing no more than four Tier I clubs in Illinois via the Four Club Restraint, it was simultaneously committed to determine the number of Tier I youth teams based not on self-interest or some arbitrary and capricious whim but on "[t]he number of rostered Players in a USA Hockey age division" (Rule 16.3.1) and "[t]he number of rostered Players in the USA Hockey age division who will play Tier I youth hockey" (Rule 16.3.2). AHAI was also required (a) to continue accepting new applications for Tier I clubs; (b) to provide an initial review of such applications; (c) to hold a vote by the "Tier I Committee" on whether to recommend acceptance or denial of the application; and (d) to convey the results of that vote to the full AHAI Board of Directors. (Rule 16.6.1.) By adopting obviously inconsistent Rules—one that permanently caps the number of Tier I clubs, and others that ostensibly require the "Tier I Committee" to continue to accept, consider the merits of, and vote, as part of the Tier I Committee, on whether to admit all new Tier I applications, AHAI all but ensures the arbitrary and capricious enforcement of its own Rules.

59.     AHAI's arbitrary Rules, and even more arbitrary enforcement of its Rules, provide the Club Defendants with structural advantages that ensure the Club Defendants will continue to receive protection from competition and other preferential treatment from AHAI. The "Tier I

Committee" is one of the most significant of these structural advantages. Shockingly, for a new club to apply for a Tier I charter from AHAI, the first gatekeeper is a Tier I Committee made up of, among others, representatives from the existing four Tier I clubs themselves. These structural advantages are, as the saying goes, like putting a fox in charge of guarding the henhouse.

60. First, AHAI created a Tier I Committee and vested it with the authority over "all matters pertaining to Tier I Member Associations … subject to the AHAI Board of Directors [sic] review, direction, change and approval." AHAI Rule 16.0, 16.1. AHAI also vested the Tier I Committee with authority to recommend "granting or terminating of authority to organize and/or operate a Tier I organization, club, or association," and the authority to recommend modifying "the total number of Tier I Teams permitted in any age division." AHAI Rule 16.1

61. Second, AHAI gave "the President of every AHAI authorized Tier I organization" a vote on the Tier I Committee.

62. Third, AHAI created a "Tier I Authorization Procedure," which established procedures for acquiring and maintaining a Tier I charter, and vested the Tier I Committee with responsibility for its operation. Giving Tier I club representatives the power to vote on issues involving the enforcement of the Tier I Authorization Procedure imbued the Club Defendants with the power to defeat any potential competitor's application by voting against it and by lobbying the handful of non-conflicted Committee members to do the same—while providing a new applicant with no way to rebut any biased assertions or baseless accusations that a conflicted Tier I club representative may make behind closed doors. AHAI conveyed this power to the Club Defendants notwithstanding the multitude of conflicts of interests that arise when a Club Defendant representative is asked to vote for or against his or her Club's own financial interests and/or his or her Club owners' or officers' own personal financial interests.

16

63. Beyond these structural advantages, AHAI also protects the Club Defendants by arbitrarily and capriciously enforcing other AHAI bylaws and rules, and the bylaws and rules of USAH, by which AHAI is required to abide.

64. For example, not only does the Four Club Restraint improperly restrict the competition and concomitant benefits that a fifth Tier I club would bring, but the Four Club Restraint as enforced by AHAI ensures that the existing four Tier I charters are automatically renewed without any consideration of whether a different organization could provide a better Tier I club than one of the four existing Tier I clubs. Despite rules that require both the acceptance and consideration of new Tier I club applications (Rule 16.6.1, et seq.), as well as rules requiring each existing charter to be reviewed annually and evaluated for potential renewal (Rule 16.4.1), AHAI has no legitimate, competitive process in place for weighing the relative merits of each application and determining the most deserving four clubs. Instead, AHAI simply relies on inertia and favoritism. It refuses to consider new applications in any respect, citing the Four Club Restraint and the existence of four incumbent clubs. AHAI's circular abuse of discretion and bad faith is exactly what happened with respect to the Reapers, and it guarantees that that the four existing Tier I clubs are permanently chartered no matter what, free to rampantly overcharge and underperform, insulated from competition of any kind.

65. The inconsistencies in AHAI's Rules & Regulations are not by accident, but by design. Since the adoption of the Four Club Restraint, it is now impossible for an outsider to separate wheat from chaff—*i.e.*, to understand which Rules are "real" and will be followed by AHAI's Board, and which ones are obsolete, out of favor, or illusory. This renders AHAI's governance in general, and its selective enforcement of its Rules specifically, arbitrary and capricious. As the Reapers discovered, the real Rules are simply whatever AHAI's Board says

they are.

66. AHAI's insular "boy's club" culture has fostered the organization's lackadaisical decision-making and arbitrary enforcement of its bylaws, rules, and procedures. AHAI's Board is composed of 15 individuals who, for all practical purposes, remain there indefinitely. One Board Member, Tony Rossi, has been on the Board since 1979, a 40 year term. Several others—Mike Mullally, John Dunne, Kevin Bolger, and Ken Michel—have all held Board positions for almost 20 years. Another group—Chuck Smith, Jim Clare, Jack Weinberg, Gregg Chudacoff, and Gino Cavallini—have sat on the Board between 5 and 10 years. AHAI's insular culture encourages and rewards Board Members for their long duration on the Board and for their loyalty. AHAI's Board has created various awards to recognize Board Members for staying on the Board for extended periods of time, including the "Leadership" award (5 years on the Board), the "Diplomate" award (10 years on the Board), the "Statesmanship" award (15 years), the "Master's Club" award (20 years), the "Pioneer" award (25 years), and the "Founder" award (30 years). The following chart demonstrates that a significant majority of AHAI's Board has been in place for many years:

| Board Member | Time Period on the Board[3] | Number of Years on the Board | Highest Award Received |
|---|---|---|---|
| Tony Rossi | 1979-present | 40 years | "Founder" |
| Mike Mullally | 2000-present | 19 years | "Diplomate" |
| Ken Michel | 2000-present | 19 years | "Diplomate" |
| John Dunne | 2003-present | 16 years | "Diplomate" |
| Kevin Bolger | 2003-present | 16 years | "Diplomate" |
| Chuck Smith | 2010-present | 9 years | "Leadership" |
| Jim Clare | 2010-present | 9 years | "Leadership" |
| Gregg Chudacoff | 2012-present | 7 years | "Leadership" |
| Jack Weinberg | 2005-2009 2017-present | 7 years | - |
| Gino Cavallini | 2014-present | 5 years | - |
| Mike Barrett | 2013-2014 (Member) 2018-present | 4 years | - |

