UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

REAPERS HOCKEY ASSOCIATION, INC.,

        Plaintiff,

    v.

AMATEUR HOCKEY ASSOCIATION
ILLINOIS, INC., et al.,

        Defendants.

No. 19 CV 1302

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Some of the better amateur hockey players in Illinois compete in a league run by the Amateur Hockey Association Illinois ("AHAI"). Only four clubs are allowed to field teams in that league. The plaintiff, Reapers Hockey Association, Inc., wants to be the fifth, and its complaint alleges that the league rule that stands in its way violates the Sherman Act. But a market that "consists of competitive amateur youth hockey at the Tier I level" does not implicate the Sherman Act and, even if it did, the alleged rule that restricted the number of clubs in that market would be reasonable. All claims are dismissed, and Reapers Inc.'s request for a preliminary injunction compelling defendant AHAI to rescind the four-club rule and let the Reapers play is denied.

## I.    Legal Standards

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) is a challenge to subject matter jurisdiction, and a court may look beyond the complaint

and "view whatever evidence has been submitted … to determine whether in fact subject matter jurisdiction exists." *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009); *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). At least until the court is satisfied that it has the power to hear the case, "no presumptive truthfulness attaches to plaintiff's allegations." *Apex Digital, Inc.*, 572 F.3d at 444 (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). Federal law governs that inquiry. *Rawoof v. Texor Petroleum Co.,* 521 F.3d 750, 756 (7th Cir. 2008).

Motions to compel arbitration are decided under a standard similar to that articulated in Federal Rule of Civil Procedure 56(e): "the opposing party must demonstrate that a genuine issue of material fact warranting a trial exists." *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002). The party opposing the motion cannot generally deny facts that allegedly demonstrate arbitrability, and must identify specific evidence in the record to support its argument. *Id.*

In order to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain a short and plain statement that plausibly suggests a right to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009); Fed. R. Civ. P. 8(a)(2). In ruling on a motion to dismiss, although a court must accept all factual allegations as true and draw all reasonable inferences in the plaintiff's favor, the court need not do the same for legal conclusions or "threadbare recitals" supported by only "conclusory statements." *Ashcroft*, 556 U.S. at 678, 80–82. The plaintiff must provide "more than labels" or "a formulaic recitation of a cause of action's elements,"

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and the complaint must "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Id.* at 562.

## II.    Facts

AHAI is USA Hockey, Inc.'s regional affiliate for the State of Illinois, [6] ¶ 25; [35-1] ¶¶ 4, 5, and USA Hockey is the United States Olympic Committee's national governing body for amateur hockey in the United States. [6] ¶¶ 17, 23; [35-1] ¶ 3.[1] AHAI and USA Hockey divide the teams that play in their leagues by skill level, and USA Hockey mandates that no more than 15% of the players in a given state should play in the highest-skill tier, called Tier I. [6] ¶ 28; [35-1] ¶ 8. AHAI has a rule that there shall be "not more than four (4) Tier I [clubs] fielding not more than eight (8) Tier I youth teams at any age level." [6] ¶ 53; [35-1] ¶ 8. Those four clubs (all defendants) are the Chicago Mission AAA Hockey Club, Inc., the Chicago Fury, Inc., Team Illinois Hockey Club, Inc., and the Chicago Young Americans, Inc. [6] ¶ 44.

Representatives from these four clubs (and AHAI board members that are not affiliated with those four clubs) serve on AHAI's Tier I Committee, which can—subject to the approval of the AHAI Board—grant or terminate the authority to operate teams at the Tier I level. [6] ¶¶ 59, 60, 85. The committee can also recommend that the AHAI board modify the four-club rule. *Id.* ¶ 60. Every president of a Tier I club has a vote on the Tier I committee. *Id.* ¶ 61. The complaint alleges that this

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings.

structure gives the club defendants the power to defeat any potential application by voting against it (or lobbying other members to do the same), and that conflicts of interest arise during these votes when club defendant representatives are asked to vote against their own financial interests. *Id.* ¶ 62.

These club defendants "control the actions of AHAI either directly (through representatives who are voting members of AHAI's 'Tier I Committee' and/or its Board of Directors) or indirectly (by using misrepresentation, misinformation, or other inappropriate influence over how AHAI Board members vote)." [6] ¶ 3. The complaint alleges that at some point after AHAI granted the fourth charter, former AHAI president John Dunne and other board members (including but not limited to Mike Mullally, Michael Barrett, and Gino Cavallini) made an agreement to restrict competition and, in furtherance of that agreement, caused AHAI to adopt the four-club rule. [6] ¶¶ 51–53; [7-2] ¶ 3.

