**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| REAPERS HOCKEY ASSOCIATION, INC. | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-01302 |
| | ) | |
| v. | ) | Judge Manish S. Shah |
| | ) | |
| AMATEUR HOCKEY ASSOCIATION ILLINOIS, INC., TEAM ILLINOIS HOCKEY CLUB, INC., CHICAGO MISSION AAA HOCKEY CLUB, INC., CHICAGO FURY, INC., and CHICAGO YOUNG AMERICANS, INC., | ) | Magistrate Judge Jeffrey Cummings |
| | ) | **Jury Trial Demanded** |
| | ) | |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT

Plaintiff Reapers Hockey Association, Inc. ("the Reapers"), by and through its attorneys, Ulmer & Berne LLP, alleges as follows:

### INTRODUCTION

1.     The Reapers, by and through its attorneys, Ulmer & Berne LLP, alleges the following based to the Reapers' own acts and personal knowledge, and on information and belief based on the investigation conducted by and through counsel. This investigation included, among other things, review and analysis of AHAI Board of Directors Meeting Minutes from 2001 through early 2019, produced by Court Order in this litigation, and various forms of publicly available information on the Defendants.

2.     This action concerns, among other things, (1) an illegal restraint of trade, in the form of a market allocation agreement, between and among horizontal competitors and facilitated by the Amateur Hockey Association Illinois, Inc. ("AHAI"), in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, (2) an illegal restraint of trade, in the form of a group boycott, between

and among horizontal competitors and facilitated by AHAI, in violation of Section 1 of the Sherman Act; (3) illegal monopolization of hockey at the Tier 1 level in the State of Illinois in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and (4) an illegal conspiracy to monopolize hockey at the Tier 1 level in the State of Illinois in violation of Section 2 of the Sherman Act.

3.      Reapers seeks injunctive relief against AHAI and the four independent economic actors engaged in the business of providing club hockey at the Tier I level in the State of Illinois, each of whom is a member of AHAI:  Team Illinois Hockey Club, Inc. ("Team Illinois"); Chicago Mission AAA Hockey Club, Inc. ("Chicago Mission); Chicago Fury, Inc. ("Chicago Fury"); and Chicago Young Americans, Inc. ("CYA") (collectively the "Club Defendants").

## NATURE OF THE ACTION AND THE PARTIES

4.      AHAI governs all organized amateur youth hockey—at all levels—in the State of Illinois. AHAI has the complete power to determine who gets to engage in the commercial activity of operating hockey clubs in Illinois, including hockey clubs operating at the Tier 1 level.  Each hockey club operating under the auspices of AHAI is an independent economic actor engaged in a commercial activity and interstate commerce.  Amateur youth hockey in the State of Illinois is big business.

5.      In 2001, AHAI arbitrarily imposed a rule limiting the number of hockey clubs that could operate at the Tier 1 level to four.  As a result of this "Four Club Restraint," which is a naked restraint of trade, the only four hockey clubs in the entire State of Illinois that are permitted to operate at the Tier 1 level are the Club Defendants.  Since 2001—and for each of the past 18 years—these same four hockey clubs (and the families that own and operate them) are the only economic actors that have been allowed to operate at the Tier 1 level.  They are thus direct

beneficiaries of the Four Club Restraint.

6. These four beneficiaries of the Four Club Restraint are the same clubs that existed when the Four Club Restraint was imposed in 2001. And they continue to be the only four clubs operating hockey clubs at the Tier 1 level in the State of Illinois. There have been no changes over the past 18 years: No new entrants and no departures from the industry. This did not just happen. It is no historical accident, nor is it the result of superior skill or business acumen demonstrated by the Club Defendants—far from it. It is the result of a conspiratorial agreement between and among these four horizontal competitors to allocate among themselves the operation of hockey at the Tier 1 level, to boycott other would-be competitors like the Reapers, and to perpetuate the monopoly position of AHAI and the joint monopoly position the Club Defendants share with AHAI regarding the operation of hockey at the Tier 1 level in the State of Illinois.

7. Hockey in the State of Illinois has exploded in popularity, with a 59% increase in the number of hockey players in Illinois since 2001. Because the demand for hockey has increased so dramatically over the past two decades in the State of Illinois, basic economic theory (including price theory at the most rudimentary level) predicts that in a competitive market, supply would increase at all hockey levels, including the Tier 1 level. The Four Club Restraint has, however, prohibited and continues to prohibit any such expansion. In addition to blocking any new entry, like that sought by Reapers, the Four Club Restraint operates to perpetuate the market allocation agreement of the incumbent Tier 1 hockey clubs (the Club Defendants), and the Rule further entrenches their monopoly power over hockey at the Tier 1 level.

8. The conspirators—AHAI and the Club Defendants—are individually and collectively obligated by their commitment to USA Hockey, Inc. ("USAH") to promote the growth and accessibility of the sport of hockey for the benefit of all young players at every skill level.

Contrary to their commitment, the conspirators have worked together—and continue to work together—to stifle competition at the Tier I level. The anticompetitive effects of their concerted and monopolistic conduct has resulted in, among other things, (1) the elimination of new entrants like the Reapers, and hence the removal of competition from the market; (2) the payment of higher, artificially inflated prices by players and their families; (3) the denial of opportunities for players, including collegiate scholarship opportunities available for Tier 1 level players; and (4) cutting off a large geographic area, the North Shore area of suburban Chicago, from having ready access to any Tier I clubs.

## JURISDICTION AND VENUE

9.       This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1337 because Counts I-IV arise under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Section 16 of the Clayton Act, 15 U.S.C. § 26. This Court has also jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 because the action arises under federal law. This Court has supplemental jurisdiction over the claims arising under the laws of the State of Illinois pursuant to 28 U.S.C. § 1367(a).

10.       This Court has personal jurisdiction over AHAI and the Club Defendants because they may be found in this District and the conduct complained of has occurred in this District.

11.       Venue is proper in this District because AHAI and the Club Defendants may be found in this District. 28 U.S.C. §§ 1391(b)(1), (c)(2). Venue is also proper in this district under 28 U.S.C. § 1391(b)(2) and 15 U.S.C. § 22 because a substantial part of the transactions, occurrences, and events giving rise to Plaintiff's claims occurred, and Defendants transact business, in this district.

## PARTIES AND CO-CONSPIRATORS

12.    The Reapers Tier I Hockey Association ("Reapers Association") was an unincorporated association formed in or around July 2018 by Steven Dry and others. Reapers Association filed a proper application with AHAI for a charter to offer hockey programs for Tier I youth hockey players, from "Squirt Major" through "U18" age groups. On January 11, 2019, in a properly noticed and convened meeting, Reapers Association and its Board of Directors agreed to incorporate, and that all rights, privileges, property, and legal claims of Reapers Association would succeed to the newly-incorporated entity. The Board voted unanimously to that effect, in accordance with Reapers Association's bylaws. Counsel for Reapers Association subsequently incorporated the organization.

13.    Plaintiff Reapers Hockey Association, Inc. ("the Reapers") is a not-for-profit corporation incorporated through counsel under the laws of the State of Illinois on January 14, 2019 (File No. 72163052). Reapers Hockey Association, Inc. accepted the assignment of all rights, privileges, property, and legal claims of Reapers Association. Reapers Hockey Association, Inc. was intended to be, and is, the successor-in-interest to Reapers Association by virtue of this assignment. Reapers Association's rights also transferred automatically under 805 ILCS 105/102.35 by operation of law. At the time of its incorporation and acceptance of the assignment, Reapers Hockey Association, Inc.'s Board members were identical to Reapers Association's. Throughout this Complaint, Reapers Association and Reapers Hockey Association Inc. will be referred to collectively as simply "the Reapers."

14.    Defendant AHAI is an Illinois not-for-profit corporation and a tax-exempt entity under Section 501(c)(3) of the United States Internal Revenue Code. AHAI "was founded as the governing body of Illinois amateur hockey in 1975." (https://www.linkedin.com/company/

5

amateur-hockey-association-illinois-ahai/about/) (last visited Oct. 4, 2019). AHAI is a sanctioned affiliate of USAH, which was appointed by Congress pursuant to the Ted Stevens Olympic and Amateur Sports Act, 36 U.S.C. § 220501, et seq., as the National Governing Body ("NGB") for the sport of amateur hockey. AHAI's principal place of business is located at the Edge Ice Arena at 735 E. Jefferson St., Bensenville, IL 60106. Despite its not-for-profit status, AHAI is nevertheless engaged in interstate commerce by virtue of the revenues it and its members generate, its travel outside the State (including holding annual board retreats outside the State), and purchasing of items that are manufactured or transported in interstate commerce, which collectively amount to more than a *de minimis* impact on the flow of interstate commerce.

15.     Defendant Team Illinois Hockey Club, Inc. ("Team Illinois") is a not-for-profit corporation and a tax-exempt entity under Section 501(c)(3) of the United States Internal Revenue Code. Team Illinois is incorporated under the laws of the State of Illinois and is based in Woodridge, Illinois.  Despite its not-for-profit status, Team Illinois is nevertheless engaged in interstate commerce by virtue of the revenue it generates, its travel outside the State and purchasing of items that are manufactured or transported in interstate commerce, which collectively amount to more than a *de minimis* impact on the flow of interstate commerce. Team Illinois generated $1.74 million in total revenue in its 2016-17 fiscal year, and almost $1.9 million in total revenue in its 2017-18 fiscal year. Team Illinois is one of only four Tier I amateur youth hockey clubs currently chartered by AHAI.  By and through the alleged conspiracy, Team Illinois has been allocated 25% of the Relevant Market.  Team Illinois is an independent economic actor separate and distinct from the other Club Defendants, and is an entity that is separate and distinct from AHAI.

16.     Defendant Chicago Mission AAA Hockey Club, Inc. ("the Mission") is a not-for-

profit corporation and a tax-exempt entity under Section 501(c)(3) of the United States Internal Revenue Code. The Mission is incorporated under the laws of the State of Illinois and is based in Chicago's Near West Side and in Bensenville, Illinois. Despite its not-for-profit status, the Mission is nevertheless engaged in interstate commerce by virtue of the revenue it generates, its travel outside the State and purchasing of items that are manufactured or transported in interstate commerce, which collectively amount to more than a *de minimis* impact on the flow of interstate commerce. The Mission generated nearly $4.4 million in total revenue in its 2016-17 fiscal year, and almost $3 million in total revenue in its 2017-18 fiscal year. The Mission is one of only four Tier I amateur youth hockey clubs currently chartered by AHAI. By and through the alleged conspiracy, The Mission has been allocated 25% of the Relevant Market. The Mission is an independent economic actor separate and distinct from the other Club Defendants, and is an entity that is separate and distinct from AHAI.

17. Defendant Chicago Fury, Inc. ("the Fury") is a not-for-profit corporation and a tax-exempt entity under Section 501(c)(3) of the United States Internal Revenue Code. The Fury is incorporated under the laws of the State of Illinois and is based in Orland Park, Illinois. Despite its not-for-profit status, the Fury is nevertheless engaged in interstate commerce by virtue of the revenue it generates, its travel outside the State and purchasing of items that are manufactured or transported in interstate commerce, which collectively amount to more than a *de minimis* impact on the flow of interstate commerce. The Fury generated nearly $1.8 million in total revenue in its 2016-17 fiscal year, and over $1.7 million in total revenue in its 2017-18 fiscal year. The Fury is one of only four Tier I amateur youth hockey clubs currently chartered by AHAI. By and through the alleged conspiracy, The Fury has been allocated 25% of the Relevant Market. The Fury is an independent economic actor separate and distinct from the other Club Defendants, and is an entity

7

that is separate and distinct from AHAI.

18.     Defendant Chicago Young Americans Amateur Hockey Association, Inc. ("CYA") is a not-for-profit corporation and a tax-exempt entity under Section 501(c)(3) of the United States Internal Revenue Code. CYA is incorporated under the laws of the State of Illinois and is based in Palatine, Illinois. Despite its not-for-profit status, CYA is nevertheless engaged in interstate commerce by virtue of the revenue it generates, its travel outside the State and purchasing of items outside the State that are transported in interstate commerce, which collectively amount to more than a *de minimis* impact on the flow of interstate commerce. CYA generated nearly $2.3 million in total revenue in its 2016-17 fiscal year, and over $2 million in total revenue in its 2017-18 fiscal year. CYA is one of only four Tier I amateur youth hockey clubs currently chartered by AHAI. By and through the alleged conspiracy, CYA has been allocated 25% of the Relevant Market. CYA is an independent economic actor separate and distinct from the other Club Defendants, and is an entity that is separate and distinct from AHAI.

19.     Various other persons and entities, not named as defendants in this Complaint, have participated as co-conspirators with Defendants in the offenses complained of herein, and have performed acts and made statements in furtherance of Defendants' conspiracy. Each person or entity is a separate economic actor from AHAI. These presently unnamed co-conspirators may be named as defendants in the future, as discovery warrants.

## **FACTUAL ALLEGATIONS**

**I.      The Mission of USA Hockey and AHAI Is To Grow The Sport of Amateur Hockey in the State of Illinois**

20.     Defendant AHAI governs all organized amateur hockey in Illinois. Its stated mission is to provide for "the growth and development of USA Hockey and its members," and "designing programs aimed at encouraging increased participation [and] improved skills." *See*

https://ahaienews.com/about/ (last visited Oct. 22, 2019). But AHAI has abandoned that mission, having been effectively hijacked into serving the business interests and profit motives of the existing four hockey clubs that possess a charter from AHAI to compete at the Tier I level. As this Second Amended Complaint and subsequent discovery will demonstrate, rather than appropriately providing for the growth and development of youth players in Illinois, AHAI and its leaders instead insulate and protect existing Tier I clubs from competition and arbitrarily and capriciously enforce the Rules on Tier I eligibility, as well as other Rules regarding member club governance, and ensure that no new Tier I club can enter the market. Indeed, contrary to its own rules, AHAI, together with the conspiring existing four Tier I clubs that are defendants in this action, imposed a naked restraint that guarantees in perpetuity a market allocation agreement and a permanent protected status for each of these four defendant clubs. This Four Club Restraint is patently anticompetitive. Only judicial intervention can put organized amateur youth hockey in Illinois back on track.

21. AHAI possesses monopoly power over amateur hockey in Illinois. AHAI has exercised this power so as to allow only four Illinois hockey clubs, the Club Defendants, to engage in the commercial activity of providing hockey at the Tier I level. The Club Defendants control the actions of AHAI directly through representatives who are voting members of AHAI's "Tier I Committee" or its Board of Directors. The Club Defendants also control the actions of AHAI indirectly, by using misrepresentation, misinformation, or other inappropriate influence over how AHAI Board members vote. The Club Defendants also abuse their not-for-profit 501(c)(3) status and operate largely for the pecuniary benefit of themselves and a small number of individuals affiliated with those clubs. AHAI turns a blind eye to these activities.

22. Among other things, AHAI and the Club Defendants have conspired (a) to maintain

and abuse AHAI's monopoly power over amateur youth hockey in Illinois; and (b) to restrain competition and trade in amateur youth hockey at the Tier I level in Illinois through an unlawful restraint. The effect of this restraint and abuse of monopoly power is, among other things, to eliminate new entrants like the Reapers, and hence to remove competition from the market, and to artificially inflate the price of participation at the Tier I level in Illinois for their own financial benefit and to the detriment of other market entrants, player participants, and player families, in perpetuity. The conspiratorial scheme is carried out, in part, by covering up unlawful and anti-competitive behavior by those affiliated with AHAI and/or the Club Defendants; delivering personal pecuniary benefits to a small group of individuals affiliated with AHAI and/or the Club Defendants; and bullying and intimidating anyone who challenges them in these efforts. In the end, this conspiracy results in pecuniary benefit to a small group of independent commercial entities, *i.e.*, the four hockey clubs who have agreed among themselves to allocate 25% of the Relevant Market. AHAI has facilitated this market allocation agreement.