---

[3] Source: www.ahai.org.

| Board Member | Time Period on the Board[3] | Number of Years on the Board | Highest Award Received |
|---|---|---|---|
| | (President) | | |
| Anita Lichterman | 2016-present | 3 years | - |
| Keri Zschach | 2017-present | 2 years | - |
| Bill Crowley | 2018-present | 1 year | - |

## VI. The Reapers' Attempts to Expand Opportunities for Tier I Hockey in the Relevant Market

67.     For several years, there has been a significant and increasing public demand for additional Tier I opportunities in Illinois.  Players, parents, coaches, officials, and others have expressed their support for growing Tier I play in the State.

68.     The new supply of a fifth Tier I youth club to the Relevant Market would provide multiple benefits for individuals who are currently playing Tier I or II youth hockey but (a) live in or near the North Shore area and are unwilling or unable to commute long distances to play for an existing Tier I club; (b) do not want to pay artificially inflated prices charged by the existing four Tier I clubs; (c) are unhappy with the quality of coaching and/or management services from their current club; (d) believe that they are not getting enough practice time on their current team and want to transfer clubs; or (e) want to gain access to junior- or college-level scouted tournaments and showcases across the country.

69.     Accordingly, in 2015 Steve Dry (a concerned parent and President of the Falcons Hockey Association Tier II club) and others approached AHAI leadership to start a dialogue about the need for AHAI to meet this market demand by either allowing the creation of a new Tier I club or by allowing existing Tier II clubs to also offer a Tier I program.

70.     At that time, John Dunne was AHAI's Board President.  In December 2015, Dry emailed AHAI President Dunne, sharing Dry's concerns that although "Illinois is either the 5th or 6th largest State for youth hockey participation … It seems like Illinois should have 2-3 additional

charters at a minimum." Dry also informed AHAI, through Dunne, that the strength of Illinois'
Tier II clubs, which "have a fantastic showing at all AAA multi-state tournaments and are
consistently in the top 20 in almost all *myhockeyrankings* divisions," demonstrated the illogic of
AHAI's position that "only 60-72 skaters and 8 goalies per age division are developed enough to
play Tier 1 hockey." Dry also informed AHAI, through Dunne, that the existing four Tier I clubs
"all bring in kids from outside Illinois which further minimizes local players' chances to play" at
that level. Dry explained that AHAI's artificial four club restriction "has created a fiefdom where
4 programs dominate the Illinois [amateur hockey] landscape."

71.     Between December 2015 and June 2018, Dry continued to push AHAI leadership
to allow a greater number of Tier I opportunities in Illinois, to clean up AHAI's governance issues,
to bring AHAI back into compliance with USAH's mission statement, rules, and guidance, and to
address the multitude of serious governance issues with the Club Defendants. AHAI leadership
generally responded with excuses, deflections, and non-responses. AHAI leaders simply preferred
to maintain the status quo, and continued to protect the Club Defendants by, among other things,
maintaining the Four Club Restraint.

72.     In May 2018, then-AHAI President Dunne and Board Member Michael Barrett
invited Dry to join them for a discussion about Dry's concerns. Their discussion took place on
May 16, 2018 at the Wildfire restaurant in Oak Brook, Illinois. Dry spoke at length about the Four
Club Restriction's negative impact on competition at the Tier I level in Illinois, as well as a variety
of governance problems, bias, and self-dealing involving AHAI and the Club Defendants. Dunne
and Barrett appeared to share Dry's commitment to resolving these issues, calling the meeting
"time well spent," and later writing to Dry that "[o]ur goals are exactly some of the thoughts and
concerns you expressed." Dunne and Barrett even suggested that Dry should become more deeply

20

involved in AHAI by joining the Board or serving on an AHAI committee so as to help them address these issues from within the organization. Dry stood ready to assist Dunne and Barrett with their supposedly shared goals.

73. But when Dry followed up with Dunne and Barrett after their May 16 meeting, via email on May 29, 2018, July 10, 2018, and August 10, 2018, neither Barrett nor Dunne bothered to reply.

74. Relatedly, in June 2018, something seemed to change. On June 2, 2018, Dunne resigned as AHAI President, and AHAI's Board unanimously elected Barrett as his replacement. Later that month, on June 29, Dry had a conversation with AHAI Board Member Mike Mullally, in which Mullally said, in sum and substance, "We [referring to the AHAI Board] are ready to consider allowing a new Tier I club. You should go ahead and fill out an application." Mullally was, and currently is, the Chair of AHAI's Tier I Committee.

75. After years of stonewalling by AHAI leadership, Dry was surprised by Mullally's sudden encouragement. Nevertheless, he was hopeful that Mullally's suggestion might indicate that there was finally an emerging consensus within AHAI to return the organization to its core mission.

76. In July 2018, bolstered by Mullally's urging the prior month, Dry and others began working in earnest to actively plan and organize support for a new Tier I club, the Reapers. Dry notified AHAI that the Reapers intended to submit an application to AHAI for a Tier I charter and requested guidance from the organization as to the form the application and supporting materials should take.