In 2015, Steven Dry (president of a Tier II club) started pushing AHAI's leadership to grant a charter for a fifth team. [6] ¶¶ 69–71. He made little headway until June of 2018, when Dunne retired, Barrett took over in his stead, and Mullally told Dry that the AHAI board was "ready to consider allowing a new Tier I club" and that Dry should "go ahead and fill out an application." [6] ¶¶ 74, 75. Dry and others then formed an unincorporated association—the Reapers Tier I Hockey Association— in order to seek a charter from AHAI to sponsor a fifth team. [58-1] ¶ 2. In July of 2018, Dry signed an application to form a Tier I club, [35-1] at 7, and his signature appears below a line that reads, "[a]s President of the The Reapers Tier 1 Hockey

4

Association, I acknowledge that I have read, understand and agree to abide by all of the AHAI By-Laws and Rules & Regulations." *Id.*

Dry says that when he emailed Mullally to say that the Association was planning to submit its application, Mullally replied—copying Barrett, Dunne, and board member Ken Michel—and confirmed that the information Dry planned to submit "should be sufficient for consideration" by the Tier I committee and the board. [6] ¶ 78. According to Dry, no one "indicated that there were any further barriers to the Board's consideration of the merits of the Reapers' application." *Id.* Mullally says that, at some point, he told Dry that, "in order for his application to be considered, the AHAI Board would be required to revise [the four-club rule] to allow for an additional Tier I club." [35-1] ¶ 10.

Dry gave presentations to the board, its Tier I Committee, and the Tier II Presidents' Committee concerning the Association's upcoming application. [6] ¶¶ 81–96; [35-1] ¶ 10. On January 7, 2019, the board voted to not rescind the four-club rule, [6] ¶ 99; [35-1] ¶¶ 11, 12, and so did not consider the merits of the Association's application. [6] ¶ 147; [35-1] ¶ 13. According to Mullally, no board member affiliated with a Tier I club participated in that vote. [35-1] ¶ 11.

Dry and the Association understood that, in order to hold a charter, the Association would need to incorporate as a non-profit entity. [58-1] ¶ 4. On January 9, 2019, the Association retained counsel in order to help with incorporation. *Id.* ¶ 8. On January 10, Dry and the Association found out that the AHAI board had voted to not rescind the four-club rule, and that the Association would not be granted a

charter. *Id.* ¶ 9; [35-1] ¶ 13. On January 11, the Association convened a properly noticed meeting of its board of directors. [58-1] ¶ 11. The board agreed that the Association "should be incorporated and that all rights, privileges, property and legal claims of [the Association] should be transferred to Reapers Inc [sic], including Reapers Association's right to sue in this litigation." *Id.* The board then voted unanimously to that effect, and did so "in accordance with [the Association's] bylaws." *Id.*[2] The Illinois Secretary of State filed the articles of incorporation for the non-profit entity the "Reapers Hockey Association" on January 14. [35-1] at 9.

The complaint describes the relevant market as "competitive amateur youth hockey at the Tier I level." [6] ¶ 31. The relevant geographic market "consists of the State of Illinois," *id.* ¶ 32, and the complaint alleges that, in that market, "Tier I competition provides players with important hockey development and recruiting opportunities that are unique to Tier I and cannot be realized elsewhere." [6] ¶¶ 31–33. The four-club rule allegedly harms competition in this market by cutting off a large geographic area of Illinois from access to Tier I clubs and by artificially inflating the prices for "Tier I youth hockey programming." [6] ¶ 120. The complaint requests an injunction prohibiting AHAI from enforcing its rule and directing AHAI to grant Reapers, Inc., a charter, [6] ¶¶ 10, 126(A)–(B), 132(A)–(B), or, in the alternative, requests an order requiring AHAI to adopt and implement an "objectively fair,

---

[2] The Association's bylaws state that the bylaws "may be amended by the Board of Directors, at any regular or special meeting called for that purpose, by a two-thirds vote of all members of the Board present at such meeting, provided that notice of such proposed …" [58-1] at 10. The version of the bylaws in the record cuts off mid-sentence. *See id.*

unbiased, and transparent process for annually weighing the relative merits of each club's application and determining the four clubs that will receive a charter each year." *Id.* ¶¶ 11, 126(C), 132(C).

## III.    Analysis

The complaint alleges that all of the defendants (AHAI and the four clubs that benefit from the rule) violated § 1 of the Sherman Act, and that AHAI violated § 2. *See* 15 U.S.C. §§ 1, 2. It also alleges that all of the defendants violated Illinois's Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. §§ 505/1– 505/12, 510/1–510/7, and seeks declaratory relief under the Declaratory Judgment Act. 28 U.S.C. § 2201. There are a few motions pending: Reapers, Inc.'s motions for a preliminary injunction, [7] and [68], AHAI's motion to stay and compel arbitration, [33], and AHAI's ([38]) and the team defendants' ([51]) motions to dismiss.

### A.    Standing and Real-Party-in-Interest

Article III's case-or-controversy requirement is fundamental, and questions about it must be answered first. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998); *Rawoof v. Texor Petroleum Co.*, 521 F.3d 750, 756 (7th Cir. 2008); *Raytheon Co. v. Ashborn Agencies, Ltd.*, 372 F.3d 451, 453 (D.C. Cir. 2004) (Article III standing must be addressed before issues of arbitrability). Such fundamental, jurisdictional questions ask whether there has been an injury in fact, whether the defendant's conduct caused that injury, and whether the injury can be redressed. *See Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560–61 (1992); *Rawoof*, 521 F.3d at 756.