23. Based on this illegal conduct, AHAI individually, and in collusion with the Club Defendants, has injured competition in the Relevant Market and in doing so, has caused injury to the business and property of the Reapers and to competition as a whole. That injury is of the type that the antitrust laws is intended to prevent. This includes, among other things, (i) precluding the Reapers from entry in the Tier I amateur hockey market in Illinois; (ii) preventing the Reapers from having its Tier I teams participate in the 2019-2020 season; and (iii) precluding Illinois youth hockey players at the Tier I level from receiving a better product at a competitive (rather than a supra-competitive) price. The Reapers also suffered injury by AHAI systematically failing to govern the Club Defendants in accord with USAH's rules and its own rules, and/or applying its mission, bylaws and rules in an arbitrary and capricious manner.

24.     In this Second Amended Complaint, the Reapers allege Defendants' conduct constitutes a horizontal market allocation agreement, which is a type of naked restraint that is a per se violation under Section 1 of the Sherman Act, 15 U.S.C. § 1 and, in the alternative, violates Section 1 under the Rule of Reason.

25.     In this Second Amended Complaint, the Reapers allege Defendants' conduct constitutes a group boycott conspiracy, a per se violation under Section 1 of the Sherman Act, 15 U.S.C. § 1 and, in the alternative, violates Section 1 under the Rule of Reason.

26.     In this Second Amended Complaint, the Reapers allege Defendant AHAI's conduct constitutes illegal monopolization, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

27.     In this Second Amended Complaint, the Reapers allege Defendants' conduct constitutes a conspiracy to monopolize, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

28.     The Reapers also allege Defendants' conduct offends the public policy of the State of Illinois, is otherwise immoral, unethical, oppressive and unscrupulous, and caused substantial injury to consumers, in violation of The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS §§ 505/1, et seq.

29.     The Reapers also allege that the Four Club Restraint is contrary to USAH's mission, bylaws and rules, violates AHAI's mission, bylaws, and rules, constitutes arbitrary and capricious conduct and an abuse of discretion, and is otherwise unenforceable.

30.     The Reapers seek preliminary and permanent injunctive relief (i) directing AHAI that it shall not enforce its rule barring any more than four Tier I charters to be issued, (ii) directing AHAI to rescind that rule, (iii) directing AHAI and the Club Defendants to refrain from any further efforts to restrain trade by means of a market allocation agreement or from entering into or carrying

out any agreement, understanding, or plan, the effect of which would be to cause players and player families to pay supra-competitive prices or prevent new, legitimate, and qualified clubs from entering Tier I level amateur youth hockey in the State of Illinois; and (iv) directing AHAI to grant the Reapers a charter to sponsor a Tier I club. The Reapers seek also permanent injunctive relief (i) barring the Club Defendants from serving on AHAI's Tier I Committee, and (ii) barring the Club Defendants from otherwise being involved in deciding issues relating to the number of Tier I charters AHAI should issue and which clubs should be awarded those charters.

31. Tier I clubs announce tryouts for the spring component of the 2020-2021 season on February 15, 2020 pursuant to recently enacted AHAI Rule 16.7.1.2. For the Reapers to be able to participate in the spring component, which is an essential part of the 2020-2021 season, the Reapers must be granted a charter no later than *February 15, 2020*.

32. In the event the Court declines to order AHAI to rescind the Four Club Restraint, the Reapers ask the Court, in the alternative, to (i) order AHAI to adopt and implement an objectively fair, unbiased, and transparent process for evaluating the merits of the Reapers' application and such applications as may be submitted by other new Tier I level clubs; (ii) order AHAI to submit a detailed, written report to the Court specifying any facts and analysis supporting that evaluation and decision whether to grant or deny a charter; and (iii) retain jurisdiction to ensure AHAI's compliance and good faith in carrying out these orders.

33. As declaratory relief, the Reapers also seek an Order declaring that Defendants' conduct in preventing new, legitimate, and qualified clubs from receiving a charter, in facilitating their market allocation and group boycott schemes, and in participating in a conspiracy to monopolize the Relevant Market., (1) violates Sections 1 and 2 of the Sherman Act; (2) violates the Illinois Consumer Fraud and Uniform Deceptive Trade Practices Act; (3) is contrary to the

mission and bylaws of USAH and AHAI, constitutes arbitrary and capricious conduct and an abuse of discretion, and is otherwise unenforceable. The Reapers also seek an Order declaring that under proper application of USAH and AHAI rules, the Reapers are rightfully entitled to a charter to sponsor a Tier I level club. The Reapers also seek an Order declaring that (i) the Club Defendants must not be directly or indirectly involved in in deciding issues relating to the number of Tier I charters AHAI should issue or which clubs should be awarded those charters; and (ii) any actions taken by the Tier I Committee and/or AHAI involving issues relating to the number of Tier I charters AHAI should issue and which clubs should be awarded those charters, with input from the Club Defendants are void.

## II.     The Structure and Purpose of USAH/AHAI Is Significantly Different than Other Sports-Related Organizations

### A.     The Structure of USAH/AHAI

34.     USAH is the National Governing Body for the sport of amateur ice hockey in the United States. Its mission is "to promote a safe and fun learning experience supporting the growth of the sport and all its participants and enthusiasts by encouraging, educating, developing, and administering all aspects of the sport." USA Hockey 2019-20 Annual Guide, at 5 (available at https://www.usahockey.com/annualguide). Accordingly, the organization's "primary emphasis is on the support and development of grassroots hockey programs." (https://www.usahockey.com/about) (last visited Oct. 4, 2019). USAH's charitable arm, the USA Hockey Foundation, notes that "Growing the game is paramount, and increasing diverse participation is key for that growth." (https://www.usahockeyfoundation.com/page/show/781463-about-the-foundation) (last visited Oct. 4, 2019). USAH is also the official representative to the United States Olympic Committee and the International Ice Hockey Federation, and in that capacity, is responsible for organizing and training men's and women's teams for international

tournaments at the world's highest level of competition. Accordingly, for up-and-coming amateur hockey athletes in the United States, USAH acts as the gatekeeper for the most valuable sporting opportunities in the world.

35.     USAH has delegated some of its responsibility over United States amateur hockey to regional affiliate organizations. These organizations include twelve districts (organized geographically) which have been given responsibility for club registration, training of officials, and risk management. The State of Illinois is in USAH's Central District.

36.     Each district, in turn, has affiliates that act as the local governing body for clubs and players within an assigned geography. AHAI is the governing body for the State of Illinois.

37.     USAH and its affiliates (such as AHAI, in the State of Illinois) regulate both club amateur hockey, in which participants pay fees to a private association, and high school hockey, at both private and public high schools.

38.     With respect to skill level, youth players and the clubs in which they participate are categorized as Tier I, Tier II, or Tier III.  Assigning players to a skill level or "Tier" is common to all or almost all amateur youth hockey and is not unique to AHAI. "Tier I" hockey is therefore a widely-understood level of hockey player ability, not a brand of hockey.  USAH, AHAI, and other USAH affiliates refer to Tier I as a "category" of hockey.

39.     Tier I clubs are intended for the highest skill level players ages 9 to 18. These clubs typically travel across the United States and to Canada to play against other clubs having elite players.  Under USAH guidelines, Tier I clubs may account for a maximum of 15% of the amateur hockey athletes in a given State, at a given age level (as measured by USAH statistics).  There are approximately 125 Tier 1 clubs in the USA.

40.     Tier II clubs are intended for individuals ages 5 to 18 and provide an opportunity

to play competitive clubs in their local area as well as provide opportunities, from time to time, to play other clubs located outside their local area, such as in national tournaments.

41.     Tier III clubs are for beginning players and are intended to provide opportunities for beginner or recreational play with limited or no travel. Tier III players will typically play all games and conduct all practices at their local rink.

### B.     Significant Differences From Other Sports Organizations

42.     There are highly significant structural and functional differences between USAH/AHAI (National and Local Governing Bodies for amateur hockey) and other, better-known sports-related organizations such as the National Collegiate Athletic Association ("NCAA") or the National Football League ("NFL").

43.     The NCAA, comprised of approximately 850 voting members, plays an important role in the regulation of amateur collegiate sports.  The NCAA is an association of schools which compete against each other to attract revenue, fans, and athletes.  The NCAA's actions come within the scope of the federal antitrust laws.  The institutions that are members of NCAA primarily exist for academic rather than athletic purposes.  The NCAA generates approximately one billion dollars in revenues each year, most of which are derived from multi-year media contracts worth several billions of dollars.  *See In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1062-63 (N.D. Cal. 2019).  Each year, the NCAA distributes about half of its revenues to its conferences, which in turn distribute most of their revenues to member schools.  *Id.* at 1063.

44.     The NFL is a professional football league comprised of 32 teams, equally divided between the National Football Conference and the American Football Conference.  The business of football comes within the scope of the federal antitrust laws.  Courts have characterized the NFL as having a "unique structure" that has been compared to a "joint venture" due to the exceptional

15

degree of cooperation among league members. *See, e.g.*, *Los Angeles Memorial Coliseum Com'n v. National Football League*, 726 F.2d 1381, 1392 (9th Cir. 1984); *North American Soccer League v. National Football League*, 670 F.2d 1249, 1251 (2d Cir. 1982) ("The NFL is an unincorporated joint venture"). The NFL is a not-for-profit organization comprised of 32 "League franchises," all but one of which (the publicly-owned Green Bay Packers) are for-profit entities. NFL Constitution and Bylaws, Article 1.1. The purpose of the NFL is to "promote and foster the primary business of League members." *Id.*, Article 2.1(A). Therefore, "[n]o corporation, association, partnership, or other entity not operated for profit nor any charitable organization or entity not presently a member of the League shall be eligible for membership." *Id.*, Article 3.2(A). NFL teams share revenues in return for surrendering extremely lucrative broadcast and licensing rights to the League. *Id.*, Article 4.4(G). In the 2018-19 season, the NFL shared $8.78 billion in national revenue with its 32 franchisees, to the tune of $274.3 million per team. Darren Rovell, *NFL Teams Share $8.78 Billion in Revenue*, The Action Network, July 13. 2019 (available at https://www.actionnetwork.com/nfl/nfl-2018-19-revenue). Moreover, players and owners have a league-wide collective bargaining agreement, ensuring that franchise owners are aligned with respect to player employment and compensation matters.

45. The USAH/AHAI governance organizations are materially different than that of the NCAA, the NFL, or similar sports organizations. AHAI is not a "league," a joint venture, or an association of teams; it is a local governing body. AHAI's chartered clubs are intended to operate independently, not as joint venturers, and are intended to promote participation in the sport of hockey in Illinois, not to dominate other states or to maximize profits. Indeed, in sharp contrast to the NCAA and NFL, AHAI and the Club Defendants do not even sell tickets to games, with the exception of the finals of the State tournament. There is no revenue sharing between AHAI and

the Club Defendants or among the Club Defendants. Unlike the member schools in the NCAA, most of whom predated and all of whom would exist separate and apart from their athletic programs, AHAI's chartered clubs exist wholly to field athletic teams.

**III. The Relevant Market for Purposes of the Sherman Act**

46. In the antitrust context, market definition focuses on "demand substitution factors, *i.e.*, on customers' ability and willingness to substitute away from one product to another in response to a price increase or a corresponding non-price change such as a reduction in product quality or service.

47. The relevant product market is amateur youth hockey at the Tier 1 level, which is a differentiated product within the larger product market consisting of amateur youth hockey.

48. The relevant geographic market consists of the State of Illinois.

49. Hereinafter, and based in part on the allegations in Paragraphs 50-55, *infra*, the "Relevant Market" is defined as, and consists of, amateur youth hockey at the Tier I level in the State of Illinois.

50. In the Relevant Market, differentiated Tier I competition provides players with the highest level of hockey development and recruiting and scholarship opportunities that are unique to Tier I level hockey and cannot be realized elsewhere. There is no functional substitutability for players at this elite level. Accordingly, the Club Defendants face an inelastic demand curve for Tier I level hockey at competitive prices. Because there is inelastic demand, basic economic theory predicts that it is profitable for the Club Defendants to raise prices by reducing output, thereby profit-maximizing at supra-competitive levels. This is because demand substitutes are not sufficient to prevent the exercise of market power since consumers (*i.e.*, players) will not substitute away from Tier I level hockey—a differentiated product—in the event of a price increase.

51. Demand substitutes for Tier 1 level hockey are thus insufficient to prevent the

exercise of market power.  Nor are demand substitutes sufficient to curtail classic cartel behavior between and among the four horizontal actors operating Tier 1 level clubs in the State of Illinois—the Club Defendants.  Here, youth hockey players (and their families) with Tier 1 level skills and ambitions will *not* substitute away from Tier 1 level hockey in the event of price increases.  As a result, the four incumbent Club Defendants—acting like cartel members—are able to extract supra-competitive prices.  This cartel has operated for each of the past 18 years.

52.     Amateur youth hockey at the Tier I level is highly differentiated from other types of competitive hockey because it represents "the top competition level available to youth hockey players in the United States" and is comprised of "the very best players."  Team Illinois, "What Is AAA Hockey?" (available at http://www.tihockey.com/?page_id=4649) (last visited Oct. 10, 2019).  It "typically draws very dedicated and committed players and families," because it requires "being on the ice 5-7 days per week," "extensive travel," and "a monetary commitment far above the recreation level." *Id.*

53.     Amateur youth hockey at the Tier I level is highly differentiated from professional hockey, in which players are paid, adult veterans of the sport. Players excluded from Tier I level hockey will likely not be able to play professional hockey as a substitute.  *See id.* ("almost all" professional hockey players participated in Tier I hockey in their youth).  Amateur hockey at the Tier I level is also highly differentiated from college hockey.  College-age players, with minor exceptions, cannot participate in Tier I hockey, and pre-college students, with minor exceptions, cannot participate in college hockey.

54.     Amateur youth hockey at the Tier I level is also highly differentiated from Tier II hockey.  The Club Defendants and AHAI acknowledge that Tier I is distinct from other types of competitive hockey because Tier I alone "provides the best coaching, best competition, and overall

best development model for high level youth players." Team Illinois, "What Is AAA Hockey?" (available at http://www.tihockey.com/?page_id=4649) (last visited Oct. 10, 2019); AHAI Rule 16.2 ("Tier I Hockey in Illinois is limited to those youth players who have the desire and ability to play at a higher level and wish to continue to develop as players by playing Tier I Hockey."). Because market participants do not consider Tier II a substitute for Tier I, more remote types of hockey such as Tier III and high school are also non-substitutes.

55. The structure of the USAH/AHAI system makes it impractical or impossible to form a rival system or otherwise offer "competitive amateur youth hockey" outside the USAH/AHAI system. AHAI and USAH bar their clubs, teams, and officials from taking part in competitions or events with non-affiliated clubs or teams, and they try to enlist every participant's help in policing these bans. *See, e.g.*, AHAI Rule 2.2 ("No AHAI registered team shall … play any Illinois team that is not a member of AHAI and USA Hockey … [or] participate in any event that is not sanctioned by either AHAI or USA Hockey."); AHAI Rule 3.3 ("all Leagues in Illinois must register with AHAI and be approved by the AHAI Registrar"); AHAI, Unregistered Teams (available at https://www.ahai.org/page/show/223721-unregistered-teams) (last visited Oct. 10, 2019) ("Playing a non-registered team voids your USA Hockey membership for that game and jeopardizes your team's status with AHAI/USA Hockey. We ask you help in encouraging teams to register with USA Hockey by refusing to play any non-registered team."); *id.* ("Please help us in our endeavor to encourage unregistered teams, leagues, and tournaments to become registered with USA Hockey by not officiating non-sanctioned games."). The relevant geographic market is no broader than the State of Illinois because the existence of Tier I level clubs in other states is not sufficient to prevent a monopolist of Tier I level hockey in Illinois from exercising market power (*i.e.*, from setting price above the competitive level) due to the high or insurmountable barriers to

players moving out of state simply to play their chosen sport. The existence of Tier I clubs outside of Illinois is also not a sufficient deterrence on cartel members (*i.e.*, the four Club Defendants). For one thing, states limit the number of out-of-state players that are allowed to participate in Tier I play. *See, e.g.*, USAH Rule III(C)(1) (Tier I teams must have a majority of resident players); AHAI Rule 5.16 (barring non-resident players from participating in the AHAI state tournament because "[i]t is the intent of [AHAI] to focus on the development of the players and participants who are residents."); Michigan Amateur Hockey Association Rule VI.M.1(d)(3) (limiting non-Michigan players at several age levels).For another, sending a child to another state to play Tier I hockey would likely require a family to move or send the child to live with someone else in a distant city. The obvious logistical challenges of such an approach make it not practical or desirable for most families. Simply put, Illinois residents cannot practically or functionally turn to Tier I clubs outside of Illinois as reasonable substitutes.