77. As Chair of the Tier I Committee, Mullally served as the point person from AHAI's side for purposes of navigating the application process, which entailed, among other things,

sharing sensitive confidential information with AHAI about club planning, finances, and hiring. In one of Dry's first communications with Mullally about the application process, aware that the Tier I Committee is composed of representatives from both AHAI and the Club Defendants, Dry requested that "[i]f the other Tier 1 clubs will be seeing our submission (finances, coaches, etc.) as they make up the Tier 1 committee we would like a NDA [non-disclosure agreement] signed." Mullally responded that "I don't believe an NDA would be necessary" because "the committee does not see the financial [sic] of the other tier 1 clubs." But Mullally added the following bizarre warning: "please remember [Tier I] is a very close community … I have heard things from some of them that I have never told them, but they seem to know about the issue or circumstance anyway. So your information, if present in the Tier 1 community … might be known faster than you think." Mullally assured Dry that confidential information spreading this way would somehow have "nothing to do with AHAI's confidentiality."

78.     On July 20, 2018, Dry informed Mullally via email that the Reapers were planning on submitting its application and supporting materials the following day. Dry provided Mullally with an overview of the materials the Reapers intended to submit. Mullally replied to Dry's email, copying AHAI President Barrett, Past President Dunne, and Board Member Ken Michel. In his reply, Mullally provided Dry with a Tier I application form, representing that it was one "that was used in the past." Mullally indicated that "with this form and the outline you supplied below, the information should be sufficient for consideration, first by the Tier 1 committee and then by the AHAI Board." Neither Mullally, nor Barrett, nor Dunne, nor Michel indicated that there were any further barriers to the Board's consideration of the merits of the Reapers' application.

79.     Supporters of the Reapers went to great lengths to complete AHAI's application and to develop a proposal that would demonstrate how granting the Reapers a charter would best

serve Tier I hockey in the State of Illinois, promote the mission of USAH, and promote the stated

mission of AHAI.  In furtherance of these efforts, supporters of the Reapers:

a.  Began the process of incorporating the Reapers as a tax-exempt 501(c)(3) organization;

b.  Identified capable individuals who were willing serve as the directors and officers of the club;

c.  Identified a club registrar, a hockey/player development director, several head coaches, a skills director, and a defensive director;

d.  Identified resources for club goalie training and off-ice training;

e.  Identified accounting and insurance professionals the club would use;

f.  Drafted and adopted bylaws for the club;

g.  Drafted and adopted a comprehensive club handbook;

h.  Drafted and adopted a variety of club policies to govern both on- and off-ice behavior of club players, coaches, parents, volunteers, and spectators, including policies governing unsportsmanlike conduct, hazing, substance abuse, concussion management, prohibited conduct, and conduct expectations for parents and spectators;

i.  Prepared projected financial statements for the Reapers organization; and

j.  Obtained proof of liquidity for Reapers President Steve Dry.

80.  The following day, on July 21, 2018, Dry submitted the Reapers' completed

application packet, including (1) the AHAI application form; (2) an electronic binder of club

materials; and (3) a PowerPoint presentation containing statistical data supporting the need for

another Tier I club in Illinois.  The application and proposal that the Reapers submitted complied

with all of AHAI's stated requirements for consideration of a new Tier I charter. Indeed, Mullally later promised Dry that he would "certify to the [Tier I] committee and [to the] Board that your proposed organization is compliant and financially viable."

81.     Weeks later, in an August 13, 2018 email to Mullally, Dry inquired about the status of the Reapers' application and when it would be considered. Mullally replied that "I have not brought this application to the Board as yet. So they are not even aware that there is an application." He also noted that "we are to have a tier 1 meeting later this month, but I have not set the date yet. You are welcome to present your proposal … to the committee at that time if you like." Dry responded "[i]t would be my pleasure and want to present to both the Tier 1 and AHAI Board. Please keep me posted on the dates."

82.     On Sunday, August 26, 2018, at 11:44 pm, Mullally emailed Dry "My apologies … I did not send you a copy of our Tier 1 meeting time. It is tomorrow, Monday at 7 bridges at 6 pm. You will have 15 minutes for a presentation and then 15 minutes for questions from the committee."

83.     Despite receiving a midnight email providing barely 16 hours of notice for a meeting at which he would need to make a presentation and convince the Tier I Committee of the merits of the Reapers' application, Dry arranged to attend the meeting and make the presentation.

84.     On August 26, Mullally distributed the Reapers' PowerPoint presentation to the Tier I Committee via email. In his email, Mullally informed the Committee that "The remainder of this application I can assure you has met the minimum criteria as stated in the AHAI [Rules & Regulations] Article 16." Article 16 of AHAI's Rules & Regulations broadly governs the requirements and procedures for obtaining a Tier I charter from AHAI.

85.     On August 27, 2018, Dry made a presentation to AHAI's "Tier I Committee." The

Tier I Committee is composed of a mix of AHAI Board Members and representatives from the four chartered Tier I clubs.  The members of the Tier I Committee to whom Dry presented were:

- Gino Cavallini (who represents the Mission while simultaneously serving as an AHAI Board Member)

- Larry Pedrie (representing Team Illinois)

- Jimmy Anderson (representing the Fury)

- Jason Ori (representing CYA)

- Harley Fisher (representing CYA)

- Michael Mullally (representing AHAI as its current Tier 1 committee chair and past President)

- John Dunne (representing AHAI as its past President)

- Ken Michel (representing AHAI)

- Pete Humann (representing AHAI)

86.    On information and belief, sometime after Dry's August 27 presentation, the Tier I Committee set forth a written recommendation to the full AHAI Board of Directors conveying the Committee's views as to whether to grant a fifth Tier I charter.

87.    On October 1, 2018, the Reapers supporters presented a proposal to the full AHAI Board of Directors.  Steve Dry, Kevin Kroeger, Ryan Taylor, Michael Motew, Jeanine Goldstein, Dean Manone, Russ Naumenko, and Murry Gunty attended for the Reapers.  Nearly all of the 15 members of the AHAI Board were present, including President Mike Barrett, Past President John Dunne, Mike Mullally, Kevin Bolger, Bill Crowley, Gino Cavallini, Chuck Smith, Jim Clare, Anita Lichterman, Jack Weinberg, Tony Rossi, and Keri Zschach. Former AHAI Board Members Pete Humann and Bill Gomolinski also attended.