The question raised by AHAI here is slightly different: whether Reapers, Inc., can recover for a harm that was suffered by its predecessor, the Reapers Association. *See Rawoof*, 521 F.3d at 756. That question implicates prudential limitations on this court's power to hear cases, *id.*, specifically that which prohibits hearing a case when the plaintiff is asserting someone else's legal rights. *Gorski v. Troy*, 929 F.2d 1183, 1186 (7th Cir. 1991) (a plaintiff must "assert his own legal interests, rather than those of third parties"); *Warth v. Seldin*, 422 U.S. 490, 500 (1975); *Rawoof,* 521 F.3d at 757. Reapers, Inc., can get around this limitation if it can show that it is the valid assignee of the Association's legal rights. *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 290 (2008) (even though the plaintiffs were suing "based on injuries originally suffered by third parties," those third parties had assigned to the plaintiffs all "'rights, title and interest' in claims based on those injuries," and as a result, the third parties' legal rights had become the plaintiffs' legal rights for purposes of prudential standing analysis).

According to Dry[3], that is exactly what the Association did. Its board convened a meeting, agreed to transfer the right to bring this lawsuit (and all of the Association's other legal rights) to Reapers, Inc., [58-1] ¶ 11, and then voted

---

[3] One of Dry's declarations does not include an averment that it was made under penalty of perjury or that the facts it recites are true and correct. *See* [58-1] at 4. But 28 U.S.C. § 1746 says only that, when some other law (or rule or regulation or order) requires that a matter be proved or supported (or evidenced or established) by sworn declaration (or oath, affidavit, verification, etc.), the matter *may* be supported (evidenced, established, etc.) by unsworn statements that meet the requirements in 28 U.S.C. § 1746(1) and (2). AHAI has cited no rule that requires that I consider only sworn declarations, oaths, affidavits or the like. *See* [65] at 8 n.1. I consider Dry's declaration on the question of the Association's assignment or transfer of rights to Reapers, Inc.

unanimously to that effect. *Id.* It even retained counsel ahead of the incorporation to ensure that it all went off without a hitch. [58-1] ¶ 8.

There is no categorical reason that assignment failed. Choses-in-action (i.e., "a legal claim," or "something on which an 'action' (a lawsuit) might be founded, such as a right to recover a debt," *GP Credit Co., LLC v. Orlando Residence, Ltd.*, 349 F.3d 976, 980 (7th Cir. 2003)) are generally assignable under Illinois law[4], *Liu v. T & H Mach., Inc.*, 191 F.3d 790, 797 (7th Cir. 1999), and choses-in-action for antitrust damages are no exception. *Fed. Ins. Co. v. Parello*, 767 F.Supp. 157, 163 (N.D. Ill. 1991) (citing *In re Fine Paper Litigation*, 632 F.2d 1081 (3rd Cir.1980); *D'Ippolito v. Cities Serv. Co.*, 374 F.2d 643, 647 (2nd Cir. 1967)). No particular form or document is required to effectuate an assignment, *Klehm v. Grecian Chalet, Ltd.*, 164 Ill.App.3d 610, 616 (1st Dist. 1987), and oral assignments are valid so long as the parties' intentions are clear from the circumstances. *Hollywood Blvd. Cinema, LLC v. FPC Funding II, LLC*, 2014 IL App (2d) 131165, ¶ 33 ("an assignment can be oral or written"); *Cmty. Bank of Greater Peoria v. Carter*, 283 Ill.App.3d 505, 508 (1st Dist. 1996). A legal right can be assigned by a vote of a corporation's shareholders. *See*

---

[4] Even if federal common law controls this question, *see Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 438 (3d Cir. 1993); *Wallach v. Eaton Corp.*, 837 F.3d 356, 369 (3d Cir. 2016); *Knott v. McDonald's Corp.*, 147 F.3d 1065, 1068 n.4 (9th Cir. 1998); *In re Steel Antitrust Litig.*, No. 08 C 5214, 2015 WL 5304629, at *4 (N.D. Ill. Sept. 9, 2015); *In re Opana ER Antritrust Litig.*, No. 14 C 10150, 2016 WL 738596, at *5 (N.D. Ill. Feb. 25, 2016), neither side points to any federal common law that would compel a different result, and general contract principles dictate that the outcome should be no different than it would be under Illinois law. *See* Restatement (Second) of Contracts § 324 (1981) (it is essential that the "obligee manifest an intention to transfer the right to another person without further action or manifestation of intention by the oblige," and "except as provided by statute or by contract," an assignment "may be made either orally or by a writing").

*Falcone v. Hinsdale Gynecology & Obstetrics, Ltd.*, 148 Ill.App.3d 439, 445 (2nd Dist. 1986). *See also* 6A Fed. Prac. & Proc. Civ. § 1545 (3d ed.) ("[t]here is no general requirement as to when an assignment must be made and it has been held that even when the claim is not assigned until after the action has been instituted, the assignee is the real party in interest and can maintain the action").