56.     On information and belief, evidence further supporting this definition of the Relevant Market (in the form of year-over-year prices charged by the clubs, etc.) is in the exclusive possession, custody, and control of the Club Defendants, AHAI, and/or USAH.

## IV.     AHAI's Monopoly Control Over Amateur Youth Hockey in the Relevant Market

57.     AHAI was founded in 1975 as a sanctioned affiliate of USAH. As such, it is the sole governing body for all USAH registered players, clubs, coaches and officials in the State of Illinois. AHAI is one of the largest amateur ice hockey governing bodies in the United States, consisting of clubs fielding nearly 2,500 member teams.

58.     AHAI is authorized by USAH to act in the best interests of AHAI's members to promote the sport of ice hockey, but only "within the bylaws and rules and regulations as promulgated by USAH."

20

59.     AHAI's stated mission is to "[p]rovide an improved grassroots foundation for the growth and development of USA Hockey and its members, designing programs aimed at encouraging increased participation, improved skills and a responsible environment for the conduct of youth hockey."

60.     Pursuant to the authority delegated to it by USAH, AHAI establishes rules and standards that govern the conduct of amateur hockey in the State of Illinois, determines what clubs and which players may participate in amateur hockey in Illinois, sponsors tournaments at which sanctioned clubs may compete, and provides clinics in which sanctioned players and coaches may enhance their skills.

61.     In the State of Illinois, except in the context of very young players eight years and younger, virtually every organized amateur hockey club, including Tier I, Tier II, and Tier III clubs, and virtually every high school hockey club, is a member of AHAI.  For players eight years of age and older, there is no alternate amateur hockey association in Illinois.

62.     AHAI sponsors or controls all amateur hockey events in Illinois.  AHAI controls all amateur hockey games, clinics, tournaments, and other events in the State.

63.     By virtue of its monopoly, AHAI has the power to issue binding requirements for all of amateur hockey in Illinois.  For example, under its Bylaw 4.9, AHAI declares that it has "complete jurisdiction over all amateur hockey in the State of Illinois," and as such sanctions "all league and tournament play in the State."  *See also* AHAI Rule 16.1 ("The Tier I Committee shall have responsibility for all matters pertaining to Tier I Member Associations, Tier I Organizations, Tier I Teams and Tier I Hockey, subject to the AHAI Board of Directors review, direction, change and approval."); AHAI Rule 16.6.1 ("No new or existing Tier I Organization shall have the authority to operate or otherwise participate in Tier I Hockey in any capacity unless it has received

its authorization in writing.").  Under its Bylaw 5.1, AHAI declares that its Board of Directors "shall determine what is in the best interest of amateur hockey and shall have the authority to develop, implement and enforce rules, policies, procedures, incentives and penalties that advance those interests."  AHAI also touts that it has "established various policies and guidelines for all of its members" which "should be adhered to by everyone involved in the sport of ice hockey." (AHAI Policies/Guidelines, available at https://www.ahai.org/page/show/223726-policies.) Everyone involved in the sport of amateur ice hockey in the State of Illinois is therefore subject to AHAI's control.

64.     Moreover, USAH sanctions tournaments throughout the United States, but only allows teams from Illinois to compete in those tournaments if they are chartered by AHAI.  While a non-chartered club could theoretically be formed, such a club and its players would effectively be barred by AHAI from competing in any USAH sanctioned Tier I play.  AHAI's action of withholding a Tier I charter therefore deprives players that have the ability to play Tier I level hockey from opportunities to compete, to develop, and to be scouted by junior and college talent scouts, who, as confirmed by various industry sources, typically only attend Tier I level events.

65.     AHAI possesses monopoly power by virtue of its control of entry and regulation of Tier I hockey in Illinois, and AHAI has engaged in exclusionary conduct in furtherance of its monopoly power.

66.     The Club Defendants have conspired, along with AHAI (of which the Club Defendants are members), to monopolize the Relevant Market, including allocating to each of the four Club Defendants 25% of the Relevant Market in furtherance of this monopoly power.

## V.     Growing Demand for Amateur Hockey in the Relevant Market

67.     Amateur youth hockey is rapidly growing in popularity in the State of Illinois.  Over the last five years, participation nationwide among youth players has increased by almost nine

percent. Amateur youth hockey is growing at an even faster rate in Illinois, with growth in excess of 18% over the last five years, and in excess of 59% since 2001.[1]

68.     In spite of this substantial growth in the demand for youth hockey, the current Tier I clubs have conspired to restrain trade by limiting output, stifling any and all competition from new market entrants. The effects of Defendants' illegal agreement and actions has resulted in a misallocation of supply for Tier I level hockey in Illinois. Currently, there are only four Tier I youth hockey clubs in Illinois, ***none*** of which are located in Chicago's North Shore geographic area: Team Illinois (based in Woodridge, Illinois), the Chicago Fury (based in Orland Park, Illinois), the Chicago Mission (based in Chicago's Near West Side and in Bensenville, Illinois), and the Chicago Young Americans (based in Palatine, Illinois).

69.     USAH affiliates in other states almost uniformly permit a higher percentage of young hockey players to participate in Tier I level hockey. The following chart shows the degree to which Illinois, with a ratio of one Tier I club to approximately every 5,840 players, is out of step with other major hockey and/or Midwest states:

| State | Approximate Number of Amateur Youth Hockey Competitors[2] | Number of Tier I Clubs | Ratio of Tier I Clubs : Number of Competitors |
|---|---|---|---|
| Indiana | 3,845 | 3 | 1 club : 1,282 players |
| New Hampshire / Vermont / Maine | 9,767 | 7 | 1 club : 1,395 players |
| New Jersey | 14,295 | 10 | 1 club : 1,423 players |
| New York | 36,340 | 18 | 1 club : 2,019 players |
| Connecticut | 11,244 | 5 | 1 club : 2,248 players |
| Iowa | 2,670 | 1 | 1 club : 2,670 players |
| Pennsylvania | 22,511 | 8 | 1 club : 2,814 players |
| Massachusetts | 43,674 | 15 | 1 club : 2,912 players |

[1] Source: USAH. Note that due to the limitations of statistical information publicly available from USAH, the figures listed here reflect the number of players in Illinois aged 6-19, not all of whom are eligible or qualified to compete in Tier I.

[2] Source: USAH. The figures listed here reflect the number of players in each State aged 6-18 for the 2017-18 season.

| State | Approximate Number of Amateur Youth Hockey Competitors[2] | Number of Tier I Clubs | Ratio of Tier I Clubs : Number of Competitors |
|---|---|---|---|
| Missouri | 6,255 | 2 | 1 club : 3,128 players |
| Michigan | 25,707 | 8 | 1 club : 3,213 players |
| Ohio | 10,224 | 3 | 1 club : 3,408 players |
| Wisconsin | 15,440 | 4 | 1 club : 3,860 players |
| **Illinois** | **23,346** | **4** | **1 club : 5,837 players** |

70.     Even as the sport is booming nationally and in the State of Illinois, the supply of Tier I hockey in Illinois is artificially restricted by AHAI, in stark contrast to the rest of the country.

**VI.     The Defendants' Illegal Conduct Under the Sherman Act**

71.     Despite the significant growth in participation and demand for high quality amateur play over the last five years, AHAI has prohibited the supply of Tier I clubs from increasing.  The same four clubs that conspired to allocate the Relevant Market among themselves in 2001 are the same four clubs that supply Tier I level hockey today.  Indeed, AHAI, working through and with these four clubs, has refused to even consider the applications of would-be rivals like the Reapers.

72.     USAH's mission and bylaws encourage the promotion and growth of the sport and the promotion of player development and excellence.  Its mission includes "supporting the growth of the sport and all its participants and enthusiasts. (USAH 2018-19 Annual Guide at 5, available at https://www.usahockey.com/annualguide.)  It "fulfills its vision, purpose, and mission by," among other things, "enabl[ing] the widest possible access to the game," "ensuring the growth of all participating member categories," and "ensuring the progressive development of all players, coaches, officials, and volunteers—from novices to the highest level of sport." (*Id.*)  And its "Key strategies for the Tier I program" include "attract[ing] the best players, coaches, and officials in the U.S.," "strengthen[ing] relationships in the hockey community by promoting the league," and "becom[ing] the most successful junior hockey league in the world." (*Id.* at 20.)

73.     In line with its pro-growth vision for the sport, USAH allows Tier I clubs to account for up to 15% of all amateur youth players in a given State. (*Id.* at 139.)  **USAH sets no other bar limiting Tier I participation**.  To the contrary, USAH ensures that regardless of the number of registered players in a State, "[e]ach Affiliate shall be permitted to have at least one team per age classification." (*Id.*)  It is clear, therefore, that USAH intends for its affiliates to aggressively promote Tier I participation.

74.     Yet AHAI refuses to expand its Tier I program.  The last time AHAI agreed to admit an additional Tier I club and grant a new Tier I charter was in or about 2001, when AHAI granted a Tier I charter to the Chicago Mission.  Prior to 2001, AHAI had no Four Club Restraint in place.

75.     On information and belief, after AHAI granted the Chicago Mission a Tier 1 charter, or in connection with AHAI granting that charter, owners of the four clubs conspired to form an illegal market allocation agreement that would ensure each club would have a perpetual 25% share of the Relevant Market.  AHAI, which controls the Relevant Market, was a necessary abettor and co-conspirator.  Accordingly, former AHAI President John Dunne and a group of AHAI Board members and representatives from the Club Defendants including, but not limited to, Mike Mullally, Michael Barrett, and Gino Cavallini, agreed to protect the then-existing Tier I clubs and to choke off any further potential competition so as to ensure their own monetary gain.  To that end, they caused AHAI to change its Rules & Regulations to prevent any new Tier I clubs from receiving a charter to operate.

76.     On information and belief, in connection with the market allocation conspiracy, Dunne, Mullally, Barrett, Cavallini, and others engaged in improper private communications about official AHAI business.  The conspirators communicated in secret to determine who to include or

exclude from their group, to avoid leaving a record of these communications, and to evade detection by honest individuals. On information and belief, the conspiracy grew over time as new individuals were recruited into the fold.

77. The owners and operators of Tier I level clubs had clear economic rationale to institute and perpetuate their market allocation scheme: (1) it eliminated new entrants like the Reapers, and hence the removal of competition from the market; (2) it allowed the Club Defendants to drive up and maintain artificially-inflated prices, resulting in higher revenue for the Club Defendants; (3) which in turn allowed the Club Defendants to skim the proceeds for personal profit, *see infra* ¶¶ 99-100.

### A. The Defendants Had Ample Opportunities to Collude and Engage in Exclusionary Conduct

78. Tier I club owners had ample opportunities to meet and discuss the creation and perpetuation of their illegal activities. Some hold seats on the AHAI Board of Directors, providing opportunities to conspire among themselves and use AHAI to help facilitate their market allocation conspiracy, including directly or indirectly influencing and/or voting on matters affecting Tier I hockey generally and their clubs specifically. All Tier I club owners hold one or more seats on the Tier I Committee, providing further opportunities to collude with one another to allocate Tier I hockey among themselves and perpetuate their monopoly over Tier I hockey in Illinois. In addition, prior to many AHAI Board meetings, AHAI Board members and representatives of the Club Defendants meet privately for drinks. They meet at USAH events, at the state tournament, district meetings, and at hockey games.

79. On information and belief, when AHAI Board members and representatives of the Club Defendants meet in these settings, they discuss maintaining the Four Club Restraint, their illegal market allocation agreement, and their illegal group boycott. On information and belief,

26

they also discuss strategies to bar the Reapers and others from entry into the market.

80.     Market allocation conspiracies and group boycotts are designed to restrict output, and basic economic theory predicts that such agreements inevitably do restrict output, which increases prices. Because market allocations and group boycotts are naked restraints of trade, they have long been held to be *per se* violations of Section I of the Sherman Act.  Accordingly, the *per se* rule applies to the conspiracy initiated and perpetuated by the Club Defendants and AHAI.

81.     In the alternative, the Defendants' market allocation agreement and group boycott are unreasonable restraints that violates Section I of the Sherman Act under the Rule of Reason.

82.     Paragraph 16.3 of AHAI's Rules & Regulations provides "Guidelines for Determining the Number of Teams" that participate in Tier I play.  Prior to 2001, Paragraph 16.3 conformed to USAH's expectations and rules.  Rule 16.3.4 provided that Tier I should consist of "[n]ot more than 15% of the total rostered Youth Players at any age level … per the USA Hockey Rule."

83.     But AHAI and the Club Defendants knew that complying with USAH's guidelines or otherwise acting consistent with other states' affiliates threatened to erode the personal fiefdoms the Club Defendants built by running both the Tier I clubs and the organization tasked with overseeing Tier I hockey in Illinois.  And so they caused AHAI to adopt a new rule, Rule 16.3.3 (the "Four Club Restraint"), which artificially restrained Tier I to "Not more than four (4) Tier I Youth Organizations fielding not more than eight (8) Tier I youth teams at any age level."

### B.     Defendants' Actions to Conceal Their Conspiratorial Conduct

84.     The conspirators took several actions in furtherance of their agreement, including making efforts to conceal their conduct.  Among other things, they conducted business in improper private communications and in improperly closed AHAI board meetings, and intentionally maintained incomplete and/or misleading board minutes, leaving only vague or no records of

official board actions or internal board deliberations.

85.     On information and belief, AHAI habitually conducts business in closed session so that no record of the proceedings is maintained.

86.     On information and belief, AHAI treats even open Board meetings as if they are closed.  Player parents and other members of the public are routinely prevented from observing open meetings.  AHAI controls access to its meetings to conceal its conduct from its members and the general public.

87.     In contrast to the Defendants' covert actions, Illinois corporations are obligated to maintain true and accurate "minutes of the proceedings of its members, board of directors *and committees* having any of the authority of the board of directors."  805 ILCS § 105/107.75 (emphasis added).  Yet, in this case, AHAI's counsel avers that it maintains no minutes whatsoever from meetings of the Tier I committee, and did not produce any minutes of any committees to the Reapers following the Court's March 6, 2019 Order to produce a complete set of Board minutes.

88.     AHAI's rudimentary Board minutes suggest that the addition of a fourth Tier I level club was directly connected to the imposition of the Four Club Restraint.  AHAI's Board minutes from January 8, 2001 indicate that the Open Committee (the precursor to the Tier I Committee presented "2 proposals (Kevin Mann – Illinois Crunch, Maddy Rossobillo – Team Chicago) … to the Board regarding the granting of a new Tier I franchise.  In addition, a proposal regarding 'New Tier I Associations' was presented. After discussion of both topics, a motion was made to approve the application from 'Illinois Crunch' along with the 'new' Tier I association rule; the motion was approved 13-1."  On information and belief, the "new Tier I association rule" referred to, but not described in the minutes, is the Four Club Restraint.  This is the only discernible reference to the Four Club Restraint in the Board minutes from 2001.

28

89.     The minutes do not show or reference that AHAI conducted any market analysis or any analysis of any kind when it passed the Four Club Restraint.

90.     The minutes do not show who voted to adopt the Four Club Restraint, who voted against, it, or whether anyone abstained.  They do not show the rationale for adopting it, the likely effects of adoption, or whether any debate occurred.

91.     The minutes show that later in the year, in September 2001, the AHAI Board unanimously approved a motion to reimburse directors, officers, and others up to $300 per year for individual umbrella liability coverage.  On information and belief, AHAI's Board voted to provide this coverage to its members because some members feared being sued in response to their vote to impose the Four Club Restraint.

92.     The minutes from 2001 to mid-2018 do not show any further votes on the Four Club Restraint, or any discussion or evaluation about the actual or potential effects of the Four Club Restraint.  The minutes from August 2013 show that AHAI received a warning that "verbiage on website can be construed as Anti-Trust."

93.     The minutes reveal that AHAI did not conduct re-chartering reviews of the Clubs every year, as it is obligated to do.