88.    The October 1 AHAI Board meeting took place at Gene & Georgetti's restaurant

25

in Rosemont, Illinois. The Reapers' President, Steve Dry, made the Reapers' presentation to AHAI's Board. He explained that in forming the club and developing the Reapers' proposal to compete as a Tier I club, the supporters of the Reapers hoped "to give back to the sport and offer an opportunity for more kids from Illinois to compete and develop at the highest level." Dry reminded the Board that "every player should have the opportunity to play at the highest level. By limiting the spots available we are not allowing the players this opportunity." He also explained to the Board that "[a]llowing more kids to advance to … this level will help advance players at all levels."

89. Dry explained that the Reapers are "a not-for-profit association, governed by a volunteer Board of Directors and paid Hockey Professionals and Support Staff," and that the Reapers will make "[e]very effort ... to keep [player] fees as low as possible."

90. Dry reminded the Board that AHAI's mission statement required it to "Provide an improved grassroots foundation for the growth and development of USA Hockey and its members, designing programs aimed at encouraging increased participation," and "improved skills." Dry explained that by artificially limiting the level of participation at the Tier 1 level in Illinois, "AHAI is not encouraging increased participation. Rather, due to the limited organizations, players are leaving the State to play at Tier 1 elsewhere, e.g. Detroit, Wisconsin, Florida, Omaha, etc."

91. Dry provided several reasons why Illinois needs a fifth Tier I club. First, Dry informed the Board that the only markets conveniently served by *any* Tier I team are Chicago's Southwestern Suburbs (the Fury), Northwestern Suburbs (CYA), Western Suburbs (Team Illinois), and the City of Chicago itself (the Mission). No other geographic market in the State of Illinois has a Tier I team. Dry explained that many families of players who are good enough to play Tier I hockey do not have the ability to drive great distances for practices and games and the

artificial restriction on the number of Tier I teams prevents these players from competing at that level. He noted that "[a]n additional program serving this vital hockey area will allow more players to participate at their deserved level of play."

92. Dry pointed out that "all existing clubs are either west of [interstate highways] 294 or 90. Meanwhile, there is a hot bed of youth hockey east of 294 and 90," an area that includes the communities of Skokie, Evanston, Glenview, Wilmette, Winnetka, and Northbrook, and the Bulldogs, Falcons, Ice Dogs, Vipers, and Winter Club Tier II teams.

93. After the presentation, Dry took a few questions from the Board. Dry's presentation and question and answer session lasted approximately 45 minutes.

94. Despite Mullally's earlier assurance that "I don't believe an NDA would be necessary," and despite his promise that any dissemination of information about the Reapers' application would have "nothing to do with AHAI's confidentiality," Mullally later distributed parts of the Reapers' application materials widely throughout the amateur hockey community. Mullally forwarded parts of the Reapers' materials to every Tier II club and high school hockey club Director and President. Predictably, many of the recipients were curious about the Reapers' proposal.

95. On October 25, 2018, hoping to address some of these questions, Dry made a presentation about the Reapers and the need for a fifth Tier I club to AHAI's Tier II Presidents' Committee, which is tasked with overseeing Tier II amateur youth hockey in Illinois. While the Tier II Presidents' Committee itself does not have jurisdiction over Tier I competition, it is nonetheless comprised of the Presidents of AHAI-chartered Tier II clubs, and current and former AHAI Board Members, including John Dunne and Pete Humann. AHAI Board Member Gino Cavallini attended the October 25 Tier II Committee meeting, despite his (1) not being a member

27

of the Tier II Presidents' Committee; (2) not being affiliated with a Tier II club; and (3) being affiliated, instead, with a Tier I club.

96.     At the October 25 Tier II Presidents' Committee meeting, Cavallini vocally challenged Dry and the Reapers, asserting (wrongly) that the Reapers' presentation contained false information.  Cavallini made these claims in front of the entire Tier II Presidents' Committee—*i.e.*, many of the AHAI Board members who were later supposed to evaluate the merits of the Reapers' application.  On information and belief, Cavallini is highly paid by the Mission.

97.     On January 7, 2019, AHAI's Board convened in closed session, again in a room at Gene & Georgetti's in Rosemont.  The Reapers identified one or more conflicted board members present at this meeting.

98.     Representatives from the Reapers and the general public were not permitted to observe the vote.  Representatives from the Reapers waited outside of the meeting for three and a half hours, hoping to be informed of the Board's decision at the conclusion of the meeting.  When Dry approached AHAI Board Member Mullally and Past President Dunne after the meeting and asked them to share the result of the vote, they declined to do so, and instead stated that the Reapers would be informed in writing within 24 to 48 hours, when the meeting minutes would be made available.

99.     AHAI did not provide the Reapers with the promised notice in writing within 24 to 48 hours.  Only after repeated prompting from the Reapers representatives did AHAI provide notification to Dry that AHAI had declined to rescind the Four Club Restraint, thereby making it impossible for the Reapers to receive a Tier I charter.  AHAI provided no written explanation of its decision, no indication that the AHAI Board had even considered the merits of the Reapers' application, and no sense of what, if any, appeals procedures might be available to the Reapers.

100.    When the Reapers inquired about how to appeal the Board's decision to maintain the Four Club Restraint, they were initially unable to obtain a response from AHAI.  When the Reapers further inquired, they received a letter from an attorney representing AHAI, Francis A. Spina of the Cremer, Spina, Shaughnessy, Jansen & Siegert law firm. He claimed that because AHAI's Board had decided not to rescind the Four Club Restraint, "no further action on the Reapers [sic] application was possible under the AHAI Bylaws and Rules."  Mr. Spina then advised that "there is no basis in the AHAI Rules for [sic] Reapers to appeal to AHAI from the January 7, 2019 board decision … the January 7 AHAI Board decision is final."  Mr. Spina's letter then warned that "Any further efforts by [sic] Reapers would be subject to the USAH 'Dispute Resolution Procedure,' including specifically Article 10(G)."