Dry's declaration identifies the entity that assigned the rights, the entity it assigned the rights to, the specific rights that were assigned, the entities against which some of those rights could be asserted, the date the assignment was made, and the acts that effectuated the assignment. [58-1] ¶ 11. Acceptance can be inferred by conduct, *see Bloch v. J. Stern & Sons*, 152 Ill.App.434, 436 (1st Dist. 1910), and Reapers, Inc.'s conduct is enough to support a finding that it accepted—and is now bound by—the assignment. *See, e.g.*, [58] at 14–15.

Federal Rule of Civil Procedure 17 is satisfied, too. Rule 17 essentially codifies these prudential limitations on standing, and embodies the general principle that one cannot sue to enforce the rights of a third party. *See Rawoof*, 521 F.3d at 757. A federal court can preside over a claim being asserted by the valid assignee of a legal right, and that same assignee becomes the real party in interest under Rule 17(a). 6A Fed. Prac. & Proc. Civ. § 1545 (3d ed.) (citing *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.,* 554 U.S. 269, 290 (2008)). And since the "modern function" of Rule 17 is "simply to protect the defendant against a subsequent action by the party actually entitled to recover," Fed. R. Civ. P. 17, Advisory Committee Notes (1966), my finding that the assignment was effective—which also means that the Association can no

longer sue to assert that right, *see Sprint Commc'ns Co.,* 554 U.S. at 285 (the "party with legal title alone" may bring suit); 6A Fed. Prac. & Proc. Civ. § 1545 (3d ed.) ("[w]hen all the rights to a claim have been assigned, courts generally have held that the assignor no longer may sue")—ensures that AHAI will not be sued twice for violating one legal right.

The Association's rights also transferred automatically via statute. *See* 805 ILCS 105/102.35. Under Illinois law, when an unincorporated association (1) incorporates by the same procedure and vote as would be required to amend its fundamental agreement, and then (2) files articles of incorporation "under Section 102.10 setting forth those facts and that the required vote has been obtained," the members of the association become members of the corporation. 805 Ill. Comp. Stat. 105/102.35(a). Section 102.10 requires that the articles of incorporation set forth (among other things) the corporation's name, the purpose for which the corporation is organized, and the corporation's address, and directs that when those provisions have been complied with, the Secretary of State must file the articles. 805 ILCS 105/102.10(a), (e). Upon incorporation pursuant to 105/102.35(a), all "rights … and property of the unincorporated association," as well as its obligations, "pass to and vest" in the new corporation. 805 ILCS 105/102.35(b).

The Association met the first requirement when it voted unanimously to incorporate at a properly noticed meeting. [58-1] ¶ 11; § 105/102.35(a). Dry says the meeting was properly noticed, and no one else has pointed to evidence suggesting it

was not. The board's unanimous vote satisfied their bylaw's requirements for amending the fundamental agreement, so it satisfied 105/102.35(a), too.

The Secretary of State eventually filed Reapers, Inc.'s articles of incorporation. [35-1] at 9. Those articles now serve as conclusive evidence that "all conditions precedent required to be performed by the incorporators have been complied with." 805 ILCS 105/102.15. The Secretary of State's decision to file the articles, [35-1] at 9, taken in combination with the presumption in § 105/102.15, satisfies Reapers, Inc.'s burden to come forward with competent evidence establishing that the rights it seeks to assert were transferred to it via statute. *See Apex Digital, Inc.*, 572 F.3d at 444; 805 ILCS 105/102.35.

The Reapers Association's rights, authority, property, and obligations all passed to and vested in Reapers, Inc. 805 ILCS 105/102.35(b). Reapers, Inc., is the real party in interest and the only party entitled to enforce the rights at issue in this lawsuit. Fed. R. Civ. P. 17(a). It is asserting its own legal rights, and no prudential limitation prohibits reaching the federal claims it presents. And there was an injury (the inability to join the league) allegedly caused by defendants' insistence on keeping the existing league structure. A decision in plaintiff's favor would redress that injury, so there is a case or controversy here.

### B.     Motion to Compel Arbitration

"An agreement to arbitrate is treated like any other contract." *Gibson v. Neighborhood Health Clinics, Inc.*, 121 F.3d 1126, 1130 (7th Cir. 1997). In order to form a binding contract, Illinois law requires "an offer, an acceptance and

consideration." *Melena v. Anheuser-Busch, Inc.*, 219 Ill.2d 135, 151 (2006). When AHAI provided Dry with a blank application form, it was making an invitation for an offer, and Dry's signed copy of the application constituted an offer to apply. *Steinberg v. Chicago Med. Sch.*, 69 Ill.2d 320, 330 (1977); *Johnson v. Lincoln Christian Coll.*, 150 Ill.App.3d 733, 739 (4th Dist. 1986). Had Mullally simply taken the application, that would have constituted an acceptance of the offer. *Steinberg*, 69 Ill.2d at 330 ("[a]cceptance of the application and fee constituted acceptance of an offer to apply under the criteria defendant had established"). But that's not what happened: Mullally says that he told Dry that, "in order for his application to be considered, the AHAI Board would be required to revise Rule 16.3.3 to allow for an additional Tier I club." [35-1] ¶ 10.