94.     The minutes reveal that the conspirators took care to keep their agreement hidden.  The minutes from February 9, 2009 show one Board member suggesting that "the AHAI Board of Directors should consider signing an 'Oath of Fealty and Confidentiality Statement.'"  The minutes from March 5, 2012 show Mullally—in an open meeting—warning fellow Board Members to "take care not to repeat these discussions to anyone outside the Board Room."  On information and belief, AHAI considered imposing "Oath[s] of Fealty" and mandating confidentiality even over its public business after becoming concerned that aspects of the conspiracy might become

known to the general public.

95.     On information and belief, in 2018 and 2019, Dunne, Mullally, Barrett, Cavallini, and others engaged in improper private communications about the Reapers' application, which was official AHAI business.  The conspirators communicated in secret to determine how to deny the Reapers a charter while keeping the conspiracy hidden.

96.     The minutes from 2018-19 do not show how (or indeed whether) the Tier I Committee voted with respect to the Reapers' application.  They do not show anything about the content of the committee's recommendation to the full board (if any was made).  The Board minutes do not state when they were prepared, and were only made available to the public after this litigation commenced, and were produced in this litigation by AHAI with no metadata showing the author or creation date or last edited dates.  Upon information and belief, they were prepared after this litigation commenced.

97.     On information and belief, AHAI Board members currently or formerly affiliated with one of the Club Defendants regularly fail to recuse themselves from votes in which they and/or their clubs are directly interested.  On information and belief, this practice includes votes on matters involving Tier I level hockey, including whether charters should be granted.  On information and belief, this has been common practice within AHAI since 2001, when AHAI adopted the Four Club Restraint at the insistence of the Club Defendants.

### VII.     The Four Club Restraint is Anticompetitive

98.     Amateur hockey in general, and Tier I level hockey specifically, is big business. *See, e.g.*, Team Illinois, "What Is AAA Hockey?" (available at http://www.tihockey.com/?page_id=4649) (last visited Oct. 10, 2019) ("The commitment to AAA hockey … requires a monetary commitment far above the recreation level … Almost all college and professional players have some if not extensive AAA hockey experience as youth players.)

30

The imposition of the Four Club Restraint has served and continues to serve the independent commercial needs of the Club Defendants and their owners and staff, but it did not serve, and has not served, the needs of USAH, AHAI's mission, or the thousands of amateur youth hockey players in the State of Illinois.

99.    Basic economic theory dictates that in a competitive market, as demand for a product increases over time, supply should increase accordingly.  However, when a supply side restraint is imposed in a market characterized by a small number of producers with inelastic demand curves, supra-competitive prices will result. That is precisely what has occurred in the Relevant Market.  The imposition of the Four Club Restraint by AHAI restricts supply as a way to enhance market power, protect the four existing Tier I clubs from competition, prevent competition and commercial opportunities of any would-be rivals like the Reapers, and, as confirmed by various industry sources, force players and families to pay artificially inflated prices to join one of those clubs in order to secure prime Tier I playing opportunities.  On information and belief, revenues derived from supra-competitive prices are then skimmed off by the Club Defendants and individuals associated with them, notwithstanding their nominal "not for profit" status.

100.    AHAI's refusal to allow a market-driven number of Tier I clubs to exist in Illinois not only allows the Club Defendants to over-charge players and families, but also deprives otherwise qualified Illinois athletes who need opportunities to perform at the Tier I level.  In amateur hockey, participation in USAH tournaments featuring Tier I competition is critically important from a player development and recruiting perspective.  Recruiters and scouts for junior- and college-level teams almost exclusively draw talent from USAH Tier I tournament play, and do not bother to target tournaments drawing only Tier II or Tier III clubs.  Accordingly, AHAI's Four Club Restraint deprives otherwise qualified and talented athletes in Illinois—athletes who

would currently be competing at the Tier I level in any other State—of critical opportunities to appear on recruiters' radar and to compete for college scholarships, among other things. *See, e.g.*, Team Illinois, "What Is AAA Hockey?" (available at http://www.tihockey.com/?page_id=4649) (last visited Oct. 10, 2019) ("Almost all college and professional players have some if not extensive AAA hockey experience as youth players.).

101.    Accordingly, the Four Club Restraint deprives otherwise qualified Illinois players of post-high school opportunities that are afforded players in other states.  This anti-competitive artificial restraint is contrary to USAH's and AHAI's stated mission, and is the result of the successful efforts by AHAI, the Club Defendants, and certain individuals to insulate their operations and fee structure from competition.  The Reapers are not currently aware of any other state having adopted a Four Club Restraint or similar restraint, and on information and belief, no other state has adopted such a restraint.

102.    The Four Club Restraint also deprives would-be competitors like the Reapers from the commercial opportunity of starting up and managing a Tier I level hockey club.

103.    Here, there is no procompetitive justification for the Four Club Restraint.  None is documented in AHAI's board minutes.  None is documented in AHAI's Tier I committee meeting minutes (which the organization fails to maintain), or in any other committee meeting minutes, for that matter.  USAH allows a 15% Tier I participation level per age cohort of registered players in the State.  *See* USAH Rule III(E).  However, because of the Four Club Restraint, Illinois is currently far short of that bar with respect to every age cohort. For example, the cohort of 11-12 year old players in Illinois has only a 1.97% Tier I participation rate.  The cohort of 13-14 year old players in Illinois has only a 2.08% Tier I participation rate..

104.    Furthermore, limits on the number of clubs are neither fundamental nor essential to

the provision of amateur youth hockey in Illinois.

105.    The Four Club Restraint cannot be justified by assertions that it promotes competitive balance in amateur Tier I level hockey.  AHAI has documented no such rationale in its board or committee minutes, and keeping scores close is not the mission of USAH or AHAI in any event.

106.    The Four Club Restraint cannot be justified by increasing ticket sales for in-season games because tickets are not sold (no admission is charged) for in-season games.  Increasing revenue from ticket sales is not the mission of USAH or AHAI in any event, and AHAI has documented no such rationale for the Four Club Restraint in its minutes.

107.    Furthermore, the Four Club Restraint does not lead to more accomplished players at the skill level above Tier I.  In the 18 years since the Four Club Restraint was put into place, only one Illinois native has been selected for the U.S. Men's Olympic Team ("Team USA"): Chris Chelios, who skated for Team USA in the 2002 and 2006 Winter Olympics.  No Illinois natives made the team in 2010, 2014, or 2018.  The contrast with other states over the same time period is striking.  Minnesota, a state with less than half the population of Illinois, has had 18 natives selected.  Connecticut, a state with roughly one quarter the population of Illinois, has had eight players make the team.  Michigan, with approximately three million fewer residents, has sent a whopping 20 players to Team USA.  If the Defendants intended to justify the Four Club Restraint as a means to promote athletic success, it has been an abject failure on that front.

108.    The adoption of the Four Club Restraint also created irreconcilable inconsistencies with other Rules & Regulations that are supposed to bind AHAI with respect to the admission of new clubs.  For while AHAI was now committed to allowing no more than four Tier I clubs in Illinois via the Four Club Restraint, it was simultaneously committed to determine the number of

Tier I youth teams based not on self-interest or some arbitrary and capricious whim but on "[t]he number of rostered Players in a USA Hockey age division" (Rule 16.3.1) and "[t]he number of rostered Players in the USA Hockey age division who will play Tier I youth hockey" (Rule 16.3.2). AHAI was also required (a) to continue accepting new applications for Tier I clubs; (b) to provide an initial review of such applications; (c) to hold a vote by the "Tier I Committee" on whether to recommend acceptance or denial of the application; and (d) to convey the results of that vote to the full AHAI Board of Directors. (Rule 16.6.1.) By adopting obviously inconsistent Rules—one that permanently caps the number of Tier I clubs, and others that ostensibly require the "Tier I Committee" to continue to accept, consider the merits of, and vote, as part of the Tier I Committee, on whether to admit all new Tier I applications, AHAI all but ensures the arbitrary and capricious enforcement of its own Rules.

109. AHAI's arbitrary Rules, and even more arbitrary enforcement of its Rules, provide the Club Defendants with structural advantages that ensure the Club Defendants will continue to receive protection from competition and other preferential treatment from AHAI. The "Tier I Committee" is one of the most significant of these structural advantages. Shockingly, for a new club to apply for a Tier I charter from AHAI, the first gatekeeper is a Tier I Committee made up of, among others, representatives from the existing four Tier I clubs themselves. These structural advantages are, as the saying goes, like putting a fox in charge of guarding the henhouse.

110. First, AHAI created a Tier I Committee and vested it with the authority over "all matters pertaining to Tier I Member Associations … subject to the AHAI Board of Directors [sic] review, direction, change and approval." AHAI Rule 16.0, 16.1. AHAI also vested the Tier I Committee with authority to recommend "granting or terminating of authority to organize and/or operate a Tier I organization, club, or association," and the authority to recommend modifying

34

"the total number of Tier I Teams permitted in any age division." AHAI Rule 16.1

111. Second, AHAI gave "the President of every AHAI authorized Tier I organization" a vote on the Tier I Committee.

112. Third, AHAI created a "Tier I Authorization Procedure," which established procedures for acquiring and maintaining a Tier I charter, and vested the Tier I Committee with responsibility for its operation. Giving Tier I club representatives the power to vote on issues involving the enforcement of the Tier I Authorization Procedure imbued the Club Defendants with the power to defeat any potential competitor's application by voting against it and by lobbying the handful of non-conflicted Committee members to do the same—while providing a new applicant with no way to rebut any biased assertions or baseless accusations that a conflicted Tier I club representative may make behind closed doors. AHAI conveyed this power to the Club Defendants notwithstanding the multitude of conflicts of interests that arise when a Club Defendant representative is asked to vote for or against his or her Club's own financial interests and/or his or her Club owners' or officers' own personal financial interests.

113. Beyond these structural advantages, AHAI also protects the Club Defendants by arbitrarily and capriciously enforcing other AHAI bylaws and rules, and the bylaws and rules of USAH, by which AHAI is required to abide.

114. For example, not only does the Four Club Restraint improperly restrict the competition and concomitant benefits that a fifth and six Tier I club would bring, but the Four Club Restraint as enforced by AHAI ensures that the existing four Tier I charters are automatically renewed without any consideration of whether a different organization could provide a better Tier I club than one of the four existing Tier I clubs. Despite rules that require both the acceptance and consideration of new Tier I club applications (Rule 16.6.1, et seq.), as well as rules requiring each

existing charter to be reviewed annually and evaluated for potential renewal (Rule 16.4.1), AHAI has no legitimate, competitive process in place for weighing the relative merits of each application and determining the most deserving four clubs. Instead, AHAI simply relies on inertia and favoritism. It refuses to consider new applications in any respect, citing the Four Club Restraint and the existence of four incumbent clubs. AHAI's circular abuse of discretion and bad faith is exactly what happened with respect to the Reapers, and it guarantees that that the four existing Tier I clubs are permanently chartered no matter what, free to rampantly overcharge and underperform, insulated from competition of any kind.

115. The inconsistencies in AHAI's Rules & Regulations are not by accident, but by design. Since the adoption of the Four Club Restraint, it is now impossible for an outsider to separate wheat from chaff—*i.e.*, to understand which Rules are "real" and will be followed by AHAI's Board, and which ones are obsolete, out of favor, or illusory. This renders AHAI's governance in general, and its selective enforcement of its Rules specifically, arbitrary and capricious. As the Reapers discovered, the real Rules are simply whatever AHAI's Board says they are.

116. AHAI's insular "boy's club" culture has fostered the organization's lackadaisical decision-making and arbitrary enforcement of its bylaws, rules, and procedures. AHAI's Board is composed of 15 individuals who, for all practical purposes, remain there indefinitely. Several Board members—Mike Mullally, John Dunne, Kevin Bolger, and Ken Michel—have all held Board positions for almost 20 years. Another group—Chuck Smith, Jim Clare, Jack Weinberg, Gregg Chudacoff, and Gino Cavallini—have sat on the Board between 5 and 10 years.

### VIII. The Reapers' Attempts to Expand Opportunities for Tier I Hockey in the Relevant Market

117. For several years, there has been a significant and increasing public demand for

additional Tier I opportunities in Illinois. Players, parents, coaches, officials, and others have expressed their support for growing Tier I play in the State.

118. The new supply of an additional Tier I club to the Relevant Market would provide multiple benefits for individuals who are currently playing Tier I or II youth hockey but (a) live in or near the North Shore area and are unwilling or unable to commute long distances to play for an existing Tier I club; (b) do not want to pay artificially inflated prices charged by the existing four Tier I clubs; (c) are unhappy with the quality of coaching and/or management services from their current club; (d) believe that they are not getting enough practice time on their current team and want to transfer clubs; or (e) want to gain access to junior- or college-level scouted tournaments and showcases across the country.

119. Accordingly, in 2015 Steve Dry (a concerned parent and President of the Falcons Hockey Association Tier II club) and others approached AHAI leadership to start a dialogue about the need for AHAI to meet this market demand by either allowing the creation of a new Tier I club or by allowing existing Tier II clubs to also offer a Tier I program.

120. At that time, John Dunne was AHAI's Board President. In December 2015, Dry emailed AHAI President Dunne, sharing Dry's concerns that although "Illinois is either the 5th or 6th largest State for youth hockey participation … It seems like Illinois should have 2-3 additional charters at a minimum." Dry also informed AHAI, through Dunne, that the strength of Illinois' Tier II clubs, which "have a fantastic showing at all AAA multi-state tournaments and are consistently in the top 20 in almost all *myhockeyrankings* divisions," demonstrated the illogic of AHAI's position that "only 60-72 skaters and 8 goalies per age division are developed enough to play Tier 1 hockey." Dry explained that AHAI's artificial four club restriction "has created a fiefdom where 4 programs dominate the Illinois [amateur hockey] landscape."

37

121. Between December 2015 and June 2018, Dry continued to push AHAI leadership to allow a greater number of Tier I opportunities in Illinois, to clean up AHAI's governance issues, to bring AHAI back into compliance with USAH's mission statement, rules, and guidance, and to address the multitude of serious governance issues with the Club Defendants. AHAI leadership generally responded with excuses, deflections, and non-responses. AHAI leaders simply preferred to maintain the status quo, and continued to protect the Club Defendants by, among other things, maintaining the Four Club Restraint.

122. In May 2018, then-AHAI President Dunne and Board Member Michael Barrett invited Dry to join them for a discussion about Dry's concerns. Their discussion took place on May 16, 2018 at the Wildfire restaurant in Oak Brook, Illinois. Dry spoke at length about the Four Club Restraint's negative impact on competition at the Tier I level in Illinois, as well as a variety of governance problems, bias, and self-dealing involving AHAI and the Club Defendants. Dunne and Barrett appeared to share Dry's commitment to resolving these issues, calling the meeting "time well spent," and later writing to Dry that "[o]ur goals are exactly some of the thoughts and concerns you expressed." Dunne and Barrett even suggested that Dry should become more deeply involved in AHAI by joining the Board or serving on an AHAI committee so as to help them address these issues from within the organization. Dry stood ready to assist Dunne and Barrett with their supposedly shared goals.

123. But when Dry followed up with Dunne and Barrett after their May 16 meeting, via email on May 29, 2018, July 10, 2018, and August 10, 2018, neither Barrett nor Dunne bothered to reply.

124. Relatedly, in June 2018, something seemed to change. On June 2, 2018, Dunne resigned as AHAI President, and AHAI's Board unanimously elected Barrett as his replacement.

Later that month, on June 29, Dry had a conversation with AHAI Board Member Mike Mullally, in which Mullally said, in sum and substance, "We [referring to the AHAI Board] are ready to consider allowing a new Tier I club. You should go ahead and fill out an application." Mullally was, and currently is, the Chair of AHAI's Tier I Committee.

125.     After years of stonewalling by AHAI leadership, Dry was surprised by Mullally's sudden encouragement. Nevertheless, he was hopeful that Mullally's suggestion might indicate that there was finally an emerging consensus within AHAI to return the organization to its core mission.

126.     In July 2018, bolstered by Mullally's urging the prior month, Dry and others began working in earnest to actively plan and organize support for a new Tier I club, the Reapers. Dry notified AHAI that the Reapers intended to submit an application to AHAI for a Tier I charter and requested guidance from the organization as to the form the application and supporting materials should take.