101.    Mr. Spina's reference to USAH Bylaw Article 10 was disingenuous.  Article 10 governs dispute resolution, discipline, and arbitration.  Bylaw 10(G) purports to require mandatory arbitration for some types of disputes between USAH members and USAH affiliates, and in conjunction with Bylaw 10(A)(3)(a), purports to shift liability for "all costs and expenses." But by its terms, USAH Bylaw Article 10 does not bind the Reapers.  The Reapers is not currently a member of USAH, or of AHAI, and does not pay dues to either organization.  The Reapers has never agreed to be presently bound by USAH Bylaw Article 10 and has never agreed to submit this dispute to USAH arbitration.  Moreover USAH does not have original jurisdiction over state and federal antitrust claims or the competence to resolve such claims.  The USAH "arbitrators" who would settle complex legal questions would be "present or former athletes who played the sport of ice hockey and those who have demonstrated experience and involvement with national, Affiliate, state, or local ice hockey organizations."  USAH Bylaw Article 10(G)(7).  USAH Bylaw Article 10 has no relevance to these proceedings.

102.    AHAI's Board of Directors met again on February 5, 2019.  On information and belief, a non-Board member attendee at that meeting asked the Board, in sum and substance, "why isn't the Reapers' application up for discussion in this meeting, and why was it never brought up for [open] discussion?"  An AHAI Board Member replied, in sum and substance, "Because Mr. Dry hasn't appealed our decision to AHAI or to USA Hockey."  This statement was false and misleading.  The AHAI Board concealed from its own members that its counsel advised the Reapers that there was "no basis" for such an appeal and that "the January 7 AHAI Board decision is final."

## VII.    AHAI Systematically Fails to Govern the Club Defendants in Accord with its Rules & Regulations, and Several AHAI Board Members Have Significant Conflicts of Interest

103.    In addition to the Four Club Restraint, AHAI protects the Club Defendants by arbitrarily and capriciously declining to enforce its Rules against them, while enforcing its Rules vigorously against others.  By way of example:

104.    AHAI Rule 19.8.1 (Government and Responsibility) mandates that all Tier I clubs must have a Board composed of at least five individuals.  But for at least three consecutive years prior to 2016, Defendant CYA did not have a five-member Board; it had a four-member Board. Defendant Team Illinois currently only has a four-member Board.  Defendants the Mission and the Fury currently only have three-member Boards.  On information and belief, AHAI knows all four of its Tier I clubs are or have been in violation of Rule 19.8.1, but continues to "renew" their Tier I charters on an annual basis.

105.    AHAI Rule 19.8.1 also mandates that all Tier I clubs must have a Board that is "representative of the Affiliate and its programs, and fundamentally fair to all the participants members [sic] of the Affiliate."  It further places "the burden of proving fundamental fairness" on the club.  But the CYA Board is composed entirely of members from a single family, the Ori

family. It is neither representative nor fair to its members, as demonstrated by the chaotic state of the club's operations and finances and its repeated failure to respond to the needs of its players and their families. On information and belief, AHAI knows CYA is in ongoing violation of Rule 19.8.1 in this respect, but continues to "renew" CYA's Tier I charter on an annual basis.

106. AHAI Rule 19.8.1 also mandates that all Tier I clubs must have a Board that is "composed of parents who have or have had a child in [its Tier I] program." Prior to 2016, of CYA's four Board members, only two had a child in CYA's Tier I program. Of the Mission's three Board Members, only one has had a child in its Tier I program. Of Team Illinois' four Board Members, only three have had a child in its Tier I program. On information and belief, AHAI knows CYA, the Mission, and Team Illinois are in violation of Rule 19.8.1 in this respect, but continues to "renew" their Tier I charters on an annual basis.

107. AHAI Rule 19.8.2 (Annual Meetings) requires that every club "shall hold an annual meeting of its participants/members with reasonable notice of such meeting given." On information and belief, in the last three years, CYA members have not been given notice of any such annual meeting. On information and belief, AHAI knows CYA is in violation of Rule 19.8.2, but continues to "renew" CYA's Tier I charter on an annual basis.

108. AHAI Rule 16.4.2 (Limitation) requires that "no person shall be an Officer, Director, Hockey Director, Coach, Coaching Director, Manager, etc. of a Tier I Organization and hold any of the above positions in an [sic] Tier II Organization." But for the last three years, Jamison ("Jamie") Ori has been a coach for the Tier II Chicago Bulldogs Youth Hockey Club. He has simultaneously been an officer of CYA (Tier I), filling the paid position of Vice President. He has simultaneously been employed by Rosebrook Pools, an Ori family business that receives considerable sums of money annually from CYA. On information and belief, AHAI knows CYA

is in violation of Rule 16.4.2, but continues to "renew" CYA's Tier I charter on an annual basis.

109. AHAI Rules 16.6.3 (Tier I Minimum Requirements) and 16.6.3.5 mandate that to possess a Tier I charter, clubs must annually provide "Financial and Historical information demonstrating that the Tier I Organization is financially solvent and stable with the ability to finance the next season." In 2015, the Mission was sued for defaulting on bonds it used to finance its 2011 acquisition of the Seven Bridges Ice Arena in southwest suburban Woodridge. In the years running up to that lawsuit, the club operated at a deficit. The Mission had revenue of $3.1 million and expenses of $4.2 million in the year ended June 30, 2013, according to a tax return filed with the Internal Revenue Service. On information and belief, AHAI knew the Mission was in violation of Rules 16.6.3 and 16.6.3.5, but "renewed" its Tier I charter regardless.

110. Several AHAI Directors had, and still have, conflicts of interest on a range of issues affecting the number and composition of Tier I clubs in Illinois.

111. For example, Gino Cavallini is presently a director and officer of the Mission and is simultaneously an AHAI Board member. The Mission's Internal Revenue Service Form 990 federal income tax return reveals that he personally received almost $138,000 in reportable compensation from the Mission in 2016. On information and belief, this compensation was only for Cavallini's Board responsibilities. On information and belief, he received additional compensation from the Mission, ostensibly for coaching and other duties. Despite Cavallini's obvious conflicts, on information and belief, AHAI allowed him to openly lobby AHAI Board members, on and off of the Tier I Committee, to maintain the Four Club Restraint and to prevent the Reapers from obtaining a Tier I charter.