In other words, Mullally imposed a condition precedent to the formation of an agreement. *Lyntel Prod., Inc. v. Alcan Aluminum Corp.*, 107 Ill.App.3d 176, 180–81 (1st Dist. 1981) ("[a] condition precedent is to be performed before the agreement becomes effective and binding on the parties and calls for the happening of some event or the performance of some act after the terms of the contract have been agreed on"). The review and assessment of the application (which would be consideration that supported the making of an agreement) was only to be provided if the board revoked the rule. The four-club rule was not revoked, [35-1] ¶¶ 11, 12, the condition precedent failed, AHAI did not take the application under advisement, and there was no agreement.

Although decisions about "*when* the contractual duty to arbitrate arises" are generally arbitrable, decisions about "*whether* there is a contractual duty to arbitrate at all" are to be decided by the court. *BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 35 (2014); *see also Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010) (where the dispute at issue concerns contract formation, the dispute is generally for courts to decide). Conditions precedent can relate either to an event that must occur before a specific contractual duty arises, or to the formation or existence of a contract itself. 13 Williston on Contracts § 38:7 (4th ed.). This condition precedent was of the latter kind; a contract—which included an obligation to comply with AHAI's by-laws—did not come into existence until certain events occurred. *See id.*; [35-1] ¶ 10.

I need not reach the issue of whether the arbitration clause (i.e., the agreement to be abide by AHAI by-laws and rules and regulations, which in turn, contains an arbitration provision) encompassed this dispute because I find that the contract never came into existence. AHAI's motion to compel arbitration, [33], is denied.

C.     **The Sherman Act**

Section 1 of the Sherman Act declares illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. There are three elements to a claim under § 1: "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in the relevant market; and (3) an accompanying injury." *Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1220 (7th Cir. 1993). Section 2 of the Sherman Act

prohibits monopolization. 15 U.S.C. § 2. There are two elements to a claim under § 2: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966).

The failure to allege the existence of a relevant commercial market is fatal to both types of claims, regardless of whether per se, quick-look, or rule-of-reason analysis is applied. *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 337 (7th Cir. 2012) ("[i]t is the existence of a commercial market that implicates the Sherman Act in the first instance"); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 455 (1993); *Fishman v. Estate of Wirtz*, 807 F.2d 520, 531 (7th Cir. 1986) ("[c]laims of monopolization under section 2 of the Sherman Act, as well as section 1 claims analyzed under the Rule of Reason, require the trier of fact to delineate the 'relevant market'"). Reapers, Inc., bears the "burden of describing a cognizable market under the Sherman Act." *Agnew*, 683 F.3d at 346 (7th Cir. 2012).

The complaint fails as a matter of law because it defines the relevant market in terms of a label that two entities have elected to attach to a particular type of athletic contest—this is too narrow. The complaint says that the market at issue "consists of competitive amateur youth hockey at the Tier I level [in Illinois]." [6] ¶ 31. But "Tier I" is a name that USA Hockey and AHAI use to refer to the league in which their "highest skill level players" compete. [6] ¶¶ 26–28. This is akin to a trademark or brand that cannot define a market for antitrust scrutiny. *See Generac Corp. v.*

15

*Caterpillar Inc.*, 172 F.3d 971, 977 (7th Cir. 1999); *Digital Equip. Corp. v. Uniq Digital Techs., Inc.*, 73 F.3d 756, 762–63 (7th Cir. 1996); *Sheridan v. Marathon Petroleum Co. LLC*, 530 F.3d 590, 595 (7th Cir. 2008).

The complaint says that "Tier I" is unique and affords opportunities for players unavailable anywhere else in Illinois. Even accepting this as a true factual allegation, it does not suggest a plausible economic market. It offers no reason to believe that an amateur hockey player living in the North Shore suburban region of Chicago (the apparently harmed consumer according to the complaint) has no options among economic substitutes—other sports, other states, other ways to play hockey that are challenging and satisfying. *See Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001) (courts dismiss antitrust claims involving "either (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way"). The complaint does not plausibly suggest that USA Hockey's label of Tier I or the choice to channel a particular method of reaching our Olympic hockey team from Illinois can withstand a relevant-market analysis. Without a cognizable market, neither the reasonableness of the restraint nor the defendants' market power can be assessed. *Agnew*, 683 F.3d at 337.

Even if Reapers, Inc., had sufficiently alleged a product market—including a sufficiently commercial[5] one to warrant application of the Sherman Act, *see Agnew*, 683 F.3d at 340—its complaint would still fail to allege an unreasonable restraint on trade. *See Denny's Marina, Inc.*, 8 F.3d at 1220. There are three categories of analysis for deciding whether an action has an anticompetitive effect: per se, quick-look, and Rule of Reason. *Agnew*, 683 F.3d at 335. *See also California Dental Ass'n v. F.T.C.*, 526 U.S. 756, 779 (1999) ("[t]he truth is that our categories of analysis of anticompetitive effect are less fixed than terms like 'per se,' 'quick look,' and 'rule of reason' tend to make them appear").