127.     As Chair of the Tier I Committee, Mullally served as the point person from AHAI's side for purposes of navigating the application process, which entailed, among other things, sharing sensitive confidential information with AHAI about club planning, finances, and hiring. In one of Dry's first communications with Mullally about the application process, aware that the Tier I Committee is composed of representatives from both AHAI and the Club Defendants, Dry requested that "[i]f the other Tier 1 clubs will be seeing our submission (finances, coaches, etc.) as they make up the Tier 1 committee we would like a NDA [non-disclosure agreement] signed." Mullally responded that "I don't believe an NDA would be necessary" because "the committee does not see the financial [sic] of the other tier 1 clubs." But Mullally added the following bizarre warning: "please remember [Tier I] is a very close community … I have heard things from some

of them that I have never told them, but they seem to know about the issue or circumstance anyway. So your information, if present in the Tier 1 community … might be known faster than you think." Mullally assured Dry that confidential information spreading this way would somehow have "nothing to do with AHAI's confidentiality."

128.     On July 20, 2018, Dry informed Mullally via email that the Reapers were planning on submitting its application and supporting materials the following day.  Dry provided Mullally with an overview of the materials the Reapers intended to submit.  Mullally replied to Dry's email, copying AHAI President Barrett, Past President Dunne, and Board Member Ken Michel.  In his reply, Mullally provided Dry with a Tier I application form, representing that it was one "that was used in the past."  Mullally indicated that "with this form and the outline you supplied below, the information should be sufficient for consideration, first by the Tier 1 committee and then by the AHAI Board." Neither Mullally, nor Barrett, nor Dunne, nor Michel indicated that there were any further barriers to the Board's consideration of the merits of the Reapers' application.

129.     Supporters of the Reapers went to great lengths to complete AHAI's application and to develop a proposal that would demonstrate how granting the Reapers a charter would best serve Tier I hockey in the State of Illinois, promote the mission of USAH, and promote the stated mission of AHAI.  In furtherance of these efforts, supporters of the Reapers:

   a.  Began the process of incorporating the Reapers as a tax-exempt 501(c)(3) organization;

   b.  Identified capable individuals who were willing serve as the directors and officers of the club;

   c.  Identified a club registrar, a hockey/player development director, several head coaches, a skills director, and a defensive director;

    d.   Identified resources for club goalie training and off-ice training;

    e.   Identified accounting and insurance professionals the club would use;

    f.   Drafted and adopted bylaws for the club;

    g.   Drafted and adopted a comprehensive club handbook;

    h.   Drafted and adopted a variety of club policies to govern both on- and off-ice behavior of club players, coaches, parents, volunteers, and spectators, including policies governing unsportsmanlike conduct, hazing, substance abuse, concussion management, prohibited conduct, and conduct expectations for parents and spectators;

    i.   Prepared projected financial statements for the Reapers organization; and

    j.   Obtained proof of liquidity for Reapers President Steve Dry.

130.    The following day, on July 21, 2018, Dry submitted the Reapers' completed application packet, including (1) the AHAI application form; (2) an electronic binder of club materials; and (3) a PowerPoint presentation containing statistical data supporting the need for another Tier I club in Illinois. The application and proposal that the Reapers submitted complied with all of AHAI's stated requirements for consideration of a new Tier I charter. Indeed, Mullally later promised Dry that he would "certify to the [Tier I] committee and [to the] Board that your proposed organization is compliant and financially viable."

131.    Weeks later, in an August 13, 2018 email to Mullally, Dry inquired about the status of the Reapers' application and when it would be considered. Mullally replied that "I have not brought this application to the Board as yet. So they are not even aware that there is an application." He also noted that "we are to have a tier 1 meeting later this month, but I have not set the date yet. You are welcome to present your proposal … to the committee at that time if you like." Dry

responded "[i]t would be my pleasure and want to present to both the Tier 1 and AHAI Board. Please keep me posted on the dates."

132.    On Sunday, August 26, 2018, at 11:44 pm, Mullally emailed Dry "My apologies … I did not send you a copy of our Tier 1 meeting time.  It is tomorrow, Monday at 7 bridges at 6 pm. You will have 15 minutes for a presentation and then 15 minutes for questions from the committee."

133.    Despite receiving a midnight email providing barely 16 hours of notice for a meeting at which he would need to make a presentation and convince the Tier I Committee of the merits of the Reapers' application, Dry arranged to attend the meeting and make the presentation.

134.    On August 26, Mullally distributed the Reapers' PowerPoint presentation to the Tier I Committee via email.  In his email, Mullally informed the Committee that "The remainder of this application I can assure you has met the minimum criteria as stated in the AHAI [Rules & Regulations] Article 16."  Article 16 of AHAI's Rules & Regulations broadly governs the requirements and procedures for obtaining a Tier I charter from AHAI.

135.    On August 27, 2018, Dry made a presentation to AHAI's "Tier I Committee."  The Tier I Committee is composed of a mix of AHAI Board Members and representatives from the four chartered Tier I clubs.  At the Reapers' presentation, the following were present:

- Gino Cavallini (who simultaneously serves as the President of the Mission and an AHAI Board Member)

- Larry Pedrie (representing Team Illinois)

- Jimmy Anderson (representing the Fury)

- Jason Ori (representing CYA)

- Harley Fisher (representing CYA)

- Michael Mullally (representing AHAI as its current Tier 1 committee chair

and past President, and who has deep, lifelong ties to CYA as a result of his father founding the predecessor club to CYA

- John Dunne (representing AHAI as its past President)

- Ken Michel (representing AHAI)

136. On information and belief, sometime after Dry's August 27 presentation, the Tier I Committee set forth a written recommendation to the full AHAI Board of Directors conveying the Committee's views as to whether to grant a fifth Tier I charter. This recommendation is not documented anywhere in AHAI Board minutes.

137. AHAI's Tier I Committee is controlled by the incumbent Tier I level hockey clubs—the Club Defendants—who have *de facto* control over the admission of new clubs. On information and belief, AHAI defers to the Tier I Committee and votes in line with the Committee's recommendations. On information and belief, AHAI has never, since adopting the Four Club Restraint in 2001, rejected the Tier I Committee's "recommendation."

138. On October 1, 2018, the Reapers supporters presented a proposal to the full AHAI Board of Directors. Steve Dry, Kevin Kroeger, Ryan Taylor, Michael Motew, Jeanine Goldstein, Dean Manone, Russ Naumenko, and Murry Gunty attended for the Reapers. Nearly all of the 15 members of the AHAI Board were present, including President Mike Barrett, Past President John Dunne, Mike Mullally, Kevin Bolger, Bill Crowley, Gino Cavallini, Chuck Smith, Jim Clare, Anita Lichterman, Jack Weinberg, Tony Rossi, and Keri Zschach. Former AHAI Board Members Pete Humann and Bill Gomolinski also attended.

139. The October 1 AHAI Board meeting took place at Gene & Georgetti's restaurant in Rosemont, Illinois. The Reapers' President, Steve Dry, made the Reapers' presentation to AHAI's Board. He explained that in forming the club and developing the Reapers' proposal to compete as a Tier I club, the supporters of the Reapers hoped "to give back to the sport and offer

an opportunity for more kids from Illinois to compete and develop at the highest level." Dry reminded the Board that "every player should have the opportunity to play at the highest level. By limiting the spots available we are not allowing the players this opportunity." He also explained to the Board that "[a]llowing more kids to advance to … this level will help advance players at all levels."

140.    Dry explained that the Reapers are "a not-for-profit association, governed by a volunteer Board of Directors and paid Hockey Professionals and Support Staff," and that the Reapers will make "[e]very effort ... to keep [player] fees as low as possible."

141.    Dry reminded the Board that AHAI's mission statement required it to "Provide an improved grassroots foundation for the growth and development of USA Hockey and its members, designing programs aimed at encouraging increased participation," and "improved skills." Dry explained that by artificially limiting the level of participation at the Tier 1 level in Illinois, "AHAI is not encouraging increased participation. Rather, due to the limited organizations, players are leaving the State to play at Tier 1 elsewhere, e.g. Detroit, Wisconsin, Florida, Omaha, etc."

142.    Dry provided several reasons why Illinois needs a fifth Tier I club. Dry informed the Board that the only markets conveniently served by *any* Tier I team are Chicago's Southwestern Suburbs (the Fury), Northwestern Suburbs (CYA), Western Suburbs (Team Illinois), and the City of Chicago itself (the Mission). No other geographic market in the State of Illinois has a Tier I team. Dry explained that many families of players who are good enough to play Tier I hockey do not have the ability to drive great distances for practices and games and the artificial restriction on the number of Tier I teams prevents these players from competing at that level. He noted that "[a]n additional program serving this vital hockey area will allow more players to participate at their deserved level of play."

44

143.     Dry pointed out that "all existing clubs are either west of [interstate highways] 294 or 90.  Meanwhile, there is a hot bed of youth hockey east of 294 and 90," an area that includes the communities of Skokie, Evanston, Glenview, Wilmette, Winnetka, and Northbrook, and the Bulldogs, Falcons, Ice Dogs, Vipers, and Winter Club Tier II teams.

144.     After the presentation, Dry took a few questions from the Board.  Dry's presentation and question and answer session lasted approximately 45 minutes.

145.     Despite Mullally's earlier assurance that "I don't believe an NDA would be necessary," and despite his promise that any dissemination of information about the Reapers' application would have "nothing to do with AHAI's confidentiality," Mullally later distributed parts of the Reapers' application materials widely throughout the amateur hockey community.  Mullally forwarded parts of the Reapers' materials to every Tier II club and high school hockey club Director and President.  Predictably, many of the recipients were curious about the Reapers' proposal.

146.     On October 25, 2018, hoping to address some of these questions, Dry made a presentation about the Reapers and the need for a fifth Tier I club to AHAI's Tier II Presidents' Committee, which is tasked with overseeing Tier II amateur youth hockey in Illinois.  While the Tier II Presidents' Committee itself does not have jurisdiction over Tier I competition, it is nonetheless comprised of the Presidents of AHAI-chartered Tier II clubs, and current and former AHAI Board Members, including John Dunne and Pete Humann.  AHAI Board Member Gino Cavallini attended the October 25 Tier II Committee meeting, despite his (1) not being a member of the Tier II Presidents' Committee; (2) not being affiliated with a Tier II club; and (3) being affiliated, instead, with a Tier I club.

147.     At the October 25 Tier II Presidents' Committee meeting, Cavallini vocally

challenged Dry and the Reapers, asserting (wrongly) that the Reapers' presentation contained false information. Cavallini made these claims in front of the entire Tier II Presidents' Committee—*i.e.*, many of the AHAI Board members who were later supposed to evaluate the merits of the Reapers' application. On information and belief, Cavallini is highly paid by the Mission.

148.    On January 7, 2019, AHAI's Board convened in closed session, again in a room at Gene & Georgetti's in Rosemont. The Reapers identified one or more conflicted board members present at this meeting.

149.    Representatives from the Reapers and the general public were not permitted to observe the discussion or the vote. Representatives from the Reapers waited outside of the meeting for three and a half hours, hoping to be informed of the Board's decision at the conclusion of the meeting. When Dry approached AHAI Board Member Mullally and Past President Dunne after the meeting and asked them to share the result of the vote, they declined to do so, and instead stated that the Reapers would be informed in writing within 24 to 48 hours, when the meeting minutes would be made available.

150.    AHAI did not provide the Reapers with the promised notice in writing, or post meeting minutes, within 24 to 48 hours. Only after repeated prompting from the Reapers representatives did AHAI provide notification to Dry that AHAI had declined to rescind the Four Club Restraint, thereby making it impossible for the Reapers to receive a Tier I charter. AHAI provided no written explanation of its decision, no indication that the AHAI Board had even considered the merits of the Reapers' application, and no sense of what, if any, appeals procedures might be available to the Reapers.

151.    When the Reapers inquired about how to appeal the Board's decision to maintain the Four Club Restraint, they were initially unable to obtain a response from AHAI. When the

Reapers further inquired, they received a letter from an attorney representing AHAI, Francis A. Spina of the Cremer, Spina, Shaughnessy, Jansen & Siegert law firm. He claimed that because AHAI's Board had decided not to rescind the Four Club Restraint, "no further action on the Reapers [sic] application was possible under the AHAI Bylaws and Rules." Mr. Spina then advised that "there is no basis in the AHAI Rules for [sic] Reapers to appeal to AHAI from the January 7, 2019 board decision … the January 7 AHAI Board decision is final." Mr. Spina's letter then warned that "Any further efforts by [sic] Reapers would be subject to the USAH 'Dispute Resolution Procedure,' including specifically Article 10(G)."

152.    Mr. Spina's reference to USAH Bylaw Article 10 was disingenuous.  Article 10 governs dispute resolution, discipline, and arbitration.  Bylaw 10(G) purports to require mandatory arbitration for some types of disputes between USAH members and USAH affiliates, and in conjunction with Bylaw 10(A)(3)(a), purports to shift liability for "all costs and expenses." But by its terms, USAH Bylaw Article 10 does not bind the Reapers.  The Reapers is not currently a member of USAH, or of AHAI, and does not pay dues to either organization.  The Reapers has never agreed to be presently bound by USAH Bylaw Article 10 and has never agreed to submit this dispute to USAH arbitration.  Moreover USAH does not have original jurisdiction over state and federal antitrust claims or the competence to resolve such claims.  The USAH "arbitrators" who would settle complex legal questions would be "present or former athletes who played the sport of ice hockey and those who have demonstrated experience and involvement with national, Affiliate, state, or local ice hockey organizations." USAH Bylaw Article 10(G)(7).  USAH Bylaw Article 10 has no relevance to these proceedings.

153.    AHAI's Board of Directors met again on February 5, 2019.  On information and belief, a non-Board member attendee at that meeting asked the Board, in sum and substance, "why

isn't the Reapers' application up for discussion in this meeting, and why was it never brought up for [open] discussion?" An AHAI Board Member replied, in sum and substance, "Because Mr. Dry hasn't appealed our decision to AHAI or to USA Hockey." This statement was false and misleading. The AHAI Board concealed from its own members that its counsel advised the Reapers that there was "no basis" for such an appeal and that "the January 7 AHAI Board decision is final."

### IX. AHAI Vigorously Enforces Its Rules Against Potential Market Entrants While Arbitrarily and Capriciously Ignoring Obvious and Troubling Rule Violations By the Four Club Defendants

154.    In addition to the Four Club Restraint, AHAI protects the Club Defendants by arbitrarily and capriciously declining to enforce its Rules against them, while enforcing its Rules vigorously against others. By way of example:

155.    AHAI Rule 19.8.1 (Government and Responsibility) mandates that all Tier I clubs must have a Board composed of at least five individuals. Larger Boards provide some additional protection against fraud, abuse, and corruption, while smaller Boards are more vulnerable because they are more easily controlled. But for at least three consecutive years prior to 2016, Defendant CYA did not have a five-member Board; it had a four-member Board. Defendant Team Illinois currently only has a four-member Board. Defendants the Mission and the Fury currently only have three-member Boards. On information and belief, AHAI knows all four of its Tier I clubs are or have been in violation of Rule 19.8.1, but continues to "renew" their Tier I charters on an annual basis. On information and belief, AHAI does so in order to help facilitate the Club Defendants' market allocation and group boycott schemes, as well as Defendants' conspiracy to monopolize the Relevant Market.

156.    AHAI Rule 19.8.1 also mandates that all Tier I clubs must have a Board that is "representative of the Affiliate and its programs, and fundamentally fair to all the participants

members [sic] of the Affiliate." It further places "the burden of proving fundamental fairness" on the club. But the CYA Board is composed entirely of members from a single family, the Ori family. It is neither representative nor fair to its members, as demonstrated by the chaotic state of the club's operations and finances and its repeated failure to respond to the needs of its players and their families. On information and belief, AHAI knows CYA is in ongoing violation of Rule 19.8.1 in this respect, but continues to "renew" CYA's Tier I charter on an annual basis. On information and belief, AHAI does so in order to help facilitate the Club Defendants' market allocation and group boycott schemes, as well as Defendants' conspiracy to monopolize the Relevant Market.