112. Joe Ori is presently a director and officer of CYA and is a former member of AHAI's Tier I Committee. CYA's Internal Revenue Service Form 990 federal income tax return

for 2016 reveals that no less than five members of the Ori family are Board Members and/or officers of CYA. As noted, *supra*, Rule 19.8.1 mandates that a Tier I club's Board must be representative and fundamentally fair to its members. On information and belief, AHAI chooses to allow this one-sided arrangement even though it constitutes a violation of Rule 19.8.1, but continues to "renew" CYA's Tier I charter on an annual basis.

113.    Jason Ori is Joe Ori's son. Jason Ori is currently the President of CYA and a current member of AHAI's Tier I Committee. The Ori family has a personal financial stake in CYA, which was co-founded by Joe Ori in 1982. CYA's Internal Revenue Service Form 990 federal income tax return reveals that Jason Ori personally received $96,000 in reportable compensation from CYA in 2016. CYA's Form 990s from recent years reveal that CYA has paid tens of thousands of dollars to its Board members and/or officers for services vaguely described as "administrative/coaching" services and "allowance for use of a personal car." In addition, CYA's 2016 Form 990 reveals that CYA paid over $83,000 to Rosebrook Pools, Inc., a pool construction and maintenance business owned by the Ori family that employs at least four other CYA directors. These funds were ostensibly for bookkeeping services, even though Joe Ori purportedly serves the role of Treasurer of the organization and Ori claims to devote 60 hours per week to this role. On information and belief, AHAI knows the leaders of CYA and other Tier I clubs routinely engage in self-dealing, but AHAI continues to "renew" their Tier I charters on an annual basis.

114.    On information and belief, discovery in this matter will likely reveal many additional instances of rule violations, arbitrary and capricious rule enforcement, self-dealing, and conflicts of interest that AHAI and the Club Defendants have thus far concealed from public view. On information and belief, discovery will also reveal significant unnecessary costs and fees that the Club Defendants have imposed on teams and players that would not be charged by the Reapers.

### VIII. AHAI and the Club Defendants Ensure that Price of Participation in Existing Tier I Clubs in the State of Illinois Is Artificially Inflated

115. AHAI is required to follow the bylaws and rules that it has set to govern its own behavior. Among the bylaws that AHAI has committed itself to is the following: AHAI is required to "encourage registration of all teams at all levels of play," By-Laws, art. III, § 3, and to "[make hockey] available to more people in all levels of competition at the lowest possible cost." By-Laws, art. III, § 1.

116. But AHAI's artificial restrictions on the supply of new Tier I clubs and other anti-competitive restrictions on the supply of new Tier I clubs and protection of existing Tier I clubs have artificially inflated the price of play. The "all-in" price (meaning all out-of-pocket costs a young athlete or his or her family must pay to participate in a given season, inclusive of all league fees, State tournament fees, coaching fees, ice fees, training fees, goalie training, fundraising fees, equipment purchases, etc.) that the Reapers would charge would be materially less than the prices charged by the Club Defendants—by at least 25 percent.

117. Additionally, the same "all-in" prices charged by the Club Defendants are substantially higher than the prices charged by Tier I amateur youth hockey clubs in comparable markets, including comparable Tier I clubs across the country where competition is not artificially restricted.

### IX. Injuries to Competition in the Relevant Market and to the Reapers Resulting from Defendants' Actions

118. AHAI, individually and in collusion with the Club Defendants, misused its monopoly power to injure competition in the Relevant Market, and to injure the Reapers and the athletes the Reapers wish to serve.

119. AHAI's and the Club Defendants' conduct has caused and will continue to cause harm to competition in the Relevant Market in a variety of ways, including, but not limited to the

following: Defendants' conduct has cut off a large geographic area, the North Shore area of suburban Chicago, from having ready access to any Tier I clubs. Also, currently youth hockey families and players in Illinois must pay prices for Tier I youth hockey programming that are artificially and substantially higher than what they would have to pay if those families and players had the ability to obtain competitive services through the Reapers. In addition, the supply of youth hockey programming services is lower than it would be if AHAI rescinded the Four Club Restraint and granted a fifth Tier I charter to the Reapers. Moreover, player choices in terms of organizational reputation, team culture, coaching preferences, and the like, are artificially limited.

120.     AHAI and the Club Defendants have similarly injured the Reapers in a variety of ways, including, but not limited to the following: (i) precluding the Reapers from entry in the Tier 1 amateur hockey market; (ii) preventing the Reapers from conducting training and tryouts in preparation for the 2019-2020 season, which begins in September 2019; and (iii) causing the Reapers to incur significant time and expense to prepare an application and present a proposal that it had no intention of granting.

## COUNT I
### (Violation of the Sherman Act, 15 U.S.C. § 1 – Conspiracy in Restraint of Trade)
### (Against All Defendants)

121.     The Reapers incorporate the previous allegations set forth in paragraphs 1 to 120.

122.     The unlawful conduct alleged herein directly involves and substantially affects interstate trade and commerce. Among other things, Illinois Tier I clubs compete both within the State of Illinois and in other U.S. states, as well as internationally.

123.     The conduct of AHAI and the Club Defendants to implement and enforce the Four Club Restraint constitutes a contract, combination, and /or conspiracy resulting in an unreasonable restraint of trade or commerce in violation of 15 U.S.C. § 1.

124.     The conduct of AHAI and the Club Defendants has reduced competition among

Tier I amateur youth hockey in Illinois by: (i) artificially limiting the number of Tier I charters available by virtue of the Four Club Restraint; (ii) refusing to rescind the Four Club Restraint; and (iii) preventing new, legitimate, and qualified clubs from entering Tier I via the issuance of a new charter.

125.    The Defendants' conduct has caused and will continue to cause harm to competition in the Relevant Market and to the business and property of the Reapers in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Such harms are of the type the antitrust laws were designed to prevent, and such harms flow from Defendants' unlawful conduct.