Reapers, Inc., says it alleges a per se anticompetitive horizontal restraint. The per se approach is used when the practice at issue is one that "would always or almost always tend to restrict competition and decrease output," such as horizontal price fixing and output limitation. *Agnew*, 683 F.3d. at 336 (citing *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 100 (1984)). A rule limiting the number of teams does not decrease output in the sense the antitrust laws care about for per se treatment. It limits the number of slots available for those who wish to play highly skilled hockey at the Tier I level, but the economic impact of this narrowed path to play a particular game is not immediately obvious. A four-club league may be a unique economic commodity with features and benefits that would not otherwise exist if it were a five-club league, and eliminating its chosen structure

---

[5] The complaint alleges that one of the club defendant's coaches was paid more than $100,000 in 2016, [6] ¶ 111, and that coach's team had more than $3 million in revenue during the year that preceded July 1, 2013. *Id.* ¶ 109.

is not obviously proconsumer—it may just create a different product entirely. *See State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997) ("we have expressed reluctance to adopt per se rules with regard to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious") (cleaned up).

The "quick-look" approach is used when "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets, but there are nonetheless reasons to examine potential procompetitive justifications." *Agnew*, 683 F.3d at 336 (cleaned up). Such reasons exist here: a rule that limits the number of teams in a league could help ensure that the teams are more evenly matched, which could help keep scores close (and protect participants not skilled enough to play against larger or stronger competitors), which could in turn help ensure that the games are exciting. That could justify higher ticket prices and might also allow the players in the league to better hone their skills. There are reasons to examine the procompetitive justifications for the restraint, and a full Rule of Reason analysis is in order. *Agnew*, 683 F.3d at 336. During that analysis, courts must conduct an "inquiry into market power and market structure designed to assess the … actual effect" of the contract, combination, or conspiracy. *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984).

The four-club rule survives that Rule of Reason analysis under the facts alleged in the complaint. Much like the NCAA's rules, which "enhance public interest in

intercollegiate athletics,"[6] AHAI's rules seek to foster a particular type of competition that is in the public's interest: that which trains amateur hockey players to compete in the Olympics and other international competitions. [6] ¶¶ 23–24. Such rules can be upheld at the "twinkling of an eye" so long as they "fit into the same mold as … rules defining the conditions of the contest, the eligibility of participants, or the manner in which members of a joint enterprise shall share the responsibilities and the benefits of the total venture." *Bd. of Regents*, 468 U.S. at 117; *Agnew*, 683 F.3d at 341–42. Restrictions that maintain a competitive balance among teams fit within that mold. *Bd. of Regents*, 468 U.S. at 101 ("[a] myriad of rules affecting such matters as the size of the field, the number of players on a team, and the extent to which physical violence is to be encouraged or proscribed, all must be agreed upon, and all restrain the manner in which institutions compete"); *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 203–04 (2010).[7] *See also Tanaka v. Univ. of S. Cal.,* 252 F.3d 1059, 1063–64 (9th Cir. 2001) ("the very existence of any given intercollegiate athletic program is predicated upon the existence of a field of competition composed of other, similar programs" that "compete in the recruiting of student-athletes and, hence, are interchangeable with each other for antitrust purposes"); *Deutscher Tennis Bund v.*

---

[6] *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 117 (1984).

[7] In *Am. Needle, Inc. v. Nat'l Football League,* the Supreme Court reviewed a district court's decision to grant summary judgment. 560 U.S. 183, 188 (2010). Although this is a motion to dismiss, and although I must not "import the summary-judgment standard into the motion-to-dismiss stage," *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F.Supp.3d 931, 953 (N.D. Ill. 2018), a proposition of law—such as that articulated in *Am. Needle* and many of the summary judgment cases cited in defendants' motions to dismiss—is just as applicable under Federal Rule of Civil Procedure 12(b) as it is under Federal Rule of Civil Procedure Rule 56.

*ATP Tour, Inc.*, 610 F.3d 820, 831 (3d Cir. 2010) (in "sports leagues, horizontal restraints on competition are essential if the product is to be available at all"). And although many of the cases considering NCAA rules have not been applied outside of the NCAA context, *see* [58] at 23, some have, *see Marucci Sports, L.L.C. v. NCAA*, 751 F.3d 368, 376 (5th Cir. 2014) (applying *Bd. of Regents,* 468 U.S. at 117, to a rule propagated by a high school athletic association), and in any event, they warrant extension here given the similarities between the leagues.