157.    AHAI Rule 19.8.1 also mandates that all Tier I clubs must have a Board that is "composed of parents who have or have had a child in [its Tier I] program." Prior to 2016, of CYA's four Board members, only two had a child in CYA's Tier I program. Of the Mission's three Board Members, only one has had a child in its Tier I program. Of Team Illinois' four Board Members, only three have had a child in its Tier I program. On information and belief, AHAI knows CYA, the Mission, and Team Illinois are in violation of Rule 19.8.1 in this respect, but continues to "renew" their Tier I charters on an annual basis. On information and belief, AHAI does so in order to help facilitate the Club Defendants' market allocation and group boycott schemes, as well as Defendants' conspiracy to monopolize the Relevant Market.

158.    AHAI Rule 19.8.2 (Annual Meetings) requires that every club "shall hold an annual meeting of its participants/members with reasonable notice of such meeting given." On information and belief, in the last three years, CYA members have not been given notice of any such annual meeting. On information and belief, AHAI knows CYA is in violation of Rule 19.8.2, but continues to "renew" CYA's Tier I charter on an annual basis. On information and belief, AHAI does so in order to help facilitate the Club Defendants' market allocation and group boycott

schemes, as well as Defendants' conspiracy to monopolize the Relevant Market.

159. AHAI Rule 16.4.2 (Limitation) requires that "no person shall be an Officer, Director, Hockey Director, Coach, Coaching Director, Manager, etc. of a Tier I Organization and hold any of the above positions in an [sic] Tier II Organization." But for the last three years, Jamison ("Jamie") Ori has been a coach for the Tier II Chicago Bulldogs Youth Hockey Club. He has simultaneously been an officer of CYA (Tier I), filling the paid position of Vice President. He has simultaneously been employed by Rosebrook Pools, an Ori family business that receives considerable sums of money annually from CYA. On information and belief, AHAI knows CYA is in violation of Rule 16.4.2, but continues to "renew" CYA's Tier I charter on an annual basis. On information and belief, AHAI does so in order to help facilitate the Club Defendants' market allocation and group boycott schemes, as well as Defendants' conspiracy to monopolize the Relevant Market.

160. AHAI Rules 16.6.3 (Tier I Minimum Requirements) and 16.6.3.5 mandate that to possess a Tier I charter, clubs must annually provide "Financial and Historical information demonstrating that the Tier I Organization is financially solvent and stable with the ability to finance the next season." In 2015, the Mission was sued for defaulting on bonds it used to finance its 2011 acquisition of the Seven Bridges Ice Arena in southwest suburban Woodridge. In the years running up to that lawsuit, the club operated at a deficit. The Mission had revenue of $3.1 million and expenses of $4.2 million in the year ended June 30, 2013, according to a tax return filed with the Internal Revenue Service. On information and belief, AHAI knew the Mission was in violation of Rules 16.6.3 and 16.6.3.5, but "renewed" its Tier I charter regardless. On information and belief, AHAI does so in order to help facilitate the Club Defendants' market allocation and group boycott schemes, as well as Defendants' conspiracy to monopolize the Relevant Market.

161.    Several AHAI Directors had, and still have, conflicts of interest on a range of issues affecting the number and composition of Tier I clubs in Illinois.

162.    For example, Gino Cavallini is presently a director and President of the Mission and is simultaneously an AHAI Board member.  The Mission's Internal Revenue Service Form 990 federal income tax return reveals that he personally received almost $138,000 in reportable compensation from the Mission in 2016, and almost $120,000 in 2017.  On information and belief, this compensation was only for Cavallini's Board responsibilities.  On information and belief, he received additional compensation from the Mission, ostensibly for coaching and other duties.  The Mission spent an additional $455,575 on salaries and wages, and almost $114,000 on employee benefits, in 2017.  On information and belief, the Mission paid a significant portion of these sums to Cavallini.  Cavallini's position with and financial interests in the Mission, while simultaneously serving on AHAI's Board, creates an inherent conflict in any matter involving Tier I level hockey. Despite Cavallini's obvious conflicts, on information and belief, AHAI allowed him to openly lobby AHAI Board members, on and off of the Tier I Committee, to maintain the Four Club Restraint and to prevent the Reapers from obtaining a Tier I charter.

163.    Andrea Hahn is presently neither a director nor an officer of the Mission.  She is identified as a "Former President" in the Mission's 2017 Form 990.  For her service as a "Former President," in 2017, the Mission paid her over $127,000 in funds collected from players and player families.  The Mission also paid Hahn's friend, Antoinette Wichert, over $67,000 to serve as Treasurer (while also paying over $18,000 for accounting services).  Andrea's husband, Dan, is also on the Board of the Mission.  The Mission organization ended its 2017-18 fiscal year with a net deficit of almost $10,000.  Cavallini and Hahn made sure that every penny, and then some, was wrung from the Mission's balance sheet.

164.    The Hahns and Wichert do not currently have, and never had, one of their children play for the Mission.  Therefore, they are not even eligible to serve on the Board of the Mission, pursuant to AHAI Rule 19.8.1.  Yet AHAI lets them remain there, year after year.

165.    Joe Ori is presently a director and officer of CYA and is a former member of AHAI's Tier I Committee.  CYA's Internal Revenue Service Form 990 federal income tax return for 2017 reveals that no less than five members of the Ori family are Board Members and/or officers of CYA.  As noted, *supra*, Rule 19.8.1 mandates that a Tier I club's Board must be representative and fundamentally fair to its members.  On information and belief, AHAI chooses to allow this one-sided arrangement even though it constitutes a violation of Rule 19.8.1, but continues to "renew" CYA's Tier I charter on an annual basis.

166.    Jason Ori is Joe Ori's son.  Jason Ori is currently the President of CYA and a current member of AHAI's Tier I Committee.  The Ori family has a personal financial stake in CYA, which was co-founded by Joe Ori in 1982.  CYA's Internal Revenue Service Form 990 federal income tax return reveals that Jason Ori personally received $96,000 in reportable compensation from CYA in 2016 and $84,000 in 2017.  CYA's Form 990s from recent years reveal that CYA has paid tens of thousands of dollars to its Board members and/or officers for services vaguely described as "administrative/coaching" services and "allowance for use of a personal car."  In addition, in 2016 CYA paid over $83,000 to Rosebrook Pools, Inc., a pool construction and maintenance business owned by the Ori family that employs at least four other CYA directors.  In 2017, CYA paid $83,200 to Rosebrook Pools.  These funds were ostensibly for bookkeeping services, even though Joe Ori purportedly serves the role of Treasurer of the organization and claims to devote 60 hours per week to this role.  On information and belief, AHAI knows the leaders of CYA and other Tier I clubs routinely engage in self-dealing, but AHAI continues to

"renew" their Tier I charters on an annual basis. On information and belief, AHAI does so in order to help facilitate the Club Defendants' market allocation and group boycott schemes, as well as Defendants' conspiracy to monopolize the Relevant Market.

167.    In sharp contrast with the practices of the Club Defendants, the Reapers enacted a bylaw that forbids paying a salary to their executives:  "All Officers of the association will be volunteer and shall receive no financial compensation." Reapers Bylaw Art. II, Section 1.

168.    On information and belief, discovery in this matter will likely reveal many additional instances of rule violations, arbitrary and capricious rule enforcement, self-dealing, and conflicts of interest that AHAI and the Club Defendants have thus far concealed from public view. On information and belief, discovery will also reveal significant unnecessary costs and fees that the Club Defendants have imposed on teams and players that would not be charged by the Reapers.

## X.    AHAI and the Club Defendants Ensure that Price of Participation in Existing Tier I Clubs in the State of Illinois Is Artificially Inflated

169.    AHAI is required to follow the bylaws that it has set to govern its own behavior. Among the bylaws that AHAI has committed itself to is the following:  AHAI is required to "encourage registration of all teams at all levels of play," By-Laws, art. III, § 3, and to "[make hockey] available to more people in all levels of competition at the lowest possible cost."  By-Laws, art. III, § 1.

170.    But AHAI's artificial restrictions on the supply of new Tier I clubs and other anti-competitive restrictions on the supply of new Tier I clubs and protection of existing Tier I clubs have artificially inflated the price of play.  The "all-in" price (meaning all out-of-pocket costs a young athlete or his or her family must pay to participate in a given season, inclusive of all league fees, State tournament fees, coaching fees, ice fees, training fees, goalie training, fundraising fees, equipment purchases, etc.) that the Reapers would charge players in the "midget" age bracket (ages

15-17)—$9,500 per year—would be materially less than the approximately $12,000 per year charged by the Club Defendants—a difference of over 20 percent. For younger players, the all-in price the Reapers would charge would be even less.

171.    Additionally, the same "all-in" prices charged by the Club Defendants are substantially higher than the prices charged by Tier I amateur youth hockey clubs in comparable markets, including comparable Tier I clubs across the country where competition is not artificially restricted.

172.    Furthermore, on information and belief, one or more of the Club Defendants have received rebates or other payments from vendors that were neither disclosed nor used to reduce the "all-in" prices charged to players and their families.

## XI.    Injuries to Competition in the Relevant Market and to the Reapers Resulting from Defendants' Actions

173.    AHAI, individually and in collusion with the Club Defendants, misused its monopoly power to injure competition in the Relevant Market, and to injure the Reapers and the athletes the Reapers wish to serve.

174.    AHAI's and the Club Defendants' illegal conduct under Sections 1 and 2 of the Sherman Act has caused and will continue to cause injury and harm to competition as a whole in the Relevant Market and to the Reapers in a variety of ways, including but not limited to the following: (1) the supply of amateur youth hockey at the Tier 1 level in the State of Illinois has been and is arbitrarily and artificially reduced, foreclosing playing, scholarship, and other remunerative opportunities for Tier 1 level hockey players below that which would be available but for the Four Club Restraint and Defendants' illegal conduct; (2) the Reapers have been denied the business opportunity of supplying Tier 1 level hockey in the State of Illinois, resulting in economic loss and damages to the Reapers; (3) Defendants' conduct has caused and continues to

cause Tier 1 level players and their families to pay supra-competitive prices and incur higher expenses to participate in Tier 1 level hockey in the Relevant Market; and (4) Defendants' conduct, in particular, has cut off a large geographic area - the North Shore area of suburban Chicago, an area that the Reapers intend to service - from having ready access to any Tier I level clubs, resulting in the payment of artificial and substantially higher fees and expenses (including increased travel costs) for existing Tier 1 level players and their families in this area. In addition, player choices in terms of organizational reputation, team culture, coaching preferences, and the like, are artificially limited for existing Tier 1 level players and eliminated for potential Tier 1 level players. The Four Club Restraint and the Defendants' illegal conduct undermine and eviscerate the stated goals and mission of AHAI, resulting in far fewer players who participate in Tier 1 level hockey in the State of Illinois than in others states, resulting in Tier 1 level hockey in Illinois to become stagnant and have no to minimal impact in producing players for USA Hockey.

175. Moreover, Defendants' conduct has further injured the Reapers by, among other things: (1) precluding the Reapers from entry in the Relevant Market; (2) preventing the Reapers from participating in the 2019-2020 season, which began in September 2019; and (3) causing the Reapers to incur significant time and expense to prepare an application and present a proposal to AHAI that Defendants' had no intent to even consider let alone act on.

176. The Four Club Restraint and Defendants' conduct further injure and harm competition by imposing an enforcing and arbitrary barrier to entry – agreed to and perpetuated by four horizontal competitors and facilitated by AHAI (the Board that the Club Defendants are members of and control and/or influence concerning the supply of Tier 1 level hockey in the State of Illinois) – on all potential entrants similarly situated to the Reapers.

## COUNT I
## (VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 1 – RESTRAINT OF TRADE
## (MARKET ALLOCATION)
## (AGAINST ALL DEFENDANTS)

177.    The Reapers re-allege and incorporate the previous allegations set forth in paragraphs 1 to 176 as if fully rewritten herein.

178.    The unlawful conduct alleged herein directly involves and substantially affects interstate trade and commerce.  Among other things, amateur youth hockey clubs at the Tier I level doing business in Illinois are engaged in business and commercial activities that affect commerce both within the State of Illinois and in other U.S. states, as well as internationally.

179.    The business and commercial activities of the Defendants affect interstate commerce in the form of, among other things, interstate and international travel by and among Tier 1 level hockey clubs, participation in out-of-State tournaments, and purchasing equipment and other items manufactured and/or transported in interstate commerce.

180.    The four Club Defendants are horizontal competitors.  Each Club Defendant is an independent economic actor engaged in the business of supplying Tier 1 level hockey in the State of Illinois.  Each Club Defendant is governed by AHAI, which oversees the supply of all Tier 1 level hockey in the State of Illinois.

181.    Beginning at least as early as 2001, and continuing to date, Defendants and their co-conspirators have engaged in a contract, combination, and/or conspiracy in unreasonable restraint of interstate trade and commerce, constituting a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.   This offense is likely to continue and recur unless the relief requested is granted.

182.    The conspiracy and agreement consists of an understanding and concert of action among Defendants and their co-conspirators to allocate the supply of amateur youth hockey at the

Tier 1 level in the State of Illinois by arbitrarily limiting the number of Tier 1 level clubs allowed to operate in the State of Illinois.

183.    For the purpose of forming and effectuating their conspiracy and agreement, some or all of the Defendants did the following things, among others:

    a.  Entered into and adhered to a contract, combination, and/or conspiracy limiting the number of Tier 1 level clubs permitted to do business in the State of Illinois to four.

    b.  Allocated and divided up among themselves the ownership and operation of Tier 1 level clubs permitted to do business in the State of Illinois.

    c.  Facilitated and furthered their contract, combination, and/or conspiracy through formal and informal meetings, including, among others, AHAI Board meetings and Tier 1 level committee meetings.

    d.  Facilitated and furthered their contract, combination, and/or conspiracy by concealing discussions, communications, and actions concerning AHAI's Board meetings, Tier 1 level committee meetings, and other informal meetings and communications related to the supply of Tier 1 level hockey in the State of Illinois.

    e.  Eliminated, through their agreed-upon Four Club Restraint, the supply of Tier 1 level hockey in the State of Illinois.

184.    Defendants' conduct has restrained or eliminated competition and has had the effect of reducing competition by, among other things:  (i) artificially limiting the number of Tier I level charters available by virtue of the Four Club Restraint; (ii) refusing to rescind the Four Club Restraint; (iii) causing players and player families to pay supra-competitive prices; (iv) preventing new, legitimate, and qualified clubs from entering Tier I level hockey via the issuance of a new

charter; and (v) protecting incumbent Tier 1 level suppliers, i.e., the Club Defendants, from competition from new entrants.

185.    Defendants' contract, combination, and/or conspiracy, in which Defendants and their co-conspirators agreed to (and did in fact) impose the Four Club Restraint, thereby removing competition among suppliers of Tier 1 level hockey in the State of Illinois, and in which Defendants and their co-conspirators agreed to (and did in fact) allocate and divide up among themselves the ownership and operation of all Tier 1 level clubs in the State of Illinois, constitutes a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. 1.

186.    Moreover, Defendants' contract, combination, and/or conspiracy has resulted in obvious and demonstrable anticompetitive effects on the Reapers and competition as a whole, as well as on players and their families either currently playing or blocked from playing Tier 1 level hockey as a result of the Four Club Restraint, such that it constitutes an unreasonable restraint on trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

187.    Where, as here, Defendants have engaged in a *per se* violation of Section 1 of the Sherman Act, no allegations with respect to the relevant product market, relevant geographic market, or market power are required.  To the extent such allegations may otherwise be necessary, the relevant product market for the purposes of this action is amateur youth hockey at the Tier 1 level.

188.    There is no practical or reasonable alternative to Tier 1 level hockey, which is a differentiated product within the larger market consisting of amateur youth hockey.  AHAI views, markets, and treats Tier 1 level hockey as separate and distinct from all other levels of amateur youth hockey, as do, among others, existing and future players, their families, coaches, professional and collegiate scouts, colleges awarding hockey-based scholarships, USA Olympic

Hockey, and club owners and operators of Tier 1 level clubs. Defendants' cartel and their ability to achieve supra-competitive revenues and profits are based on this differentiation between Tier 1 level hockey and all other levels of amateur youth hockey.