**WHEREFORE, the Reapers respectfully request:**

**A.**    Judgment in favor of the Reapers and against Defendants for preliminary and permanent injunctive relief directing Defendants that AHAI shall not enforce the Four Club Restraint, and that AHAI shall rescind the Four Club Restraint;

**B.**    Judgment in favor of the Reapers and against the AHAI for preliminary and permanent injunctive relief directing AHAI that it shall grant the Reapers a charter to sponsor a Tier I team;

**C.**    In the event the Court declines to order AHAI to rescind the Four Club Restraint, the Reapers ask the Court, in the alternative, to order AHAI to adopt and implement an objectively fair, unbiased, and transparent process for annually weighing the relative merits of each club's application and determining the four clubs that will receive a charter each year;

**D.**    Reasonable attorneys' fees and costs incurred in having to prosecute this matter, pursuant to 15 U.S.C. § 15; and

**E.**    Any other relief to which the Reapers are entitled.

**COUNT II**
**(Violation of the Sherman Act, 15 U.S.C. § 2 – Monopolization and Anti-Competitive**

**Conduct in Furtherance Thereof)**
**(Against AHAI)**

126.    The Reapers incorporate the previous allegations set forth in paragraphs 1 to 120.

127.    The unlawful conduct alleged herein directly involves and substantially affects interstate trade and commerce.  Among other things, Illinois Tier I clubs compete both within the State of Illinois and in other U.S. states, as well as internationally.

128.    The conduct of AHAI to implement and enforce the Four Club Restraint is being undertaken to monopolize or maintain the monopoly over the Relevant Market in violation of 15 U.S.C § 2.

129.    For the purpose of maintaining its monopoly power, AHAI committed numerous acts, including but not limited to: (i) artificially limiting the number of Tier I charters available by virtue of the Four Club Restraint; (ii) refusing to rescind the Four Club Restraint; (iii) preventing new, legitimate, and qualified clubs from entering Tier I via the issuance of a new charter; and (iv) depriving consumers of the benefits of competition among Tier I amateur youth hockey clubs.

130.    AHAI's conduct has caused and will continue to cause harm to competition in the Relevant Market and to the business and property of the Reapers.  Such harms are of the type the antitrust laws were designed to prevent, and such harms flow from Defendants' unlawful conduct.

131.    Unless this Court intervenes, there is a dangerous probability that AHAI's attempt at monopolization and anti-competitive conduct will succeed.

**WHEREFORE, the Reapers respectfully request:**

A.    Judgment in favor of the Reapers and against AHAI for preliminary and permanent injunctive relief directing AHAI that it shall not enforce the Four Club Restraint, and that AHAI shall rescind the Four Club Restraint;

B.    Judgment in favor of the Reapers and against AHAI for preliminary and permanent

injunctive relief directing AHAI that it shall grant the Reapers a charter to sponsor a Tier I club;

  **C.**  In the event the Court declines to order AHAI to rescind the Four Club Restraint, the Reapers ask the Court, in the alternative, to order AHAI to adopt and implement an objectively fair, unbiased, and transparent process for annually weighing the relative merits of each club's application and determining the four clubs that will receive a charter each year;

  **D.**  Reasonable attorneys' fees and costs incurred in having to prosecute this matter, pursuant to 15 U.S.C. § 15; and

  **E.**  Any other relief to which the Reapers are entitled.

**COUNT III**
**(Violation of the Illinois Consumer Fraud Act and Uniform Deceptive Trade Practices Act,**
**815 ILCS §§ 505/1, et seq.)**
**(Against All Defendants)**

  132.  The Reapers incorporate the previous allegations set forth in paragraphs 1 to 120.

  133.  The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS §§ 505/1, et seq., protects both consumers and competitors from unfair methods of competition and other unfair or deceptive business practices in the conduct of any trade or commerce.

  134.  The Reapers are "consumers" of AHAI's products or services for purposes of section 505/1(e) of the ICFA. The Reapers are also "businessmen" (*i.e.*, competitors) with respect to the Club Defendants for purposes of the ICFA.

  135.  Defendants are "persons" for purposes of Section 505/1(c) of the ICFA, and are engaged in "trade or commerce" for purposes of Section 505/1(f) of the ICFA. The ICFA applies to Defendants' actions and conduct as described herein because it protects consumers and competitors, like the Reapers, from unfair or deceptive conduct by persons engaged in trade or commerce, like the Defendants.

38

136.     Under the ICFA, conduct is unfair if it (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers.

137.     AHAI's conduct, in collusion with the Club Defendants, is unfair within the meaning of the ICFA (i) because it offends Illinois' public policy against unreasonable restraints on trade; (ii) because it involves ongoing violations and abuses of the Illinois Revenue Code's tax exemptions for legitimate nonprofit and charitable organizations; (iii) because it is otherwise immoral, unethical, oppressive and unscrupulous, and (iv) because it caused substantial injury to consumers who purchased its goods and/or services.

138.     Defendants' conduct is willful and wanton.

139.     Defendants' conduct caused substantial injury to consumers by (i) artificially limiting the number of Tier I charters available by virtue of the Four Club Restraint; (ii) refusing to rescind the Four Club Restraint; (iii) preventing new, legitimate, and qualified clubs from entering Tier I via the issuance of a new charter; (iv) preventing new, legitimate and qualified clubs from competing equally with the Club Defendants for one of the four charters AHAI is currently authorized to issue; and (v) depriving consumers of the benefits of competition among Tier I amateur youth hockey clubs.

140.     Defendants' conduct similarly caused substantial injury to the Reapers by: (i) precluding the Reapers from entry in the Tier 1 amateur hockey market; (ii) preventing the Reapers from conducting training and tryouts in preparation for the 2019-2020 season, which begins in September 2019; and (iii) causing the Reapers to incur significant time and expense to prepare an application and present a proposal that it had no intention of granting.