The four-club rule fits the mold. One of the conditions of any contest is the skill level of the opponent, and the four-club rule is a choice about how many players are skilled enough to play AHAI's preferred Tier I brand of hockey. In that way, it also defines the eligibility of the participants and the scope of competition against which Olympic hopefuls can hone their skills. Even assuming that the four-club rule is a restraint,[8] it is a reasonable one. *Bd. of Regents*, 468 U.S. 85, 101 (1984) (league sports are the "leading example" of an "activit[y] [that] can only be carried out jointly," since what the league "market[s] … is competition itself—contests between competing institutions"). That defect, too, applies equally to all of Reapers, Inc.'s § 1 and § 2

---

[8] As noted above, the complaint alleges that Tier I hockey is a unique and the rule restricts opportunities for players from the North Shore. But the four-club rule does not appear to restrain Reapers, Inc. from offering "competitive amateur youth hockey," and does not apparently restrain a rising star player from getting the attention of scouts through means other than the four AHAI Tier I clubs.

claims. *See Digital Equip. Corp. v. Uniq Digital Techs., Inc.,* 73 F.3d 756, 761 (7th Cir. 1996).

Reapers, Inc.'s § 1 claim against the club defendants fails for an additional reason; the allegations describe a pattern of conduct that is just as consistent with non-conspiratorial conduct. "[L]awful parallel conduct" that could "just as well be independent action" does not "bespeak unlawful agreement." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007) (dismissing the complaint in part because it rested on "descriptions of parallel conduct and not on any independent allegation of actual agreement"). Absent "smoking gun" direct evidence of a conspiracy (not alleged to exist here), circumstantial evidence can support an inference of an agreement if it sufficiently alleges "a mixture of parallel behaviors, details of industry structure, and industry practices, that facilitate collusion." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 627 (7th Cir. 2010). *See also Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*, 971 F.2d 37, 51 (7th Cir. 1992) ("[m]otivation to enter a conspiracy is never enough to establish a traditional conspiracy") (quoting 6 Phillip E. Areeda, Antitrust Law ¶ 1411 (1986)).

But the allegations here do not measure up. There is no allegation that the club defendants communicated in any way about the vote (or had the opportunity to do so), nor sufficient factual context to support the conclusory allegation that the team defendants "control[ed] the actions of AHAI either directly … or indirectly." [6] ¶ 3. Instead, the complaint relies upon the type of inference that is prohibited by *Twombly*; parallel conduct that could just as easily be independent action does not

suggest a conspiracy to restrain trade. 550 U.S. at 556–57. And even though the complaint alleges that the team defendants had the power to vote on the "Tier I Committee," ¶ 61, it does not allege that the Tier I Committee had the ultimate power to rescind the four-club rule (that power belonged to the board, *see* [6] ¶ 62), and further fails to allege that the team defendants actually voted to keep the rule; all it alleges is that they had the power to recommend that the board do the same, and made a written recommendation conveying their views (whatever those views were). *See* [6] ¶ 86. It doesn't say that they recommended keeping the rule. *See* [53] at 5. Even if those views were that the four-club rule should not be struck down, that type of internal jockeying is not enough to state a claim under § 1 or § 2 of the Sherman Act. *Fishman v. Estate of Wirtz*, 807 F.2d 520, 544 (7th Cir. 1986) (finding that the act of lobbying a governing board was itself competitive behavior that undermined the plaintiff's allegation that the Sherman Act had been violated).

Reapers, Inc.'s § 2 claims also fail because AHAI was under no duty to deal with them. The Sherman Act generally does not prohibit freely exercising one's "independent discretion as to parties with whom [one] will deal." *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919). To the degree *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601 (1985), suggests otherwise, it represents "the outer boundary of § 2 liability" (or near to it) and is not applicable when (as here) there was no previous course of conduct suggesting that the refusal-to-deal was anticompetitive or irrational. *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408–09 (2004). AHAI's (and the club defendants') decision

to not deal with the Reapers was not "irrational but for its anticompetitive effect." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1075 (10th Cir. 2013). Limiting the number of teams has procompetitive justifications and is therefore not a cognizable act of monopolization under *Aspen Skiing*.

Finally, the injuries Reapers, Inc., complains of might not be "of the type the antitrust laws were intended to prevent." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *Tri-Gen Inc. v. Int'l Union of Operating Engineers, Local 150, AFL-CIO*, 433 F.3d 1024, 1031 (7th Cir. 2006). Normally, "a plaintiff must demonstrate consumer injury" to be able to assert antitrust violations. *Tri-Gen Inc.*, 433 F.3d at 1031. Reapers, Inc. does not allege that it consumes the products the defendants allegedly provide (i.e., "competitive amateur youth hockey at the Tier I level," [6] ¶ 31). It is not a hockey player seeking to participate in the Tier I league, nor is it a coach seeking to lead a team in that league, nor is it a parent that is being forced to pay an inflated price or travel great distances so that their child can play in that league. *See* [6] ¶ 116. Reapers, Inc., alleges that a fifth team would provide "multiple benefits" to many different "individuals who are currently playing Tier I or II youth hockey," but none of those individuals are listed as plaintiffs. *See* [6] ¶ 68. The one plaintiff in this case—Reapers Hockey Association, Inc.—applied for a charter to "offer hockey programs for Tier 1 youth hockey players." [6] ¶ 16. In other words, it applied to sell the product that is being consumed in this market—not to buy it. And lost cartel profits are insufficient because "a producer's loss is no concern of the antitrust laws, which protect consumers from suppliers rather than suppliers

from each other." *Stamatakis Indus., Inc. v. King*, 965 F.2d 469, 471 (7th Cir. 1992); *see also Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr. of Durango*, 582 F.3d 1216, 1225–26 (10th Cir. 2009) (plaintiff's desire to join an alleged cartel or monopoly does not state an antitrust injury).