189. To the extent such allegations may otherwise be necessary, the relevant geographic market is the State of Illinois. AHAI's authority to charter Tier 1 level clubs is limited to Illinois. It has no governing authority outside of Illinois. Each of the four Club Defendants is chartered to operate clubs solely in Illinois. The pervasive impact of the Four Club Restraint is realized on Illinois residents, as players residing in the State of Illinois dominate the rosters of AHAI-approved Tier 1 level clubs, and existing and future Tier 1 level players have no practical, functional, or reasonable substitutes to which to turn outside the State of Illinois. Tier 1 level clubs in other states severely limit the number of out-of-state players who can play on their Tier 1 clubs.

190. The Relevant Market in this action, to the extent such allegations may otherwise be necessary, is amateur youth hockey at the Tier 1 level in the State of Illinois.

191. Defendants collectively possess market power in the Relevant Market. Defendants (including the four Club Defendants who are horizontal competitors) agreed to impose, imposed, and/or facilitated a market allocation agreement intended to remove competition in the Relevant Market, and their market allocation agreement has had anticompetitive effects in the Relevant Market. Collectively, Defendants are the sole governing authority and sole suppliers of Tier 1 level hockey in the State of Illinois. The existing Four Club Restraint, which was agreed upon and entered into by AHAI and the existing Club Defendants, and which has been in place and adhered to since 2001, entrenches the incumbent Tier 1 level clubs and prohibits any new market entrant in the Relevant Market. The Four Club Restraint is tantamount to the following declaration to

would-be competitors like the Reapers and other similarly situated businesses: Stay out and keep out.

192.    Defendant's' contract, combination, and/or conspiracy has had and will continue to have anticompetitive effects, including: (1) the elimination of new entrants like the Reapers and similarly situated businesses, and hence the removal of competition from the market; (2) reduced output, resulting in the payment of higher, artificially inflated prices by players and their families; (3) reduced output, resulting in the denial of opportunities for Tier 1 level players, including collegiate scholarship opportunities available for Tier 1 level players; and (4) perpetually entrenching the incumbent suppliers of Tier I level amateur hockey to the exclusion of new entrants.

193.    Defendants' contract, combination, and/or conspiracy is not reasonably necessary to accomplish any procompetitive objective, or, alternatively, its scope is broader than necessary to accomplish any such objective.

194.    AHAI's conduct has caused and will continue to cause injury and harm to competition and to the business and property of the Reapers.  Such injury and harm are of the type the antitrust laws were designed to prevent, and such injury and harm flows from Defendants' unlawful conduct.

**WHEREFORE, the Reapers respectfully request:**

**A.**    Judgment in favor of the Reapers and against Defendants for preliminary and permanent injunctive relief directing AHAI that it shall not enforce the Four Club Restraint, and that AHAI shall rescind the Four Club Restraint, and directing AHAI and the Club Defendants (1) to refrain from any further efforts to restrain trade by means of a market allocation agreement; and (2) to refrain from entering into or carrying out any agreement, understanding, or plan, the effect

of which would be to cause players and player families to pay supra-competitive prices or to prevent new, legitimate, and qualified clubs from entering Tier I level amateur youth hockey in the State of Illinois;

**B.**     Judgment in favor of the Reapers and against AHAI for preliminary and permanent injunctive relief directing AHAI that it shall grant the Reapers a charter to sponsor a Tier I team;

**C.**     In the event the Court declines to order AHAI to rescind the Four Club Restraint, the Reapers ask the Court, in the alternative, to (1) order AHAI to adopt and implement an objectively fair, unbiased, and transparent process for evaluating the merits of the Reapers' application and such applications as may be submitted by other new Tier I level clubs, (2) order AHAI to submit a detailed, written report to the Court specifying any facts and analysis supporting that evaluation and decision whether to grant or deny a charter, and (3) retain jurisdiction to ensure AHAI's compliance and good faith in carrying out these orders;;

**D.**     Reasonable attorneys' fees and costs incurred in having to prosecute this matter, pursuant to 15 U.S.C. § 15; and

**E.**     Any other relief to which the Reapers are entitled.

<u>**COUNT II**</u>
<u>**(VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 1 – RESTRAINT OF TRADE**</u>
<u>**(GROUP BOYCOTT)**</u>
<u>**(AGAINST ALL DEFENDANTS)**</u>

195.     The Reapers re-allege and incorporate the previous allegations set forth in paragraphs 1 to 176.

196.     The unlawful conduct alleged herein directly involves and substantially affects interstate trade and commerce.  Among other things, amateur youth hockey clubs at the Tier I level doing business in Illinois are engaged in business and commercial activities that affect commerce within the State of Illinois and in other U.S. states, as well as internationally.

197.    The business and commercial activities of the Defendants affect interstate commerce in the form of, among other things, interstate (and international) travel by and among Tier 1 level hockey clubs, participating in out-of-State tournaments, and purchasing equipment and other items manufactured and/or transported in interstate commerce.

198.    The four Club Defendants are horizontal competitors.  Each Club Defendant is an independent economic actor engaged the business of supplying Tier 1 level hockey in the State of Illinois.  Each Club Defendant is governed by AHAI.

199.    Beginning at least as early as 2001, and continuing to date, Defendants and their co-conspirators have engaged in a contract, combination, and/or conspiracy in unreasonable restraint of interstate trade and commerce, constituting a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.   This offense is likely to continue and recur unless the relief requested is granted.

200.    The conspiracy and agreement consists of an understanding and concert of action among Defendants and their co-conspirators to enter into and engage in a group boycott facilitated by AHAI, the purpose and effect of which is and has been to exclude the Reapers and other potential new entrants from the business of supplying amateur youth hockey at the Tier 1 level in the State of Illinois.

201.    For the purpose of forming and carrying out their group boycott conspiracy and agreement, some or all of the Defendants did the following things, among others:

      a.    Entered into and adhered to a contract, combination, and/or conspiracy intending to and resulting in a group boycott of the Reapers and other potential new entrants seeking to engage in the business of supplying amateur youth hockey at the Tier 1 level in the State of Illinois.

b.  Agreed and adhered to a contract, combination, and/or conspiracy limiting the number of Tier 1 level clubs permitted to do business in the State of Illinois to four.

c.  Allocated and divided up among themselves the ownership and operation of Tier 1 level clubs permitted to do business in the State of Illinois.

d.  Facilitated and furthered their group boycott agreement and conspiracy through formal and informal meetings, including, among others, AHAI Board meetings and Tier 1 level committee meetings.

e.  Facilitated and furthered their group boycott agreement and conspiracy by concealing discussions, communications, and actions concerning AHAI's Board meetings, Tier 1 level committee meetings, and other informal meetings and communications related to the supply of Tier 1 level hockey in the State of Illinois.

f.  Eliminated, through their agreed-upon Four Club Restraint, would-be rivals from the supply of Tier 1 level hockey in the State of Illinois.

g.  Refused, pursuant to the Four Club Restraint, to even consider the Reapers' charter application for the current season.

202.  The group boycott conduct of AHAI and the Club Defendants which has been and is facilitated by the Four Club Restraint, has restrained or eliminated competition and has had the effect of reducing competition among amateur youth hockey clubs at the Tier I level doing business in Illinois by: (i) artificially limiting the number of Tier I level charters available by virtue of the Four Club Restraint; (ii) refusing to rescind the Four Club Restraint; (iii) causing players and their families to pay supra-competitive prices; and (iv) preventing new, legitimate, and qualified clubs from entering Tier I level hockey in the State of Illinois via the issuance of a new charter.

203.    Defendants' contract, combination, and/or conspiracy, in which Defendants and their co-conspirators agreed to impose the Four Club Restraint to limit competition among suppliers of Tier 1 level hockey in the State of Illinois, and to engage in a group boycott directed at potential new suppliers of Tier 1 level amateur youth hockey in the State of Illinois, is a *per se* offense that has caused and will continue to cause injury  and harm to competition and to the business and property of the Reapers in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

204.    Moreover, Defendants' contract, combination, and/or conspiracy has resulted in obvious and demonstrable anticompetitive effects on the market for amateur youth hockey, the Reapers, as well as on players and their families currently playing or blocked from playing Tier 1 level hockey as a result of the Four Club Restraint, such that it constitutes an unreasonable restraint on trade in violation of Section 1 of the Sherman Act, 15 U.S.C. 1.

205.    Where, as here, Defendants have engaged in a *per se* violation of Section 1 of the Sherman Act, no allegations with respect to the relevant product market, geographic market, or market power are required.  To the extent such allegations may otherwise be necessary, the relevant product market for the purposes of this action is amateur youth hockey at the Tier 1 level.

206.    There is no practical or reasonable alternative to Tier 1 level hockey, which is a differentiated product within the larger market consisting of amateur youth hockey.  AHAI views and treats Tier 1 level hockey as separate and distinct from all other levels of amateur youth hockey, as do, among others, existing and future players, their families, coaches, professional and collegiate scouts, colleges awarding hockey-based scholarships, USA Olympic Hockey, and club owners and operators of Tier 1 level clubs.   Defendants' cartel and their ability to achieve supra-competitive revenues and profits are based on this differentiation between Tier 1 level hockey and all other levels of amateur youth hockey.

64

207.    The relevant geographic market is the State of Illinois.  AHAI's authority to charter Tier 1 level clubs is limited to Illinois.  It has no governing authority outside of Illinois.  Each of the four Club Defendants is chartered to operate clubs solely in Illinois.  The pervasive impact of the Four Club Restraint is realized on Illinois residents, as players residing in the State of Illinois dominate the rosters of AHAI-approved Tier 1 level clubs, and existing and future Tier 1 level players have no practical, functional, or reasonable substitutes to which to turn outside the State of Illinois.   Tier 1 level clubs in other states severely limit the number of out-of-state players who can play on their Tier 1 clubs.

208.    Defendants collectively possess market power in the Relevant Market.  Defendants (including the four Club Defendants who are horizontal competitors) agreed to impose, imposed, and/or facilitated a group boycott agreement intended to remove competition in the Relevant Market, and their group boycott agreement has had anticompetitive effects in the Relevant Market. Collectively, Defendants are the sole governing authority and sole suppliers of Tier 1 level hockey in the State of Illinois.  The existing Four Club Restraint, which was put in place by AHAI and the existing Club Defendants, and which has been in place since 2001, prohibits any new market entrants in the Relevant Market.   The Four Club Restraint is tantamount to the following declaration to would-be competitors:    Stay out and keep out.

209.    Defendant's' contract, combination, and/or conspiracy has had and will continue to have anticompetitive effects, including: (1) the elimination of new entrants like the Reapers and other similarly situated potential new entrants, and hence the removal of competition from the market; (2) the payment of higher, artificially inflated prices by players and their families; (3) reduced output, resulting in the denial of opportunities for players at the Tier 1 level, including collegiate scholarship opportunities available for Tier 1 level players; and (4) perpetually

entrenching the incumbent suppliers of Tier I level amateur hockey to the exclusion of new entrants.

210.    Defendants' contract, combination, and/or conspiracy is not reasonably necessary to accomplish any procompetitive objective, or, alternatively, its scope is broader than necessary to accomplish any such objective.

211.    AHAI's conduct has caused and will continue to cause injury and harm to competition and to the business and property of the Reapers. Such injury and harm are of the type the antitrust laws were designed to prevent, and such injury and harm flows from Defendants' unlawful conduct.

**WHEREFORE, the Reapers respectfully request:**

**A.**      Judgment in favor of the Reapers and against Defendants for preliminary and permanent injunctive relief directing AHAI that it shall not enforce the Four Club Restraint, and that AHAI shall rescind the Four Club Restraint, and directing AHAI and the Club Defendants (1) to refrain from any further efforts to conduct a group boycott directed at potential new suppliers of Tier 1 level amateur youth hockey in the State of Illinois; and (2) to refrain from entering into or carrying out any agreement, understanding, or plan, the effect of which would be to cause players and player families to pay supra-competitive prices or to prevent new, legitimate, and qualified clubs from entering Tier I level amateur youth hockey in the State of Illinois;

**B.**      Judgment in favor of the Reapers and against AHAI for preliminary and permanent injunctive relief directing AHAI that it shall grant the Reapers a charter to sponsor a Tier I team;

**C.**      In the event the Court declines to order AHAI to rescind the Four Club Restraint, the Reapers ask the Court, in the alternative, to (1) order AHAI to adopt and implement an objectively fair, unbiased, and transparent process for evaluating the merits of the Reapers'

application and such applications as may be submitted by other new Tier I level clubs, (2) order AHAI to submit a detailed, written report to the Court specifying any facts and analysis supporting that evaluation and decision whether to grant or deny a charter, and (3) retain jurisdiction to ensure AHAI's compliance and good faith in carrying out these orders;

**D.** Reasonable attorneys' fees and costs incurred in having to prosecute this matter, pursuant to 15 U.S.C. § 15; and

**E.** Any other relief to which the Reapers are entitled.

### COUNT III
### (VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 2)
### (MONOPOLIZATION)
### (AGAINST DEFENDANT AHAI)

212. The Reapers re-allege and incorporate the previous allegations set forth in paragraphs 1 to 176.

213. The unlawful conduct alleged herein directly involves and substantially affects interstate trade and commerce. Among other things, amateur youth hockey clubs at the Tier I level doing business in Illinois are engaged in business and commercial activities that affect commerce both within the State of Illinois and in other U.S. states, as well as internationally. This offense is likely to continue and recur unless the relief requested is granted.

214. The business and commercial activities of the Defendants affect interstate commerce in the form of, among other things, interstate (and international) travel by and among Tier 1 level hockey clubs, participating in out-of-State tournaments, and purchasing equipment and other items manufactured and/or transported in interstate commerce.

215. Defendant AHAI possesses monopoly power in the Relevant Market. AHAI is the sole governing authority of Tier 1 level hockey in the State of Illinois.

216.    Beginning at least as early as 2001, and continuing to date, AHAI has engaged in the monopolization of the Relevant Market, constituting a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.   AHAI has willfully acquired, maintained, and retained its monopoly power. This offense is likely to continue and recur unless the relief requested is granted.

217.    In willfully monopolizing the Relevant Market and in furtherance of carrying out its monopolization, AHAI has engaged in exclusionary conduct, including, among other things: (1) facilitating an illegal horizontal market allocation agreement among incumbent Tier 1 level hockey clubs in the State of Illinois, with the purpose and effect of eliminating the Reapers and similarly situated potential entrants in the Relevant Market; (2) facilitating an illegal horizontal group boycott among incumbent Tier 1 level suppliers in the State of Illinois, with the purpose and effect of eliminating the Reapers and other similarly situated potential new entrants in the Relevant Market; (3) facilitating an illegal horizontal agreement among incumbent Tier 1 level suppliers to arbitrarily reduce output (i.e., the supply of Tier 1 level hockey) in the Relevant Market below competitive levels; (4) facilitating an illegal horizontal agreement among incumbent Tier 1 level suppliers in the Relevant Market with the purpose and effect of increasing fees and costs for Tier 1 level hockey players and their families; (5) facilitating the Four Club Restraint for the benefit of incumbent Tier 1 level hockey suppliers in the Relevant Market and to the detriment of the Reapers and similarly situated potential new entrants; and (6) facilitating the Four Club Restraint to enrich the Club Defendants, who are members of and influence AHAI as Board and Tier 1 Committee members.

218.    For the purpose of maintaining its monopoly power and in monopolizing the Relevant Market, AHAI committed numerous other exclusionary acts, including but not limited to: (i) artificially limiting the number of Tier I level suppliers in the Relevant Market by virtue of

the Four Club Restraint; (ii) refusing to rescind the Four Club Restraint; (iii) causing players and their families to pay supra-competitive prices; and (iv) preventing new, legitimate, and qualified Tier 1 level suppliers from entering the Relevant Market by refusing to issue, and refusing to even consider, issuance of a new charter to the Reapers.

219.    Moreover, AHAI's monopolization of the Relevant Market has demonstrable anticompetitive effects on competition as a whole and on the Reapers, as well as on players and their families either currently playing or blocked from playing Tier 1 level hockey in the Relevant Market as a result of the Four Club Restraint.

220.    AHAI's conduct has caused and will continue to cause injury and harm to competition in the Relevant Market and to the business and property of the Reapers.  Such injury and harm are of the type the antitrust laws were designed to prevent, and such injury and harm flows from Defendants' unlawful conduct.