141.     The injury to consumers and to the Reapers caused by Defendant's conduct is not outweighed by any countervailing benefits to consumers or competition, and the injury is one that

consumers or the Reapers could not have reasonably avoided because AHAI possesses monopoly power over amateur hockey in Illinois, virtually every organized amateur hockey club in Illinois is a member of AHAI, and for players eight years of age and older (who the Reapers intend to serve), there is no alternate amateur hockey association in Illinois.

142.    Defendants' unfair practices occurred during the marketing and sale of their goods and/or services, and therefore occurred in the course of trade and commerce.

**WHEREFORE, the Reapers respectfully request:**

A.    An Order in favor of the Reapers and against AHAI for declaratory relief, pursuant to 735 ILCS 5/2-701, finding that the Four Club Restraint violates the Illinois Consumer Fraud Act and Uniform Deceptive Trade Practices Act, 815 ILCS §§ 505/1, et seq., and is otherwise unenforceable;

B.    An Order in favor of the Reapers and against AHAI for declaratory relief, pursuant to 735 ILCS 5/2-701, finding that the Four Club Restraint is contrary to USAH's mission, bylaws and rules, violates AHAI's mission, bylaws, and rules, constitutes arbitrary and capricious conduct and an abuse of discretion, and is otherwise unenforceable;

C.    An Order in favor of the Reapers and against the Club Defendants for declaratory relief, pursuant to 735 ILCS 5/2-701, finding that (i) they must not be directly or indirectly involved in in deciding issues relating to the number of Tier I charters AHAI should issue or which clubs should be awarded those charters; and (ii) any actions taken by the Tier I Committee and/or AHAI involving issues relating to the number of Tier I charters AHAI should issue and which clubs should be awarded those charters, with input from the Club Defendants are void; and

D.    Reasonable attorneys' fees and costs incurred in having to prosecute this matter, pursuant to 815 ILCS 505/10a;

**E.**     Punitive damages in an amount to be determined at trial; and

**F.**     Any other relief to which the Reapers are entitled.

## COUNT IV
### (Request for Declaratory Relief)
### (Against All Defendants)

143.     The Reapers incorporate the previous allegations set forth in paragraphs 1 to 120.

144.     AHAI's conduct, in collusion with the Club Defendants, entitles the Reapers to relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq*.

145.     There is a substantial controversy between the Reapers and Defendants as to whether AHAI can impose anti-competitive restraints on the market for amateur hockey in Illinois through the Four Club Restraint and whether the Club Defendants can (i) cause AHAI to apply USAH's mission, bylaws and rules in an arbitrary and capricious manner; (ii) cause AHAI to apply its mission, bylaws, and rules, in an arbitrary and capricious manner; and (iii) allow themselves to be involved in deciding issues relating to the number of Tier I charters AHAI should issue and which clubs should be awarded those charters, despite their disqualifying conflicts.

146.     The Reapers contend that AHAI's adoption and enforcement of the Four Club Restraint, and AHAI's refusal to consider the merits of the Reapers' application for a Tier I charter, violates Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, violates the Illinois Consumer Fraud Act and Uniform Deceptive Trade Practices Act, 815 ILCS §§ 505/1, et seq., violates USAH's mission, bylaws and rules, and violates AHAI's mission, bylaws, and rules.  The Reapers contend that AHAI and the Club Defendants cause AHAI to apply USAH's mission, bylaws and rules, as well as AHAI's mission, bylaws, and rules, in an arbitrary and capricious manner. Defendants' conduct in this regard constitutes a separate and independent ground for declaratory relief.

147.     Defendants deny the Reapers' contentions, and instead contend that the Four Club

Restraint does not violate the Sherman Act or the Illinois Consumer Fraud and Uniform Deceptive Trade Practices Act. Defendants further contend that their conduct does not amount to arbitrary and capricious conduct.

148.    As a result of the wrongful and self-serving actions by AHAI and the Club Defendants, the Reapers have suffered irreparable injuries including, but not limited to, significant delays, missed recruiting, hiring, training, leasing, and other opportunities, and ultimately being barred from forming a Tier I club altogether. Without this Court's intervention, the Reapers will soon suffer further, irreparable injuries by being forced to miss the 2019-20 amateur hockey season, and all of the recruiting, training and development opportunities associated with operating during the 2019-20 season.

149.    This substantial controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

**WHEREFORE, the Reapers respectfully request:**

A.    An Order in favor of the Reapers and against AHAI for declaratory relief finding that the Four Club Restraint violates Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, violates the Illinois Consumer Fraud Act and Uniform Deceptive Trade Practices Act, 815 ILCS §§ 505/1, et seq., and is otherwise unenforceable;

B.    An Order in favor of the Reapers and against AHAI for declaratory relief finding that the Four Club Restraint is contrary to USAH's mission, bylaws and rules, violates AHAI's mission, bylaws, and rules, constitutes arbitrary and capricious conduct and an abuse of discretion, and is otherwise unenforceable;

C.    An Order in favor of the Reapers and against AHAI for declaratory relief finding that under proper application of USAH and AHAI rules, the Reapers are rightfully entitled to a

charter to sponsor a Tier I club;

      **D.**    An Order in favor of the Reapers and against the Club Defendants for declaratory relief finding that (i) they must not be directly or indirectly involved in in deciding issues relating to the number of Tier I charters AHAI should issue or which clubs should be awarded those charters; and (ii) any actions taken by the Tier I Committee and/or AHAI involving issues relating to the number of Tier I charters AHAI should issue and which clubs should be awarded those charters, with input from the Club Defendants are void; and

      **D.**    Any other relief to which the Reapers are entitled.

## JURY DEMAND

    150.    The Reapers demand trial by jury in this action.

DATED:  February 21, 2019          Respectfully submitted,

                                **ULMER & BERNE LLP**

                                By:    */s/ Shawn J. Gebhardt*
                                          Ronald S. Betman
                                          Shawn J. Gebhardt
                                            Ulmer & Berne LLP
                                            500 W. Madison, Suite 3600
                                            Chicago, IL 60661
                                            312-658-6500 (phone)
                                            312-658-6501 (fax)
                                            rbetman@ulmer.com
                                            sgebhardt@ulmer.com

                                            ***Attorneys for Reapers Hockey Association***