But that is only one possible interpretation of the complaint: another interpretation is that Reapers, Inc., wants to compete by underselling the other teams, "thus weakening or breaking the cartel," and that Reapers was ejected from the league "in order to prevent it from, or punish it for, doing this." *Hammes v. AAMCO Transmissions, Inc.*, 33 F.3d 774, 783 (7th Cir. 1994). That type of loss is of the type the antitrust laws were intended to prevent, *see id.*, and because the complaint says that Reapers, Inc., will be able to charge those lower prices whether there are five teams or four, *see* [6] ¶ 116, that finding does not depend on Reapers, Inc.'s request to revoke the four-club team rule: even if it remains and they are granted a fourth charter, their complaint says they would still be able to charge lower prices, and I must take that assertion as true. *See* [6] ¶ 116.[9]

In sum, the complaint does not state a claim of anticompetitive conduct under the Sherman Act, but the plaintiff has adequately alleged that it is an appropriate party to bring the lawsuit. Because the foregoing is sufficient to resolve all of the parties' disputes under the Sherman Act, I do not decide whether the complaint

---

[9] The court in *Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr. of Durango*, 582 F.3d 1216, 1226 (10th Cir. 2009), found no antitrust injury in part because it saw no guarantee that consumers would benefit from the plaintiff's requested relief. The facts alleged here are different; there is an allegation that Reapers will charge less and increase convenience for the "underserved" North Shore region.

sufficiently alleges that AHAI had enough market power to warrant § 2 liability. I also do not decide whether AHAI's actions were immune under the Amateur Sports Act—an affirmative defense that ordinarily is not resolved on a motion to dismiss. Counts I and II of the complaint are dismissed.

### D.    The Remaining Claims

The Declaratory Judgment Act does not itself confer jurisdiction. *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950); *Manley v. Law*, 889 F.3d 885, 893 (7th Cir. 2018), *reh'g denied* (June 8, 2018); 28 U.S.C. § 2201. With no remaining federal causes of action to decide between these non-diverse parties, *see* [6] ¶¶ 16–22, and with no jurisdictional basis other than 28 U.S.C. § 1331 and 15 U.S.C. § 26 alleged in the complaint ([6] ¶¶ 13, 14) or argued in the briefing, I do not have (and in any event, decline) jurisdiction to decide the parties' remaining disputes. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 136 (2007) (the Declaratory Judgment Act says that a federal court "*may* declare the rights and other legal relations of any interested party, not that it *must* do so"). For the same reason, Reapers, Inc.'s state-law claims are dismissed without prejudice. *See Domanus v. Locke Lord LLP*, 847 F.3d 469, 483 (7th Cir. 2017) ("[t]ypically, when a case is dismissed under Rule 12(b)(6), the district court will relinquish jurisdiction over [state law] claims and allow the state courts … to take over if that is proper under their rules"); 28 U.S.C. § 1367(c)(3).

The complaint does not state a federal claim, and therefore, I find that Reapers, Inc., is not likely to succeed on the merits. Its request for a preliminary injunction is

denied. *See Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.,* 549 F.3d 1079, 1086 (7th Cir. 2008) (a party seeking a preliminary injunction must show that its claim has some likelihood of succeeding on the merits). *See also Gillespie v. City of Indianapolis,* 13 F.Supp.2d 811, 828 (S.D. Ind. 1998), *aff'd,* 185 F.3d 693 (7th Cir. 1999) (denying as moot plaintiff's motion for preliminary injunction after granting motions to dismiss that disposed of all of the plaintiff's claims); *Go-Tane Serv. Stations, Inc. v. Dep't of Energy,* No. 81 C 945, 1981 WL 1272, at *1 (N.D. Ill. Apr. 10, 1981).

## IV. Conclusion

Plaintiff's motions for preliminary injunction, [7] and [68], are denied. AHAI's motion to stay and compel arbitration, [33], is denied. Defendants' motions to dismiss, [38] and [51], are granted. All dismissals are without prejudice. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana,* 786 F.3d 510, 519 (7th Cir. 2015). Plaintiff has leave to file an amended complaint if it believes it can cure the deficiencies identified in this opinion. If no amended complaint is filed by October 25, 2019, the dismissal of the federal claims will convert to a dismissal with prejudice and final judgment will be entered terminating the case. A status hearing is set for October 23, 2019, at 9:30 a.m.

ENTER:

Manish S. Shah
United States District Judge

Date: September 26, 2019

26