**WHEREFORE, the Reapers respectfully request:**

A.    Judgment in favor of the Reapers and against AHAI for preliminary and permanent injunctive relief directing AHAI that it shall not enforce the Four Club Restraint, and that AHAI shall rescind the Four Club Restraint, and directing AHAI (1) to refrain from any further efforts to monopolize the Relevant Market; (2) to refrain from any further exclusionary conduct in the Relevant Market; and (3) to refrain from entering into or carrying out any agreement, understanding, or plan, the effect of which would be to cause players and player families to pay supra-competitive prices or to prevent new, legitimate, and qualified clubs from entering Tier I level amateur youth hockey in the State of Illinois;

B.    Judgment in favor of the Reapers and against AHAI for preliminary and permanent injunctive relief directing AHAI that it shall grant the Reapers a charter to sponsor a Tier I club;

69

C.     In the event the Court declines to order AHAI to rescind the Four Club Restraint, the Reapers ask the Court, in the alternative, to order AHAI to adopt and implement an objectively fair, unbiased, and transparent process for evaluating the merits of the Reapers' application and such applications as may be submitted by other new Tier I level clubs, (2) order AHAI to submit a detailed, written report to the Court specifying any facts and analysis supporting that evaluation and decision whether to grant or deny a charter, and (3) retain jurisdiction to ensure AHAI's compliance and good faith in carrying out these orders;

D.     Reasonable attorneys' fees and costs incurred in having to prosecute this matter, pursuant to 15 U.S.C. § 15; and

E.     Any other relief to which the Reapers are entitled.

**COUNT IV**
**(VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 2)**
**(CONSPIRACY TO MONOPOLIZE)**
**(AGAINST ALL DEFENDANTS)**

221.    The Reapers re-allege and incorporate the previous allegations set forth in paragraphs 1 to 176 as if fully rewritten herein.

222.    The unlawful conduct alleged herein directly involves and substantially affects interstate trade and commerce. Among other things, amateur youth hockey clubs at the Tier I level doing business in Illinois are engaged in business and commercial activities that affect commerce both within the State of Illinois and in other U.S. states, as well as internationally.

223.    The business and commercial activities of the Defendants affect interstate commerce in the form of, among other things, interstate (and international) travel by and among Tier 1 level hockey clubs, participating in out-of-State tournaments, and purchasing equipment and other items manufactured and/or transported in interstate commerce.

224.    Defendants AHAI and the Club Defendants jointly possess monopoly power in theRelevant Market.

225.    AHAI and the Club Defendants have willfully conspired to acquire and maintain their monopoly power in the Relevant Market, and they have in fact conspired to monopolize and monopolized the Relevant Market through, among other things, the imposition of and adherence to the Four Club Restraint, and facilitating and engaging in market allocation and group buyout agreements, constituting a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.   This offense is likely to continue and recur unless the relief requested is granted.

226.    AHAI and the Club Defendants have willfully conspired to monopolize the Relevant Market and have engaged in numerous exclusionary acts in carrying out their conspiracy, including, among other things:   (1) entering into and facilitating an illegal horizontal market allocation agreement among incumbent Tier 1 level hockey clubs in the State of Illinois, with the purpose and effect of eliminating the Reapers and similarly situated potential entrants in the Relevant Market; (2) entering into and facilitating an illegal horizontal group boycott among incumbent Tier 1 level suppliers in the State of Illinois, with the purpose and effect of eliminating the Reapers and other similarly situated potential new entrants in the Relevant Market; (3) entering into and facilitating an illegal horizontal agreement among incumbent Tier 1 level suppliers to arbitrarily reduce output (i.e., the supply of Tier 1 level hockey) in the Relevant Market below competitive levels;   (4) entering into and facilitating an illegal horizontal agreement among incumbent Tier 1 level hockey suppliers in the Relevant Market with the purpose and effect of increasing fees and costs for Tier 1 level hockey players and their families; (5) entering into and facilitating the Four Club Restraint for the benefit of incumbent Tier 1 level suppliers in the Relevant Market and to the detriment of the Reapers and similarly situated potential new entrants;

and (6) entering into and facilitating the Four Club Restraint to enrich the Club Defendants, who are members of and influence AHAI as Board and Tier 1 Committee members.

227.    As part of their conspiracy to monopolize the Relevant Market, AHAI and the Club Defendants conspired to commit (and in fact committed) numerous other exclusionary acts, including but not limited to: (i) artificially limiting the number of Tier I level suppliers in the Relevant Market by virtue of the Four Club Restraint; (ii) refusing to rescind the Four Club Restraint; (iii) causing players and their families to pay supra-competitive prices by reducing the output of Tier 1 level hockey in the Relevant Market; and (iv) preventing new, legitimate, and qualified Tier 1 level suppliers from entering the Relevant Market by refusing to issue, and refusing to even consider, issuance of a new charter to the Reapers.

228.    AHAI's and the Club Defendants' conspiracy to monopolize the Relevant Market has caused and will continue to cause injury and harm to competition in the Relevant Market and to the business and property of the Reapers.  Such injury and harm are of the type the antitrust laws were designed to prevent, and such injury and harm flows from Defendants' unlawful conduct.

**WHEREFORE, the Reapers respectfully request:**

A.    Judgment in favor of the Reapers and against AHAI for preliminary and permanent injunctive relief directing AHAI that it shall not enforce the Four Club Restraint, and that AHAI shall rescind the Four Club Restraint; and directing AHAI and the Club Defendants (1) to refrain from any further efforts to monopolize the Relevant Market; (2) to refrain from any further exclusionary acts in the Relevant Market; and (3) to refrain from entering into or carrying out any agreement, understanding, or plan, the effect of which would be to cause players and player families to pay supra-competitive prices or to prevent new, legitimate, and qualified clubs from entering Tier I level amateur youth hockey in the State of Illinois

**B.** Judgment in favor of the Reapers and against AHAI for preliminary and permanent injunctive relief directing AHAI that it shall grant the Reapers a charter to sponsor a Tier I club;

**C.** In the event the Court declines to order AHAI to rescind the Four Club Restraint, the Reapers ask the Court, in the alternative, to order AHAI to adopt and implement an objectively fair, unbiased, and transparent process for evaluating the merits of the Reapers' application and such applications as may be submitted by other new Tier I level clubs, (2) order AHAI to submit a detailed, written report to the Court specifying any facts and analysis supporting that evaluation and decision whether to grant or deny a charter, and (3) retain jurisdiction to ensure AHAI's compliance and good faith in carrying out these orders;

**D.** Reasonable attorneys' fees and costs incurred in having to prosecute this matter, pursuant to 15 U.S.C. § 15; and

**E.** Any other relief to which the Reapers are entitled.

**COUNT V**
**(VIOLATION OF THE ILLINOIS CONSUMER FRAUD ACT AND UNIFORM DECEPTIVE TRADE PRACTICES ACT, 815 ILCS §§ 505/1, ET SEQ.)**
**(AGAINST ALL DEFENDANTS)**

229. The Reapers re-allege and incorporate the previous allegations set forth in paragraphs 1 to 176.

230. The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS §§ 505/1, et seq., protects both consumers and competitors from unfair methods of competition and other unfair or deceptive business practices in the conduct of any trade or commerce.

231. The Reapers are "consumers" of AHAI's products or services for purposes of section 505/1(e) of the ICFA. The Reapers are also "businessmen" (*i.e.*, competitors) with respect to the Club Defendants for purposes of the ICFA.

232.     Defendants are "persons" for purposes of Section 505/1(c) of the ICFA, and are engaged in "trade or commerce" for purposes of Section 505/1(f) of the ICFA.  The ICFA applies to Defendants' actions and conduct as described herein because it protects consumers and competitors, like the Reapers, from unfair or deceptive conduct by persons engaged in trade or commerce, like the Defendants.

233.     Under the ICFA, conduct is unfair if it (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers.

234.     AHAI's conduct, in collusion with the Club Defendants, is unfair within the meaning of the ICFA (i) because it offends Illinois' public policy against unreasonable restraints on trade; (ii) because it involves ongoing violations and abuses of the Illinois Revenue Code's tax exemptions for legitimate nonprofit and charitable organizations; (iii) because it is otherwise immoral, unethical, oppressive and unscrupulous, and (iv) because it caused substantial injury to consumers who purchased its goods and/or services.

235.     Defendants' conduct is willful and wanton.

236.     Defendants' conduct caused substantial injury to consumers by (i) artificially limiting the number of Tier I charters available by virtue of the Four Club Restraint; (ii) refusing to rescind the Four Club Restraint; (iii) preventing new, legitimate, and qualified clubs from entering Tier I via the issuance of a new charter; and (iv) depriving consumers of the benefits of competition among Tier I amateur youth hockey clubs.

237.     Defendants' conduct similarly caused substantial injury to the Reapers by: (i) precluding the Reapers from entry in the Tier 1 amateur hockey market; (ii) preventing the Reapers from participating in the 2019-2020 season, which began in September 2019; and (iii) causing the Reapers to incur significant time and expense to prepare an application and present a proposal that

74

it had no intention of granting.

238.    The injury to consumers and to the Reapers caused by Defendants' conduct is not outweighed by any countervailing benefits to consumers or competition, and the injury is one that consumers or the Reapers could not have reasonably avoided because AHAI possesses monopoly power over amateur hockey in Illinois, virtually every organized amateur hockey club in Illinois is a member of AHAI, and for players eight years of age and older (who the Reapers intend to serve), there is no alternate Tier 1 amateur hockey association in Illinois.

239.    Defendants' unfair practices occurred during the marketing and sale of their goods and/or services, and therefore occurred in the course of trade and commerce.

**WHEREFORE, the Reapers respectfully request:**

**A.**    An Order in favor of the Reapers and against AHAI for declaratory relief, pursuant to 735 ILCS 5/2-701, finding that the Four Club Restraint violates the Illinois Consumer Fraud Act and Uniform Deceptive Trade Practices Act, 815 ILCS §§ 505/1, et seq., and is otherwise unenforceable;

**B.**    An Order in favor of the Reapers and against AHAI for declaratory relief, pursuant to 735 ILCS 5/2-701, finding that the Four Club Restraint is contrary to USAH's mission, bylaws and rules, violates AHAI's mission, bylaws, and rules, constitutes arbitrary and capricious conduct and an abuse of discretion, and is otherwise unenforceable;

**C.**    An Order in favor of the Reapers and against the Club Defendants for declaratory relief, pursuant to 735 ILCS 5/2-701, finding that (i) the Club Defendants must not be directly or indirectly involved in in deciding issues relating to the number of Tier I charters AHAI should issue or which clubs should be awarded those charters; and (ii) any actions taken by the Tier I Committee and/or AHAI involving issues relating to the number of Tier I charters AHAI should

issue and which clubs should be awarded those charters, with input from the Club Defendants are void; and

**D.**     Reasonable attorneys' fees and costs incurred in having to prosecute this matter, pursuant to 815 ILCS 505/10a;

**E.**     Punitive damages in an amount to be determined at trial; and

**F.**     Any other relief to which the Reapers are entitled.

**COUNT VI**
**(REQUEST FOR DECLARATORY RELIEF)**
**(AGAINST ALL DEFENDANTS)**

240.     The Reapers re-allege and incorporate the previous allegations set forth in paragraphs 1 to 176.

241.     AHAI's conduct, in collusion with the Club Defendants, entitles the Reapers to relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq*.

242.     There is a substantial controversy between the Reapers and Defendants as to whether AHAI can impose anti-competitive restraints on the market for amateur hockey in Illinois through the Four Club Restraint and whether the Club Defendants can (i) cause AHAI to apply USAH's mission, bylaws and rules in an arbitrary and capricious manner; (ii) cause AHAI to apply its mission, bylaws, and rules, in an arbitrary and capricious manner; and (iii) allow themselves to be involved in deciding issues relating to the number of Tier I charters AHAI should issue and which clubs should be awarded those charters, despite their disqualifying conflicts.

243.     The Reapers contend that AHAI's adoption and enforcement of the Four Club Restraint, and AHAI's refusal to consider the merits of the Reapers' application for a Tier I charter, violates Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, violates the Illinois Consumer Fraud Act and Uniform Deceptive Trade Practices Act, 815 ILCS §§ 505/1, et seq., violates USAH's mission, bylaws and rules, and violates AHAI's mission, bylaws, and rules. The Reapers

contend that AHAI and the Club Defendants cause AHAI to apply USAH's mission, bylaws and rules, as well as AHAI's mission, bylaws, and rules, in an arbitrary and capricious manner. Defendants' conduct in this regard constitutes a separate and independent ground for declaratory relief.

244.    Defendants deny the Reapers' contentions, and instead contend that the Four Club Restraint does not violate the Sherman Act or the Illinois Consumer Fraud and Uniform Deceptive Trade Practices Act. Defendants further contend that their conduct does not amount to arbitrary and capricious conduct.

245.    As a result of the wrongful and self-serving actions by AHAI and the Club Defendants, the Reapers have suffered irreparable injuries including, but not limited to, significant delays, missed recruiting, hiring, training, leasing, and other opportunities, and ultimately being barred from forming a Tier I club altogether. Defendants have already prevented the Reapers from participating in the 2019-2020 season, which began in September 2019. Without this Court's intervention, the Reapers will soon suffer further, irreparable injuries by being forced to miss the 2020-2021 amateur hockey season, and all of the recruiting, training and development opportunities associated with operating during the 2020-2021 season.

246.    This substantial controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

**WHEREFORE, the Reapers respectfully request:**

**A.**    An Order in favor of the Reapers and against AHAI for declaratory relief finding that the Four Club Restraint violates Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, violates the Illinois Consumer Fraud Act and Uniform Deceptive Trade Practices Act, 815 ILCS §§ 505/1, et seq., and is otherwise unenforceable;

B.      An Order in favor of the Reapers and against AHAI for declaratory relief finding that the Four Club Restraint is contrary to USAH's mission, bylaws and rules, violates AHAI's mission, bylaws, and rules, constitutes arbitrary and capricious conduct and an abuse of discretion, and is otherwise unenforceable;

C.      An Order in favor of the Reapers and against AHAI for declaratory relief finding that under proper application of USAH and AHAI rules, the Reapers are rightfully entitled to a charter to sponsor a Tier I club;

D.      An Order in favor of the Reapers and against the Club Defendants for declaratory relief finding that (i) they must not be directly or indirectly involved in in deciding issues relating to the number of Tier I charters AHAI should issue or which clubs should be awarded those charters; and (ii) any actions taken by the Tier I Committee and/or AHAI involving issues relating to the number of Tier I charters AHAI should issue and which clubs should be awarded those charters, with input from the Club Defendants are void; and

D.      Any other relief to which the Reapers are entitled.

## JURY DEMAND

247.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Reapers demands a trial by jury on all issues so triable.

DATED:  October 24, 2019                    Respectfully submitted

                                            **ULMER & BERNE LLP**

                                            By:     /s/ Shawn J. Gebhardt
                                                    Ronald S. Betman
                                                    Shawn J. Gebhardt
                                                    Ulmer & Berne LLP
                                                    500 W. Madison, Suite 3600
                                                    Chicago, IL 60661
                                                    312-658-6500 (phone)

312-658-6501 (fax)
rbetman@ulmer.com
sgebhardt@ulmer.com

Richard T. Hamilton, Jr.
(*pro hac vice* pending)
Ulmer & Berne LLP
Skylight Office Tower
1660 West 2nd Street, Suite 1100
Cleveland, OH  44113
216-583-7466 (phone)
216-583-7467 (fax)
rhamilton@ulmer.com

***Attorneys for The Reapers Hockey Association***

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that on the **24th day of October, 2019**, a true and correct copy of the foregoing **SECOND AMENDED COMPLAINT**, was electronically filed with the Clerk of the United States District Court for the Northern District of Illinois, using the Court's CM/ECF System, which shall send notification of such filing to all parties registered to use ECF or are represented by a registered E-filer.  Parties may access this filing through the Court's CM/ECF System.

*/s/ Shawn J. Gebhardt*

Shawn J. Gebhardt
Ulmer & Berne LLP
500 W. Madison St., Suite 3600
Chicago, IL 60661
312-658-6500 (phone)
312-658-6501 (fax)
sgebhardt@ulmer.com